# THE STATE v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

In Banc, January 27, 1912.

1. SUNDAY: Day of Rest: Public Policy. The law does not deal with Sunday as a day of worship, but with it only as a day of rest. It does not have regard to the religious character of the day, but to it as a day of rest. Laws regulating its use are not religious regulations, but civil, and are based upon a sound public policy, which recognizes that rest one day in seven is for the general good of mankind.

2. ————: ————: Traveling: Work of Necessity or Act of Rest. Traveling on a railroad train on Sunday may be a work of necessity or an act of rest. In either case, it is not unlawful. No common carrier can make itself a judge to determine whether any of its passengers riding on Sunday is riding under such circumstances as make him a violator of the Sunday laws. A railroad company owes the public the same duties of service on Sunday as on week days.

3. ————: Passenger Train: Every Day: Includes Sunday. The words "every day" in the Act of 1907, requiring all persons and companies operating a railroad to "run at least one regular passenger train each way every day" over all its lines, include Sunday.

4. ————: Passenger Train: Compulsory Operation: Constitutional. The Act of 1907, requiring all persons or companies operating a railroad in this State, to "run at least one regular passenger train each way every day," does not violate any provision of the Missouri Constitution. It does not compel trainmen to work contrary to their religious views, and their right to worship "according to the dictates of their own conscience" is not restrained or denied thereby, nor does it interfere with their religion. The employee is not compelled to work on Sunday; if he works on Sunday it is voluntary, and such work on a passenger train has never been made unlawful in this State, nor was it unlawful at common law. No violence to Sunday as a day of rest is done by the act.

5. ————: ————: ————: Class Legislation. Said act is valid although applicable only to railroads.

6. ————: ————: ————: Interstate Commerce. Nor does it operate as a regulation of interstate commerce; on the contrary, it is an aid to such commerce.

State v. Railroad.

7. ————: ————: ————: **Loss to Company.** A railroad company may be compelled by law to furnish trains for the carriage of passengers, although a loss may result to it from the public service rendered.

**Per WOODSON, J., concurring.**

1. **SUNDAY: Usually Not Excepted.** The law does not ordinarily consider Sunday as *dies non*. It is never so considered unless excepted by an express statute, or because of some rule pertaining to proceedings in court. In computing time under a statute Sunday will be counted unless expressly excepted.

2. ————: ————: **Passenger Train Every Day.** The words "every day" used in the Act of 1907, requiring all persons or companies operating a railroad in this State to "run at least one regular passenger train each way every day over all lines," include Sunday. The statute not only does not expressly except Sunday, but the words "in their plain and ordinary and usual sense" clearly include Sunday.

3. ————: **Running Passenger Trains: Work on Sunday: Repeal of Statute.** The statute prohibiting labor on Sunday does not prohibit work of necessity or charity. It does not, therefore, prohibit the running of passenger trains on Sunday, for such trains may be a work of necessity, and the Act of 1907, requiring at least one regular train to be "run each way every day over all lines," does not by necessary implication repeal the existing Sunday law. On the contrary, it is simply a legislative declaration that the running of such a passenger train is a work of necessity. There is no inconsistency between the two acts.

4. ————: **Day of Rest: Religious Observance: Legislative Interpretation of Statute.** In the eyes of the law, Sunday is a civil institution, a day of rest, designed to promote the health, morals, peace, order, happiness and well-being of mankind, and not a religious institution set apart and devoted to religious worship; and the laws requiring men to abstain from ordinary labor on that day are not a requirement of religious observances, nor is Sunday considered from a religious standpoint, but only from the standpoint of a civil institution designed for the public good. The State has the right to authorize the performance of any kind of labor on Sunday, and to forbid the performance of certain kinds of work, and to make exceptions to the general prohibitions, and to interpret said exceptions by subsequent legislative declarations; for instance, since the existing Sunday law (Sec. 2240, R. S. 1909) excepted from its prohibitions work of necessity, a subsequent General Assembly had authority to declare, as it practically did by the Act of 1907, that the running of at least one regular passenger train each way every day over all lines of railroad was a work of necessity.

5. ———: Running Passenger Trains on Sunday: Compulsory: Unjust Discrimination and Classification of Employees. The Act of 1907, requiring all persons and companies operating a railroad to "run at least one regular passenger train each way every day over all lines," is not such a discrimination against the employees of steam railroads, and in favor of the employees of all other kinds of carriers, as renders the act unconstitutional. The employees of steam railways constitute a reasonable and natural classification of persons within the meaning of the constitutional provisions prohibiting discriminations.

6. ———: ———: ———: Interference with Conscience and Right to Worship. The Act of 1907, requiring all railroads to run at least one regular passenger train each way over its lines on Sunday, does not violate the constitutional provision prohibiting any "human authority to control or interfere with the rights of conscience," or "by any law" to molest any person "on account of his religious persuasion or profession." The act does not mention railroad employees, and does not compel them to work on Sunday or any other day; nor does it interfere with their religious freedom to worship God according to the dictates of their own conscience, or to refrain from all kinds of labor on that day. No employee of a railroad could be arrested or prosecuted under that act for refusing to operate a train on Sunday. He is not compelled to accept such employment, nor to remain in it if he has religious scruples against performing the work required. There is no such discrimination against railroad employees as renders said act unconstitutional. Because some of the trainmen may have conscientious scruples against working on Sundays is no reason for excusing the railroad company from running trains on Sunday. Besides, in this case railroad employees are not complaining; the prosecution is against a railroad company, and the law requires such a company, as a work of necessity, to run passenger trains on Sunday.

7. ———: ———: ———: Interstate Commerce. The Act of 1907, requiring all persons and companies "operating any railroad or part of a railroad in this State" to "run at least one regular passenger train each way every day over all lines, or part of a line, of railroad so operated by such person . . . or corporation in this State," is not an attempt to regulate interstate commerce, although the usual train run on the line runs between a town in another State and one in this State. The act does not purport to require a train to be run beyond the boundaries of the State; it applies to trains within the State. The mere fact a State statute may indirectly affect interstate commerce, while endeavoring to regulate the internal police affairs of the State, will not render the act void as a violation of the interstate commerce clause of the U. S. Constitution.

Per LAMM, J., dissenting.

1. **CRIMINAL STATUTE: Strict Construction.** A penal statute is to be strictly, not liberally, construed; and that means, according to its very letter. It is not to be extended by implication, intendment, analogies or equitable considerations.

2. ————: ————: **Every Day to Include Sunday.** Following the rule of strict construction, and having in view the public policy in relation to the observance of Sunday, the words "every day" in the Act of 1907, requiring every person or company operating a railroad in this State to "run at least one regular passenger train each way every day," may be allowed to include Sunday, since they are plain and not technical words, though the holding is not without doubt and consequent hesitation.

3. **SUNDAY: Public Policy: Compulsory Train Service: Crime Not to Work.** Public policy is got at, among other things, from the whole body of existing statutory and constitutional law. It is also shadowed forth by the settled customs, manners, maxims and ethical beliefs of the people, which by age, universal acceptance and usage have become part and parcel of the warp and woof of the social compact, and which should as far as possible be read into the statutes; and any statute which makes it a crime for any class of men not to work on Sunday, as does the Act of 1907 requiring all railroad companies to "run at least one regular passenger train each way every day" over all lines, flies in the face of public policy. Said act is a daring, anxious and unheard of experiment, and is out of harmony with the uniform public policy of this State making Sunday a day of rest, as shown by a review of a large number of statutes which were at the time of its enactment and had been for generations live law in this State. It is also out of harmony with the public policy as declared by the noble preamble of the Constitution, which reads: "We, the people of Missouri, with profound reverence for the Supreme Ruler of the Universe, and grateful for His goodness, do, for the better government of the State, establish this Constitution;" and other provisions of the Constitution.

4. ————: ————: **Constitution and Statutes Only Expressive of Existing Public Policy.** The Constitution and statutes in no sense create the public policy of recognizing God and religious worship, and of setting Sunday apart from secular and business days. They only tend to outline, preserve and aid such public policy; they are only unmistakable tokens, symbols, signs, evidence of a public policy coming down to us in a long line of descent from our fathers—a policy hallowed by time and a thousand sacred memories, tenderly cherished in the hearts of Missouri people, so old, so omnipresent, so persistent as to

admit of being personified, and now sitting and always has sat by the household fire of every Missourian's home, sipping from his cup and dipping in his dish.

5. ————: ————: **Day of Rest: Primarily a Sacred Day.** Sunday is a day of rest, and many decisions proceed on the theory that rest one day in seven promotes the well-being of men, mentally, morally and physically. But that theory does not impugn the idea that the day of rest is also a sacred day. Sunday is primarily a sacred day, and for profound reasons of State the day of rest is united by law with that sacred day, and they are made one and indivisible. The arm of the civil power, under our Constitution and laws and public policy, has interposed to aid "the mild voice of Christianity" in securing the due observance of Sunday as a day of rest.

6. ————: **Necessary to Religious Freedom.** The compulsory observance of one day in seven as one of rest is in line with and necessary to the constitutional idea of religious freedom. It was ordained, not only for scientific, physical and moral reasons, but in order to secure the full enjoyment of the rights of conscience, and full religious liberty.

7. ————: **Public Policy: Statutes Relating Thereto May Change.** A public policy evidenced only by statutes may be modified or abrogated by a legislative act, and if the modifying statute only conflicts with existing statutes however deeply that public policy may be imbedded therein, it will not be held to be void merely because it changes that policy. But when the public policy is grounded in the Constitution, a statute which is entirely out of harmony with it, though not perhaps expressly so, will be held to be void.

8. ————: ————: **Running Trains on Sunday: Unconstitutional Statute.** The Act of 1907, requiring all persons and corporations operating a railroad in this State to "run at least one regular passenger train each way every day" over all lines, makes it a crime not to work in operating a railroad train, and infringes upon and curtails the religious liberty of the citizen, whether he ply the vocation of a trainman or that of operating the railroad; it is in the teeth of the natural, indefeasible and constitutional right of every man to worship Almighty God according to the dictates of his own conscience; by mere "human authority" it seems to control and interfere with the rights of conscience of such citizen; it is therefore unconstitutional, and in violation of the public policy of the State as expressed in numerous constitutional provisions. No citizen can be punished, under the organic law, for refusing to desecrate a day made sacred by his religion, and protected by public policy and that organic law. If his conscience tell him to worship on Sun-

State v. Railroad.

day, no statute can stand in his way. If his conscience tell him to observe that day by contemplation, by rest, or by innocent recreation, he may, as the Constitution now stands, do so, unafraid, unfretted and unpunished by human law.

9. ———: ———: ———: ———: Indirect Interference with Religious Liberty. The Constitution says no person is to be molested in his person or estate on account of his religious persuasion or profession; and any law that encourages, aids, abets or seeks to compel any human authority, corporate or not, to persuade, cajole, threaten or intimidate the citizen into violating that provision of the Constitution, or any other provision guaranteeing to him religious liberty or liberty of conscience or the right to use Sunday as a day of rest or worship, is as much in violation of such provisions as it would be if it sought directly to encompass that prohibited end.

10. ———: ———: ———: Corporation Implies Men. The statute says that "all persons, copartnerships, companies or corporations operating any railroad or part of a railroad in this State, shall . . . run at least one regular passenger train each way every day over all lines." *Held*, that the statute implies men, and in its final analysis deals with men, whether the railroad is operated by an individual or a corporation. It takes the manual labor and presence of men, not only on the train, but all along the line, to run the train; and the statute is just as invalid where a corporation alone is the defendant as it would be were a single individual who owned the railroad the only defendant.

11. ———: ———: ———: Not Illegal to Run Train on Sunday: Illogical Deduction. It is illogical to hold that, because the statutes do not prohibit the running of a passenger train on Sunday, since that is a work of necessity, therefore a statute that makes it criminal not to run a train on Sunday is constitutional. The conclusion is a *non sequitur*.

12. ———: ———: ———: Reading Exception Into Statute. The court, in view of the rule requiring strict construction of criminal statutes, would not be justified in reading into the statute an exception excusing the railroad from running its passenger trains on Sunday in case its employees refuse to labor on that day on the ground that to so work would be an interference with their religious liberty and freedom of conscience.

Appeal from Worth Circuit Court.—*Hon. Wm. C. Ellison,* Judge.

AFFIRMED.

*Kelso & Kelso* and *Spencer & Nelson* for appellant.

(1) The law does not require the running of trains on Sunday, because Sunday is not specifically named, and the words "every day" do not include Sunday for following reasons: (a) In computing time, Sunday is not counted as a day in legal proceedings. State v. May, 142 Mo. 149; Jordan v. Railway, 92 Mo. App. 85. (b) It is the policy of our law to consider Sunday as excluded in computing time, as the statute on that subject (Sec. 4160) provides that "if the last day be Sunday, it shall be excluded." (c) If it had been intended to require running of trains on Sunday, the law should have named Sunday. It must be strictly construed and cannot be construed to include a day not ordinarily considered a day in law, and not mentioned in the act. (d) As Sunday is not named, and Sec. 2240, R. S. 1899, prohibits labor on Sunday, and the Act of 1907 does not purport to repeal or modify section 2240, the courts cannot indulge in the presumption that the Act of 1907 repeals section 2240, so as to permit the labor of running Sunday trains on a mere branch line, where no public necessity therefor exists. Repeals by implication are not favored and a later statute will not be construed as repealing a former statute unless the two are so inconsistent that they cannot stand together or be reconciled. Yall v. Gillham, 187 Mo. 405; State ex rel. v. Wilder, 197 Mo. 27. The Act of 1907 and section 2240 can stand together when the Act of 1907 is construed as not requiring the labor of running trains on Sunday, and it therefore should be so construed. (e) It is not charged nor proven, that the running of passenger trains on Sunday is a public necessity on this branch between the two little towns mentioned in the information, hence if the train had been run, the defendant and its employees could, so far as it appears from this record,

have been prosecuted for violating section 2240, prohibiting labor on Sunday. (f) The Act of 1907 is a criminal statute and must be strictly construed, and the same is true of section 2240. Before the Legislature could require the running of passenger trains on Sunday on a branch line between two small towns, it must have protected the carrier and its employees against prosecution (under Sec. 2240) for laboring on Sunday, by declaring such train service to be a public necessity, which it could have done by specifically naming Sunday in Act of 1907. (2) If, however, the words "every day" in the Act of 1907 be so construed as to include Sundays, then the law, in so far as it attempts to require the running of passenger trains on Sunday between the points mentioned in the information, is unconstitutional and void for the following reasons: (a) It deprives the defendant of equal protection under the law in that it is a discrimination against steam railroads, and in favor of all other carriers, persons and corporations, because it requires steam railroads to perform service on Sunday while no other carrier, person or corporation of any kind whatever is required by any law to do anything whatever on Sunday. Art. 14, Amendments U. S. Constitution. (b) It deprives employees of steam railroads of equal protection under the law, in that it is a discrimination against employees of steam railroads and in favor of all other vocations and the employees of all other kinds of carriers, because labor on Sunday is not required of any other persons whatever. Art. 14, Amendments U. S. Constitution. (c) It interferes with the religious liberty of railroad employees because Sunday is the day of worship for Christians and kept sacred by them, and the right to so observe and enjoy said day is guaranteed to them by Sec. 5, art. 2, Missouri Constitution. (d) Defendant cannot run Sunday trains without the labor of employees, and it cannot compel its employees to labor on Sunday for

two reasons: First, because requiring them to labor on Sunday is a discrimination against them, which the law will not permit and which the defendant cannot enforce; and second, because requiring them to labor on Sunday would prevent them from keeping the day sacred and worshiping thereon, thereby interfering with their religious liberty, and the court cannot assume that railroad employees are not Christians and have no religious scruples. The Act of 1907, therefore, requires of defendant an impossibility, and to subject it to a fine for failure to perform a service it is powerless to perform, deprives it of its property without due process of law and of equal protection under the law.

*Herbert S. Hadley* and *Elliott W. Major,* Attorneys-General, and *John Kennish* and *F. G. Ferriss,* Assistant Attorneys-General, for the State.

(1) The law requiring railroad companies to "run at least one regular passenger train each way every day," requires the running of such train on Sunday as well as on other days. (a) The Legislature having used the words "every day," and the same being words having no technical import, we must take them in their plain or ordinary and usual sense, and in that sense Sunday is included. R. S. 1899, sec. 4160; Webster's International Dictionary, "Every;" Lewis's Sutherland Statutory Const. (2 Ed.), sec. 390, p. 749; United States v. Hartwell, 6 Wall. (U. S.) 385; Geary v. Parker, 65 Ar'r. 521; The Oluf, 19 Fed. 459. (b) In computing time under a statute, as to matters not to be transacted in court, Sunday will be counted unless expressly excepted. Lieberman v. Findley, 84 Mo. App. 387; Patchin v. Bonsack, 52 Mo. 431; State v. Green, 66 Mo. 631; Keeter v. Wilmington, 86 N. C. 346; City ex rel. v. Landis, 54 Mo. App. 324; National Bank v. Williams, 46 Mo. 17. (c) Sunday is a civil

institution, and is regulated as such, notwithstanding it is the day of the week given up by Christian people to religious worship. In contemplation of law, Sunday is merely a day of rest, and in law it is not regarded from the standpoint of the religious. Hennington v. Georgia, 163 U. S. 304; State v. Railroad, 15 W. Va. 362; 27 Am. & Eng. Ency. Law, 388; Bloom v. Richards, 2 Ohio St. 405; Ex parte Newman, 9 Cal. 521; State v. Ambs, 20 Mo. 218. (d) At common law, judicial proceedings only were prohibited on Sunday. A person was not prohibited from doing his ordinary labor on Sunday. 27 Am. & Eng. Ency. Law, 389; Eden v. People, 161 Ill. 296; Boynton v. Page, 13 Wend. (N. Y.) 429. (e) Said Act of 1907 does not repeal or conflict with Revised Statutes, section 2240, forbidding labor or work ''other than the household offices of daily necessities, or other works of necessity or charity,'' for the reason that the running of trains on Sunday is excluded from the statutes on the ground of its being ''a work of necessity.'' 2 Elliott on Railroads (2 Ed.), p. 100, sec. 717; Comm. v. Railroad, 80 Ky. 291; Yoniski v. State, 79 Ind. 393; Edgerton v. State, 67 Ind. 593; Carver v. State, 69 Ind. 64; Murray v. Commonwealth, 24 Pa. 270; Comm. v. Nesbit, 34 Pa. 409; Burnett v. Tel. Co., 39 Mo. App. 611. (f) Running railroad trains on Sunday has always been deemed lawful in Missouri, as is shown by the fact that it has always been practiced, and that its lawfulness has never been questioned. Running railroad passenger trains is not prohibited on Sunday anywhere in the civilized world, and is seldom regulated any differently on Sunday than on a week-day. Comm. v. Nesbit, 34 Pa. 404; Carver v. State, 69 Ind. 64. (g) But, if it be held that running trains on Sunday is not a work of necessity, and that there is a conflict between said Act of 1907, and said section 2240, then a compliance with the requirements of the Act of 1907 could not be construed as an 2unlawful act violative of sec-

tion 2240, because it is an approved canon of construction that, if a special provision applicable to a particular subject be inconsistent with a general law, the special will prevail. State ex rel. v. Foster, 187 Mo. 610. (2) The said Act of 1907, is reasonable and necessary to the proper public use of railroads, and it applies impartially alike to all engaged in the railroad business. It is, therefore, constitutional and valid. (a) The use to which railroads are applied, is a public use. The people, having an interest in the use, have the right, through the Legislature, to subject the railroads to such reasonable regulations as will effectuate the objects of their creation. State v. Railroad, 83 Mo. 150; 2 Elliott on Railroads (2 Ed.), pp. 7-10, secs. 662, 663, p. 82, sec. 709; Baldwin's American Railroad Law, 213; Jacobson v. Railroad, 40 L. R. A. (Minn.), 389; Munn v. Illinois, 94 U. S. 113; Railroad v. Bristol, 151 U. S. 571; McGowan v. Wilmington, 95 N. C. 417; Railroad v. Ohio, 173 U. S. 285; Branch v. Railroad, 77 N. C. 347; Keeter v. Railroad, 86 N. C. 346; State v. Railroad, 17 Neb. 647; R. R. Comrs. v. Railroad, 63 Me. 269; State v. Railroad, 43 Conn. 351; Smyth v. Ames, 169 U. S. 545; Gates v. Railroad, 53 Conn. 333. (b) It is within the power of the State to compel a railroad company to operate its road and run daily trains to accommodate the public. State v. Railroad, 29 Conn. 538; People v. Railroad, 70 N. Y. 569. (c) No constitutional rights of railroad companies or railroad employees are violated by requiring reasonable train service for necessary public travel on Sunday. Comm. v. Railroad, 80 Ky. 291; Carver v. State, 69 Ind. 64; Murray v. Commonwealth, 24 Pa. 270; State v. Ambs, 20 Mo. 218; Bloom v. Richards, 2 Oh. St. 405. (d) There is no unjust discrimination and no denial of the equal protection of the laws within the purview of said Act of 1907, inasmuch as its regulations are applicable alike to all "persons, copartnerships, companies or corporations operating

any railroad," although not applicable to other corporations or individuals. Baldwin's American Railroad Law, p. 213, 217; Humes v. Railroad, 82 Mo. 231; 2 Elliott on Railroads (2 Ed.), p. 82, sec. 709; Railroad v. Humes, 115 U. S. 523; Health Department v. Rector, 145 N. Y. 32; Railroad v. Bristol, 151 U. S. 571; State v. Swagerty, 203 Mo. 517; State v. Cantwell, 179 Mo. 245; Grainger v. Douglass Park, 148 Fed. 513. (e) The act in question is presumed to be constitutional until the contrary is clearly shown. It is only when acts of the Legislature manifestly infringe on some provision of the Constitution, that they can be declared void for that reason. In case of doubt, every possible presumption not directly and clearly inconsistent with the language and subject-matter is to be made in favor of the constitutionality of the act. State ex rel. v. Railroad, 48 Mo. 471; State ex rel. v. Aloe, 152 Mo. 477; State v. Cantwell, 179 Mo. 261; Atchison v. Mathews, 174 U. S. 96; Grainger v. Douglas Park, 148 Fed. 534. (3) The State, in requiring railroads to run trains every day within its borders, is acting within the proper limits of its police power, and such exercise of that power upon interstate railroads is not such as to unlawfully interfere with commerce between the States. 2 Elliott on Railroads, secs. 667, 690, pp. 18, 56; Railway v. Ohio, 173 U. S. 303, 308, 40 L. R. A. 392; Baldwin's American Railroad Law, pp. 384, 385; Gladson v. Minnesota, 166 U. S. 429.

JAMES S. BOTSFORD, Special Judge.—This cause comes by appeal from the Worth Circuit Court. At the hearing here, one of the judges of this court, having been of counsel, did not sit, and the remaining six judges being equally divided in opinion, the special judge in the case was appointed. [Const. of Mo., article 6, section 11.] The cause is resubmitted by the parties to the court thus constituted. The suit originated by a

criminal information to recover a fine for the violation of a statute which was enacted in 1907 (Laws 1907, p. 180), and reads as follows:

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Sec. 1. That all persons, copartnerships, companies or corporations operating any railroad or part of a railroad in this State shall, unless hindered by wrecks or providential hindrance, run at least one regular passenger train each way every day over all lines, or part of a line, of railroad so operated by such person, copartnership, company or corporation in this State, which train shall stop at all regular stations along the line of such railroad for the purpose of receiving and discharging passengers.

"Sec. 2. Any person, copartnership, company or railroad corporation violating the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not less than one hundred dollars nor more than five hundred dollars for each offense.

"Approved March 19, 1907."

The information charged defendant company with having failed to run a regular passenger train each way over its line of railroad between Grant City and Worth, in said county, on July 28, 1907, which day fell on Sunday, the first day of the week. At the trial, a jury was waived and the cause submitted to and decided by the court on an agreed statement of facts which were the same as the facts stated in the information. It appears from the agreed statement that defendant had and has a railroad between Chariton, Iowa, and St. Joseph, Missouri, through said Worth county, with said Grant City and Worth as regular stations, and that defendant habitually ran a regular passenger train each week day, each way on its said line, but did not run and failed and refused to run any pas-

senger train on said line on said Sunday. Both the information and agreed statement negatived that defendant was hindered from running passenger trains on said Sunday by wrecks or providential hindrance. The points made by the company were that Sunday was not included within said Act of 1907, and that if construed to include Sundays said act was invalid under the Constitution of Missouri and also under that of the United States. The trial court overruled these points and gave a final judgment against the company, finding it guilty, and assessing a fine of $100. Those points having been saved by proper exceptions and an overruled motion for a new trial, preserved in a bill of exceptions, are before us on defendant's appeal.

The first point, that Sunday is not included in the act by the use therein of the words "every day", depends for its solution on the question whether the running of trains as enjoined by the act, is lawful on Sunday the same as on a week day. Sunday is a day of a dual character. It is the Christian's day of worship; it is also the day of rest of men everywhere, irrespective of whether they have or have not a creed or a religious belief. The law does not deal with Sunday as a day of worship, but with it only as a day of rest. The confusion of the two characteristics of the day has doubtless contributed to the large number of conflicting decisions by the courts.

The Missouri Sunday laws have regard to that day as a day of rest, and not to the religious character of the day. They are civil, not religious regulations, and are based upon a sound public policy which recognizes that rest one day in seven is for the general good of mankind. [Hennington v. Georgia, 163 U. S. 299-304.] Those laws are sustained as civil, municipal or police regulations, without reference to the fact that the day of rest is also the Christian's day of rest and worship. [State v. Ambs, 20 Mo. 214; State v. Granne-

man, 132 Mo. 326, 331; St. Louis v. De Lassus, 205 Mo. 578, 585; Swann v. Swann, 21 Fed. 299; 27 Am. & Eng. Ency. Law (2 Ed.), p. 388; Lindenmuller v. People, 33 Barb. 548.]

The decisions of our courts that Sunday is not included in the four days given for filing a motion for a new trial, are because, at common law and under the statutes, with certain exceptions, judicial proceedings cannot take place on Sunday. At common law, only judicial proceedings on Sunday were unlawful. [27 Am. and Eng. Ency. Law (2 Ed.), p. 389; Merritt v. Earle, 29 N. Y. 116; Pepin v. Baptiste, 24 R. I. 550; Eden v. People, 161 Ill. 296; Roberts v. Barnes, 127 Mo. 415.] Labor and the making of contracts were not prohibited. [Swann v. Swann, 21 Fed. 299.]

In the above case of Swann v. Swann, 21 Fed. 299, which was a case decided in the United States Circuit Court for the Eastern District of Arkansas, the following propositions were adjudged, as appears from the syllabus of the case.

"3. Lord's Day Contracts—Valid in Tennessee, When.—In Tennessee isolated private contracts made on the Lord's day, outside of the ordinary calling of the parties to them, are valid.

"4. Same—Arkansas Rule.—Prima facie contracts made in Arkansas on the Lord's day are void; but contracts made in that State, on that day, between parties who observe as a day of rest any other day of the week, agreeably to the faith and practice of their church or society, are valid.

"5. Same—Common Law.—At the common law, contracts made on the Lord's day were as valid as those made on any other day.

"6. Public Policy—How Ascertained.—The only authentic and admissible evidence of the public policy of a State, on any given subject, are its constitution, laws and judicial decisions.

"7.  Lord's Day Acts—Police Regulations.—The Lord's day acts are not religious regulations; they are a legitimate exercise of the police power, and are themselves police regulations."

The opinion in the case is by Judge CALDWELL. It contains a full citation of the authorities, English and American, and an extended consideration of the subject.

Missouri has had a legislative policy on the subject of Sunday laws for eighty-five years. That policy first found expression in the Missouri Revised Statutes of 1825, and has continued through all the revisions since then until now. The Sunday laws of this State as they appeared in the first Revised Statutes of Missouri in 1825 and which may be found at pages 310 and 311 thereof, and which were approved February 11, 1825, read as follows:

"Sec. 90. *Be it further enacted,* That if any person on the Lord's day, Sabbath or Sunday, shall be found laboring, or shall compel his or her apprentice, servant or slave, or the apprentice, servant or slave of any other person, to labor or perform other services, unless it be the ordinary household offices of daily necessity and charity, or other works of necessity or charity, he, she, or they, so offending, shall, on conviction, forfeit and pay the sum of one dollar for every offense, deeming every apprentice, servant or slave so compelled, as constituting a distinct offence; Provided, That no person who is a member of any religious society, who observes as a Sabbath any other day than the Christian Sabbath, shall be liable to the penalty herein incurred for a breach of the Sabbath, so that they observe one day in seven, agreeably to the regulations aforesaid, saving to ferrymen the right of crossing passengers.

"Sec. 91. *Be it further enacted,* That if any white person shall be guilty of shooting, horse racing, cock fighting, hunting, or of frequenting tippling houses or

groceries, on the first day of the week, called Sunday, or Sabbath he shall, on conviction, be fined not less than one, nor more than ten dollars: Provided, however, That this section shall not extend to any person or persons, who may hunt, shoot or kill any wolf, panther, wild cat or other animal or fowl, which may in any way depredate upon, or destroy any tame stock, growth or grain.

"Sec. 92. *Be it further enacted,* That if any person shall expose to sale any wares, merchandise, goods or chattels, or shall keep open any ale, or porter house or grocery, or shall retail any ale or porter, or any strong or spirituous liquors, after ten o'clock in the morning, on the first day of the week, called Sunday, every person, so offending, shall, on conviction, be fined not less than one nor more than ten dollars: Provided, that this section shall not extend to the sale of articles of provision, or to the sale of any article of immediate necessity."

The same statutes, couched in different phraseology, as contained in the revision of 1899 and which appear at pages 623 and 624 of volume 1 of the Revised Statutes of Missouri of 1899, read as follows:

"Sec. 2240. Every person who shall either labor himself, or compel or permit his apprentice or servant, or any other person under his charge or control, to labor or perform any work other than the household offices of daily necessity, or other works of necessity or charity, or who shall be guilty of hunting game or shooting on the first day of the week, commonly called Sunday, shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars.

"Sec. 2241. The last section shall not extend to any person who is a member of a religious society by whom any other than the first day of the week is observed as a Sabbath, so that he observes such Sabbath, nor to prohibit any ferryman from crossing passengers on any day of the week; nor shall said last section

be extended or construed to be an excuse or defense in any suit for the recovery of damages or penalties from any person, company or corporation voluntarily contracting or engaging in business on Sunday. [R. S. 1889, sec. 3853.]

"Sec. 2242. Every person who shall be convicted of horse racing, cock fighting or playing at cards or games of any kind, on the first day of the week, commonly called Sunday, shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars. [R. S. 1889, Sec. 3854-m.]

"Sec. 2243. Every person who shall expose to sale any goods, wares or merchandise, or shall keep open any ale or porter house, grocery or tippling shop, or shall sell or retail any fermented or distilled liquor on the first day of the week, commonly called Sunday, shall, on conviction, be adjudged guilty of a misdemeanor and fined not exceeding fifty dollars. [R. S. 1889, Sec. 3855-n.]"

These statutes exempt from their operation "works of necessity and charity." Those words are to be found in like statutes of many of our sister States. The meaning of the word "necessity" has been the subject of controversy in a large number of the conflicting decisions on this subject. That word should be construed reasonably and neither too literally or liberally. By the word "necessity" in the Sunday law, we are not to understand a physical and absolute necessity, but a moral fitness or propriety of the work and labor done under the circumstanves of the particular case may well be deemed a necessity within the statute. [State v. Schatt, 128 Mo. App. 622-636; Burnett v. Telegraph Co., 39 Mo. App. l. c. 611.] See, also, to the same effect the remarks of Chief Justice MARSHALL in McCulloch v. Maryland, 4 Wheat. 316, as to the meaning of the word "necessary" in the Constitution of the United States. See, also, Yonoski v. State, 79 Ind. 393; State v. Collett, 72 Ark. 167.

Again, in section 90, Revised Statutes 1825, appear at the end of the section the words, "saving to ferrymen the right of crossing passengers," and language of like meaning has appeared in every succeeding revision. In 1825, when the statute with those words was first passed, ferryboats and steamboats on the rivers performed the functions since assumed by the railroads, which then had no existence in the State. In the days of steamboat traffic, nothing was more common than the running of those boats on Sunday the same as on week days. Now in their place we have railroads, and in place of ferryboats we have bridges across the Mississippi, Missouri, Osage, Kaw and other rivers. Can there be any doubt but that in early times the running of both ferryboats and river vessels was lawful, even without the saving clause in the Law of 1825? The carrying of neither freight nor passengers by common carrier, whether it be by steamboat or a railway train, on Sunday, is forbidden by the common law, and if not forbidden by statute, is as lawful on Sunday as on a week day.

Carrying freight on Sunday is a work of necessity. [Philadelphia, etc. Railroad v. Lehman, 56 Md. 209; Powhatan Co. v. Railroad, 24 How. 247.]

In the case of Railroad v. Lehman, 56 Md. 209, l. c. 228, the facts were as follows:

The railway company was sued by Lehman for delay in delivering Lehman's cattle too late to be sold on Monday morning in the market for which they were destined. The declaration of the plaintiff Lehman alleged that the cattle were received by defendant railway company on July 28, 1878, which was Sunday, and that the cattle were detained by the railway company upon its road, in Baltimore, until about half past 12 a. m. of the morning of Monday, July 29, 1878. There was a demurrer by the railway company to the declaration, which was overruled in the trial court. Afterwards there was a trial, resulting in a verdict and judgment

against the railway company, which appealed. The Maryland Supreme Court, in deciding the case, adjudged the following propositions:

"4. That its obligation was to carry, according to its public profession, and the conveniences at its command. And if injury were sustained by reason of any neglect of this duty, or other wrongful act in the carrying and delivery of the cattle, the fact of their having been received to be carried, or having been carried on Sunday, could afford no excuse to the defendant, or exoneration from liability.

"5. That the carrying forward of the cattle by the defendant on Sunday was not illegal; it was fairly and justly a work of necessity, and therefore excepted from the operation of the statute.

"6. That even upon the supposition that the plaintiffs were violating the law in having their cattle transported on a Sunday, the defendant could not avail itself of such infraction of the law by the plaintiffs as a defense to an action for the consequences of a wrong or negligence of its own."

The case shows that in consequence of the delay in transit of the cattle they did not arrive in the market of their destination until Wednesday, July 31, 1878, instead of Monday, July 29, 1878. The court in its opinion, at p. 228, uses the following language:

"The carrying forward of the cattle by the defendant on Sunday was not illegal; it was fairly and justly a work of necessity, and therefore excepted from the operation of the statute. And that being the case, there is no ground for the excuse relied on by the defendant. [Powhatan Steamboat Co. v. Railroad, 24 How. 247-253; Carroll v. Railroad, 58 N. Y. 126; Flagg v. Millbury, 4 Cush. 243.] And even upon the supposition that the plaintiffs were violating the law in having their cattle transported on a Sunday, it is well settled that the defendant could not avail itself of such infraction of the law by the plaintiffs, as a defense to an ac-

tion for the consequences of a wrong or negligence of its own. [Philadelphia, etc. Railroad v. Towboat Co., 23 How. 209; Mohney v. Cook, 26 Pa. St. 342; Sutton v. Town of Wauwatosa, 29 Wis. 21; Carroll v. Railroad, 58 N. Y. 126.] The court below was clearly right, therefore in overruling the demurrer of the defendant to the declaration of the plaintiffs.''

In the case of Commonwealth v. Louisville & Nashville Railroad Co., 80 Ky. 291, the Court of Appeals of Kentucky ruled that: ·''1.   The running of its passenger trains by appellee upon its railroad transporting passengers, baggage, etc., on the Sabbath day is not a violation of section 10, article 17, chapter 29, General Statutes.

''2.   Such use of its trains on that day held to be 'a work of necessity.' ''

That was a proceeding in the name of the Commonwealth against the railroad company under the Kentucky statute, which provides as follows: ''No work or business shall be done on the Sabbath day, except the ordinary household offices, or other work of necessity or charity. If any person, on the Sabbath day, shall himself be found at his own or any other trade or calling, or shall employ his apprentices or other persons in labor or other business, whether the same be for profit or amusement unless such as is permitted above, he shall be fined not less than two nor more than fifty dollars for each offense.''

The petition in the case to recover the fine on the part of the Commonwealth against the railroad company, alleged that on Sunday, April 3, 1881, the company did run and operate over its railroad track, in the county of Jefferson, a certain train, consisting of one locomotive engine, baggage car, and three several passenger coaches, and that said train was running and transporting for the profit of the defendant, passengers and their baggage, merchandise, express packages, and the United States mail into the State of Ken-

tucky for sundry points within the State, and through said State into other States. That for the purpose of operating said train the company did hire and employ certain persons to work and labor on the train as engineers, brakeman, and baggage-master, and for which labor they were paid their wages. And it was further alleged that such work was not a work of necessity or charity. In the opinion in the case, the court said:

"The sole power of determining the policy of such an enactment as is brought in question is vested in the legislative department of the State government by the Constitution, and unless the passage of this Sunday law, as it is usually termed, is inhibited by some provision of that instrument, it must be sustained. The legislative will is supreme on all such questions, and when not abridging the civil rights or privileges of the citizen, must be held to be constitutional. The constitutionality of similar enactments has been passed on and sustained by courts of last resort in nearly every State of the Union, and this concurrence of opinion, together with a reference to former decisions of this court on kindred subjects, concludes, in our opinion, the constitutional question raised, and we will discuss the application of the statute alone to the acts of this company, entertaining no doubt as to the constitutionality of the law.

"The meaning to be attached to the words 'or other *work of necessity*' found in the act, must control the decision of this case, and if we are to attach to those words their scientific or physical meaning, that is, that the action of the company was inevitable or could not have been otherwise, its liability would at once be fixed, as it might have stopped its trains or declined to receive freight or passengers unless upon the agreement that the delay in transportation should relieve it from responsibility. Under such a ruling the cooking of food or the feeding of stock on the Sabbath might be dispensed with, and every other necessity

in the way of labor that was not indispensable to man's existence.

"Could this have been the legislative intent when using such language in the statute? or shall we not interpret the words as having a legal meaning designed to apply to the wants of the citizen, adapting the language in its construction to the manners, habits, wants, and customs of the people it is to affect?—and, in many cases, the rights and duties of those charged with a public or private duty, and the obligations they are under to others must also be considered in determining the character of labor falling within the statutory prohibition. It is argued in the case of Sparhawk v. Union Passenger Railway Company, reported in 54 Pennsylvania, p. 401, that it was not intended by such acts to exempt the party charged from the prohibition of the statute because his labor was a work of necessity to others, but it must be a work of necessity to him who does the labor. We do not so construe the statute. If so, why protect the apothecary who sells his medicines for the relief of the patient, or the dairyman who furnishes milk for his customers, or the hotel keeper who furnishes his guests with food and lodging? It is the exigencies of the object to be accomplished that determines, to a great extent, the means to be resorted to for that purpose. No safer rule, we think, can be established, or any better definition given of the word *necessity*, than is found in the decision cited as adverse to the views therein expressed and that is: 'The law regards that as necessary which the common sense of the country, in its ordinary mode of doing business, regards as necessary,' The change in the habits and customs of the people, and the mode and character of transportation and travel, makes that a necessity at this day that half a century since would not have been so regarded.

"It is impossible, and certainly not practicable, to draw the line of distinction with certainty between

works of necessity and such labor as falls within the denunciation of the statute, and we are not disposed to venture so far as to attempt to place a limit to the *meaning* of the word *necessity* when applied to the wants of man. In the case of McGatrick against Wason, reported in 4th Ohio State, p. 566, it was held 'that works of necessity are not limited to the preservation of life, health, or property from impending danger. The necessity may grow out of, or indeed be incident to, the general course of trade or business, or even be an exigency of a particular trade or business, and yet be within the exception of the act. Hence the danger of navigation being closed may. make it lawful to load a vessel on Sunday, if there is no other time to do so.'

"In the case of the Phil. & Balt. Railroad Co. v. Steam Towboat Co., 23 Howard, 209, the court said: 'We have shown, in our opinion delivered at this term, that in other Christian countries, where the observance of Sundays and other holidays is enforced by both Church and State, the sailing of vessels engaged in commerce, and even their lading and unlading, were classed among the works of necessity which are excepted from the operation of such laws. This may be said to be confirmed by the usage of all nations, so far at least as it concerns commencing a voyage on that day.'

"Railroad companies, as carriers of passengers, furnish at this day almost every accomodation to the traveler that is to be found in the hotels of the country. His meals, as well as sleeping apartments, are often furnished him, and to require the train, when on its line of travel, to delay its journey that the passenger may go to a hotel to enjoy the Sabbath, where the same labor is required to be performed for him as upon the train, or to require him to remain on the train and there live as he would at the hotel, would certainly not carry out the purpose of the law, and besides

the necessity for reaching his home or place of destination must necessarily exist in so many instances as to make it indispensable that the train should pursue its way. So of the train transporting goods, merchandise, live stock, fruits, vegetables, etc., that, by reason of delay, would work great injury to parties interested. A private carriage in which is the owner or his family, driven by one who is employed by the month or the year, to the church in which the owner worships, or to the home of his friend or relative, on the Sabbath, is not in violation of the statute. So in reference to the use of street railroads in towns and cities on the Sabbath day. Those who have not the means of providing their own horses or carriages travel upon street cars to their place of worship, or to visit their friends and acquaintances; and such is the apparent necessity in all such cases, that no inquiry will be directed as to the business or destination of the traveler whether in the one case or the other, nor will an inquiry be directed as to the character of the freight being transported; nor will the person desiring to hire the horse from the livery stable be compelled to disclose the purpose in view in order to protect the keeper from the penalty of the law. Such employments are necessary, and not within the inhibition of the statute.''

It has been held that the rule as to judicial proceedings had on Sunday, should not be unduly extended.

In the case of Pepin v. Societe St. Jean Baptiste, 24 R. I. 550, it was decided by the Supreme Court of Rhode Island that: ''A benefit association whose object is not profit, but to relieve members and their families in case of sickness and death, is a charitable organization, and the transaction of its business is a work of necessity and charity, and can be done on Sunday.'' That was a suit by mandamus, brought by a member of a benefit society who had been excluded therefrom by an order of the society made on Sunday.

There was a demurrer by the society to the petition for the mandamus, and in discussing the demurrer, the court in its opinion used the following language:

"Another ground for demurrer is that, as the hearing and expulsion took place on Sunday, it was illegal and void. It was a rule of the common law that Sunday is a non-judicial day, and many cases have held that a judgment entered on Sunday was void. The petitioner argues that the trial in this case was an exercise of judicial power, and therefore void. The cases relied on by him relate to judgments of courts, where it has been held, in some upon common law authority and in some upon statutory provisions, that judgments so entered were void. We recognize the correctness of such decisions upon common law authority, and also upon grounds of public policy and recognition of Christian practice. The present case, however, does not come within such grounds of prohibition. While there was a trial, the respondent was not a court of law, but a benevolent association, and its action was a part of the business of such society. Such bodies are recognized as charitable organizations, because their object is not individual profit, but a provision to relieve its members and their families in case of sickness and death. There was no rule at common law to forbid such societies to transact their business on Sunday. Possibly they are of too recent date to have been embraced in such a rule. As said by SAVAGE, C. J., in Story v. Elliott, 8 Cow. 27, 18 Am. Dec. 423: 'By the common law then, it appears, all judicial proceedings are prohibited. All other acts are lawful unless prohibited by statute.' That case involved an award made on Sunday, and the court held it void as a judicial proceeding, because arbitrators are not only jurors to determine facts, but judges to adjudicate as to the law; and their award, when fairly and legally made, is a judgment conclusive between the parties, from which there is no appeal. Accepting the rule thus

stated, we do not think that the action here complained of was a judicial proceeding in the sense in which the term was used at common law. Nor by the court in the opinion last cited. Evidently the courts of New York do not so regard it, for in People ex rel. v. Young Men's Society, 65 Barb. 337, it was held that a notice to answer charges served on Sunday, and a hearing, resulting in expulsion from a benevolent society, on the next Sunday, were not illegal because the papers were served and were returnable on Sunday, because they were not illegal at common law nor forbidden by statute. The court added: 'The relator chose to be long to a society which held all its regular meetings on that day, and if, at such a meeting, he was served with a notice to attend the next meeting, it does not rest with him to make the objection.' In McCabe v. Father Matthew Society, 24 Hun, 149, it was held that a resolution of suspension was not rendered invalid by the fact that it was adopted at a meeting held on Sunday, for the reason 'it is pure charity to relieve sick members, and the passage of such a resolution on Sunday would be unobjectionable.' In Turnverein v. Carter, 71 Mich. 608, under Comp. Laws, chapter 55, section 1, like our laws in excepting works of necessity and charity, it was held that a resolution authorizing a mortgage by the society, passed on Sunday, was void because it was not a religious or charitable association; implying that a charitable association might have done so. No cases are cited by the petitioner, and we know of none, which hold that a society of this sort may not transact its business on Sunday. That which comes nearest to such a statement is Society v. Commonwealth, 52 Pa. 125, 91 Am. Dec. 139. The court sustained the expulsion of a member of a relief association for the sick, at a meeting held on Sunday, on the ground that the question of illegality for that cause was not before the court as one of the grounds of demurrer. The court added, by way of *quaere*: 'It

might be well to consider how far such trials on Sunday comport with the legislation of the State and the genius of our institutions.' The statute was similar to ours in excepting works of necessity and charity. We think that the necessary work of charitable organizations is within the intent and words of our statute. The petitioner argues against such a construction, for the reason that he might not be able to compel the attendance of witnesses or the aid of counsel on Sunday. This consideration, however, is not raised by any facts set forth in the record. The attendance of witnesses before such a tribunal cannot be compelled at any time; but a lawyer appearing to defend might be regarded as doing work of his ordinary calling. If either witnesses or counsel should be unwilling to attend on Sunday, or for any cause tending to deprive one of a fair trial he should ask for a reasonable postponement on that account and it should be refused, there would be strong reason for holding such an expulsion to be illegal. But no such facts appear in this case. We decide that the demurrer to the answer cannot be sustained upon the grounds stated.''

In the case of Western Union Telegraph Co. v. Griffin, 1 Ind. App. 46, it was held that the sending of a telegraph message on Sunday, addressed to a doctor, notifying him that the sender's daughter was ill and asking him to come at once, was reasonably necessary under the law of Indiana. Suppose a person living at Grant City, Missouri, should early Sunday morning receive a telegram of the death of a relative, at St. Joseph, Missouri, the previous midnight. The sending and delivering of the telegram would be lawful. How could it be affirmed that the taking of the next train on Sunday to St. Joseph would be unlawful? And if in the Indiana case cited above, it was lawful to telegraph on Sunday for a doctor to come to attend a sick person on Sunday, was it not also lawful for the doctor to ride on the next train in answer to the call?

In the case of Western Union Telegraph Co. v. Wilson, 93 Ala. 32, it was held that the notification to a person of the death of his father and a request to attend the funeral involved such a moral necessity that a contract to send a telegraphic message for that purpose is valid, though made on Sunday. In the opinion in that case, the court said: "We cannot doubt but that the emergency of the death and burial of one's father involves such moral necessity for his presence before and at the funeral as brings any contract, made to that end on Sunday, within the exception of cases of necessity made by our statute, if indeed such contracts would not also be within the exception in favor of works of charity, in a liberal sense of that term. [Code, Sec. 1749; Burns v. Moore, 76 Ala. 339; Railroad v. Levy, 59 Tex. 542; Doyle v. Railroad, 118 Mass. 195.]"

In the case of State v. Collett, 72 Ark. 167, it was held, that where a belt in a mill employing two hundred persons broke on Saturday through an unexpected defect, and could not be repaired that day because gasoline could not be procured in a town of three thousand inhabitants, the repairing of it Sunday morning, without which the mill would have to be shut down Monday, as after the belt was glued it had to dry eighteen hours before it could be used, was a work of necessity within the meaning of the Sunday law of Arkansas.

Suppose there were a like mill at Albany, Missouri, and an accident happened to it too late Saturday evening to be repaired that day. Would it be unlawful to use defendant's passenger and freight trains which run between that city and St. Joseph Sundays the same as on other days, to obtain the necessary repairs so as to resume work on Monday?

It is a well-known fact that Monday morning is the best time in the week to market live stock shipped to Chicago, St. Louis, Kansas City, St. Joseph or Omaha.

but if a train of live stock loaded up in Texas for one
of those markets, must under the act of Congress, stop
for rest, water and feed of the cattle after being out
twenty-eight hours, must the train also remain on a
switch or side track over Sunday?

In the case of the City of Topeka v. Hempstead,
58 Kan. 328, it was held that: "The delivery of milk
to his customers by a dairyman is a work of necessity,
and not within the inhibition of a law forbidding any
labor on Sunday other than works of necessity or
charity."

Suppose the electric lighting, gas heating, hotel and
street railway companies of the large cities of this
State were to refuse to perform their public duties on
Sunday by closing down that day, on the ground that
the performance of those duties that day is unlawful,
would such a refusal or contention be sustained?

In the case of Sullivan v. Railroad, 82 Me. 196, it
was held that riding upon Sunday, for exercise, and
for no other purpose, is not a violation of the Maine
Sunday statute. In the opinion in that case the court
uses the following language:

"The defendant's contention in support of the
single question raised by the exceptions is founded
upon the erroneous assumption that riding upon Sun-
day for exercise, and for no other purpose, is a viola-
tion of the statute in relation to the observance of the
Lord's day. The statute is not to be so construed.
Such an interpretation would be contrary to the spirit
as well as the letter of a statute which expressly ex-
cepts from its prohibition works of necessity or char-
ity. [Rev. St., c. 124, Sec. 20.]

"And this exception may properly be said to cover
everything which is morally fit and proper, under the
particular circumstances of the case, to be done upon
the Sabbath.

"Tested by this rule, our own court, in O'Connell v. Lewiston, 65 Me. 34, and Davidson v. Portland, 69 Me. 116, has held that walking out in the open air upon the Sabbath for exercise is not a violation of the statute.

"In other jurisdictions, also, it has been held not to be unlawful to ride to a funeral (Horne v. Meakin, 115 Mass. 326), walking to prepare medicine for a sick child (Gorman v. Lowell, 117 Mass. 65), riding to visit a sick sister (Cornan v. Boston, 136 Mass. 384), traveling to visit a sick friend (Doyle v. Railroad, 118 Mass. 195), a servant riding to prepare needful food for her employer (King v. Savage, 121 Mass. 303), a father riding to visit his two boys (McClay v. Lowell, 44 Vt. 116), walking for exercise (Hamilton v. Boston, 14 Allen, 475), and walking partly for exercise and partly to make a social call (Barker v. Worcester, 139 Mass. 74)."

In the case of Louisville & Nashville Railroad Co. v. Commonwealth, 30 S. W. 878, the State of Kentucky sued the railway company to recover a penalty for running an excursion train on Sunday. From a judgment in the trial court against the company that company appealed to the Kentucky Court of Appeals, where the judgment of the trial court was reversed and the cause remanded with directions to sustain a demurrer to the petition in the case. There seems to have been two cases and the appeals were decided together. In the opinion in the case, the court said: "These two cases involve the same questions, and were heard together. These appeals are prosecuted from judgments of the Taylor Circuit Court rendered in suits of the Commonwealth of Kentucky against appellant, instituted to recover the penalty prescribed by section 10, article 17, chapter 29, General Statute, which provides that no work or business shall be done on the Sabbath day, except the ordinary household offices or other work of necessity or charity, and pro-

'vides a fine of from two to fifty dollars for each offense. Appellant filed its demurrer in each of these cases, which was overruled, and a trial resulted in a judgment against apellant in each case for $300. From these judgments appellant has appealed, and insists that no cause of action was stated in the petition. The petitions alleged, in substance, that the appellant, being a railroad corporation, did on the Sabbath day, run and operate a train of cars on its railroad in Taylor county, through the county to Louisville, by way of Lebanon, and that said train did not carry freight nor United States mail; that no regular trains were run on said road on the Sabbath day. The allegations of the petition show that the train was an excursion train, and that a lower rate of fare was charged than on regular trains. The question presented for consideration is, Was the running of said train a work of necessity? Appellant refers to the case of the Commonwealth against the appellant, decided by this court at its May term, 1882, in which the meaning and proper construction of the statute under consideration was discussed at length, and in that case it was decided that the running of regular trains by appellant on Sunday was a work of necessity. [See 80 Ky. 292.) It seems that, if trains can be lawfully run and operated on every Sabbath day for any and all purposes, an excursion train may be lawfully run when deemed necessary. It also seems that after the decision supra was rendered the Legislature adopted the views therein announced, and section 1321 of the Kentucky statutes permits the running of steam railroads on Sunday. It seems to us that the petition in these cases fails to show a right to recover, and the demurrer thereto should have been sustained. The judgment in each case is therefore reversed, and causes remanded, with directions to sustain the demurrers, and for further proceedings consistent with this opinion.''

In the case of Doyle v. Railroad, 118 Mass. 195, it appears that the plaintiff had ridden in one of defendant's railway cars from Lynn to Boston on Sunday, for the purpose of visiting a sick friend whom he thought might need assistance and for the ·purpose of rendering such assistance as he might find necessary, and the Supreme Court of Massachusetts held that such travel was lawful.

In the case of Murray v. Commonwealth, 24 Pa. St. 270, the Supreme Court of Pennsylvania adjudged the following propositions:

"1. A lock-keeper in the employ of the Schuylkill Navigation Company is not liable to conviction for violating the Act of 22d April, 1794, prohibiting worldly employment on Sunday, for opening the lock-gates on the Schuylkill Canal to admit the passage of boats on the Sabbath day, on the demand of owners or captains of boats navigating the canal.

"2. The Schuylkill river is a public highway; and as people have a right for some purposes to pass along it even on Sunday, the company must keep it open; and the agents of the company are not to judge as to the lawfulness of the travel; which is due at the risk of incurring the penalty prescribed for the violation of Sunday, inflicted in the mode prescribed by law."

That was a case where Murray was charged with having violated the law prohibiting worldly employment on the Lord's day. The act of Murray, the defendant, consisted in opening the lock-gates of the Schuylkill Canal on Sunday to admit. of the passage of boats, upon the demand of their owners or captains engaged in navigating the canal. The legality of the conviction of the defendant Murray was the sole question for decision in the Supreme Court. In the opinion in the case, LOWRIE, J., said;

"The Schuylkill river is a public highway; and as people are not forbidden by law, and therefore have a right, for some purposes, to pass along it, even on

the Lord's day, the Navigation Company must keep it open, and, for this purpose, must have lock-keepers to act for them. There may, indeed, be unlawful travel on Sunday, and for such travel there can be no right to have the locks opened; but the criminality of the lock-keeper is not proved by the criminality of the travel, because, as agent of the company, he is bound to keep the navigation open for travel, and is not made the judge of its rightness.

"Every man travels at his own risk on Sunday, and that risk is measured legally only by the legal penalty. To stop him would be the imposition of a different penalty, tenfold more serious perhaps; and it is not the remedy of the law. Besides this, the law would not impose upon the lock-keeper the authority to judge of the rightness of the travel, without investing him with the exemption from liability for misjudgment that ordinarily belongs to judicial officers, and then the traveler would be without remedy in case of his error of judgment, and would be justified in going on in case of a decision in his favor. This would make a lock-keeper, in this respect, a more important public officer than a justice of the peace."

We have seen from the foregoing considerations and citations, that, viewed from the standpoint of labor, much of the travel on Sunday on the railways, are works of "necessity" within the meaning of our laws, and the opinion of Mr. Justice LOWRIE in the case last cited, is a precise authority, emanating from a great judge, to the effect that no common carrier can make itself a judge or magistrate of the law to determine whether any of its passengers riding on Sunday, is riding under circumstances which make him a violator of law, or not.

Thus far I have proceeded upon the theory that traveling is labor, not rest. The statutes of the different States forbid labor, not rest. Suppose a family goes to church Sunday morning in an automobile. Is

their so going labor or rest? If they go out in the same way fifty miles or more the same afternoon, is that labor or rest? If instead of their riding in a carriage or automobile, guided either by one of the family or by an employed driver or chauffeur, they ride in the same way Sunday morning and afternoon in a street car, or a suburban trolley line, is that labor or rest? If a person stays all day Sunday at a hotel, is that labor or is it rest? And if he, instead of staying at a hotel, obtains the same accommodations on a moving train of cars, is that labor or rest? Riding on a train of cars on Sunday may or may not be worship, but I am of opinion that the citizen may observe Sunday as a rest day, in any manner he chooses to rest, that he may do so either in his private vehicle or in a conveyance of a common carrier, or at a hotel, or at his home, and that he does not thereby infringe either upon any of our statutes or upon the policy of the State as evidenced thereby.

It follows that traveling on Sunday on the trains of railways is not unlawful, and that the words "every day" in the Act of 1907 under consideration includes Sundays with the other days of the week. Even if said act in so including Sunday had changed the legislative policy of the State, or had repealed or modified by implication any former statute, the result would be the same. And here we are brought to the point that the Act of 1907, so construed as to include Sunday, is violative of the State Constitution. Here it should be noted that while the Federal Constitution is a grant of enumerated powers, a State Constitution is a body of limitations of the powers of the Legislature and the other departments of the State government. [Cooley's Const. Lim. (17 Ed.), 126.]

What is there in our State Constitution prohibitive of the Act of 1907 in question?

The following are the sections of our State Constitution respecting the subject of religion. Sections

5, 6, 7 and 8 of article 2 of the Missouri Constitution read as follows:

"Sec. 5.   That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no person can, on account of his religious opinions, be rendered ineligible to any office of trust or profit under this State, nor be disqualified from testifying, or from serving as a juror; that no human authority can control or interfere with the rights of conscience; that no person ought, by any law, to be molested in his person or estate, on account of his religious persuasion or profession; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of this State, or with the rights of others.

"Sec. 6.   That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall voluntarily make a contract for any such object, he shall be held to the performance of the same.

"Sec. 7.   That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.

"Sec. 8.   That no religious corporation can be established in this State, except such as may be created under a general law for the purpose only of holding the title of such real estate as may be prescribed by law for church edifices, parsonages and cemeteries."

Also section 11 of article 11 of the same Constitution:

"Sec. 11. Neither the General Assembly nor any county, city, town, township, school district or other municipal corporation, shall ever make an appropriation or pay from any public fund whatever, anything in aid of any religious creed, church or sectarian purpose, or to help to support or sustain any private or public school, academy, seminary, college, university or other institution of learning controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the State, or any county, city, town or other municipal corporation, for any religious creed, church or sectarian purpose whatever."

None of these provisions of the Constitution are violated by the Act of 1907 in question. The employees of the company voluntarily do the lawful work of running its trains on Sunday, and their rights to worship "according to the dictates of their own conscience" are in no wise restrained or denied. Any employee may accept or refuse employment on Sunday; he may remain at home, or he may attend worship at a church. There is no more compulsion in his service on Sunday than on a week day, and it is not shown, if indeed it could be shown, that there is any more difficulty in a railroad company employing trainmen for their Sunday trains than for a druggist, hotelkeeper, street car company, telegraph company, telephone company, gas company, or other public service company to hire clerks and other employees for their service on the same day. It is not shown, if indeed it could be shown, that railway employees act otherwise than voluntarily in their Sunday work, and the employee having exercised a lawful choice freely and voluntarily, I think the company cannot vicariously claim the right to make a different choice for the em-

ployee than the one he makes for himself. [St. Louis v. Shields, 52 Mo. 351.] Nor is the Act of 1907 violative of the Missouri Constitution because of the words of its preamble, which expresses that "with profound reverence for the Supreme Ruler of the Universe and grateful for His Goodness" the people "establish this Constitution." If this clause means that all men must observe Sunday not only as a day of rest but also as a day of worship, then the preamble violates section 6 of article 2 above cited, and as a consequence an established religion by the State follows.

The Act of 1907 does not do any violence to Sunday considered as a day of rest, and does not violate the policy of the State or any provisions of the Constitution. If the act had either denied, aided or commanded the observance of the day as a day of worship, such provision would in my opinion be contrary to the Constitution.

Nor is the act open to the objection of class legislation. The law is valid although applicable alone to railroads. [Humes v. Railroad, 82 Mo. 221-223; State v. Swagerty, 203 Mo. 517; Missouri Pacific Railway v. Humes, 115 U. S. 512; New York, etc. Railroad v. Bristol, 151 U. S. 1. c. 571; Atlantic Coast Line v. Corporation Commission, 206 U. S. 1.] The act contains no element of unjust discrimination, and no denial of the equal protection of the laws, it being alike applicable to all the railroads of the State. [Railroad v. Bristol, 151 U. S. 556, supra.] Nor does the act operate as a regulation of interstate commerce. [Hennington v. Georgia, 163 U. S. 299; Lake Shore Railway v. Ohio, 173 U. S. 285-306.] On the contrary the act is an aid to interstate commerce rather than a hindrance or burden.

A railway company may be compelled by law to furnish trains for the carriage of passengers. [Commonwealth v. Railroad, 85 S. W. 712; People ex rel. v. Railroad, 70 N. Y. 569.]

And loss to a railroad is no defense to a petition for a mandamus to compel obedience to such a law. [State to use v. Railroad, 83 Mo. 144, 150; Railroad v. Bristol, 151 U. S. 556; Railroad v. Ohio, 173 U. S. 285; Railroad v. Corporation Commission, 206 U. S. 1.]

And if the Legislature may compel railroad companies to perform their duties to the public by running passenger trains on week days, and if, as I hold, they owe the public the same duties of service on Sunday, as on week days, then it follows that the Act of 1907 commanding such performance and providing penalties for refusals to obey, is constitutional and valid. I think the judgment should be affirmed, and it is so ordered.

*Valliant, C. J., Woodson* and *Brown, JJ.,* concur; *Woodson, J.,* files separate concurring opinion; *Lamm, Ferriss,* and *Graves, JJ.,* dissent in an opinion by *Lamm, J.; Kennish, J.,* having been of counsel, did not sit.

## SEPARATE CONCURRING OPINION.

WOODSON, J.—I adhere to the views expressed in the opinion filed in this case by me, in Division No. 1, and refile it here; and for the reasons therein stated, as well as those expressed by our learned Special Judge JAMES S. BOTSFORD, I concur in the opinion filed herein by him *in toto.*

WOODSON, J.—On August 3, 1907, the prosecuting attorney of Worth county filed an information against the defendant, in the circuit court of that county, charging the defendant, a railroad corporation, maintaining a line of railroad and operating its trains of cars thereon, in this State, with having failed to run a regular passenger train each way over its

said line of railroad between Grant City and Worth, in said county, on July 28, 1907. At the October term of said court, the prosecuting attorney, by leave of court, amended said information by interlineation, and refiled the same. Thereupon, the defendant filed its motion to quash the information, which was by the court overruled. The defendant then entered a plea of not guilty, and also filed an answer.

The answer set up the defense that the Act of March 19, 1907 (Laws 1907, p. 180), the basis of the information, does not require the defendant to run passenger trains on Sunday; but, if it does so, then the act is unconstitutional and void, for the reason that it deprives the defendant of its property without due process of law; does not afford it equal protection of the law; is class legislation, and interferes with interstate commerce.

A trial was had at said October term, without the intervention of a jury, and the cause was submitted to the court on the following agreed statement of facts, to-wit (formal parts omitted):

"It is hereby stipulated and agreed between plaintiff and defendant, that a jury shall be waived and the cause shall be submitted to the court on the following agreed statement of facts, and none other, to-wit:

"Defendant admits that, continuously from and after July 1, 1907, to the present time, it was and is a railroad corporation organized under the laws of the State of Illinois, and that continuously from July 1, 1907, to the present time, except on Sundays, it has been doing business in Worth county, Missouri, as a railroad corporation, and has, during all of said time, except on certain Sundays, been operating a railroad between Chariton, Iowa, and St. Joseph, Missouri, by the way of, and in and through Worth county, Missouri, and through Grant City and the village of Worth, at which points there were and are regular stations of said company on said railroad, and doing

an interstate business between said town of Chariton, Iowa, and St. Joseph, Missouri, and that it also does a local business at all stations on said line in both the States of Iowa and Missouri; that defendant's regular south-bound passenger train on its said line of railroad through Worth county, Missouri, did, on each Monday, Tuesday, Wednesday, Thursday, Friday and Saturday, since the first day of July, 1907, and up to the present time, start regularly from Chariton, Iowa, at 4:25 a. m., passing through Toga, Iowa, at 6:07 a. m., through Grant City, in Worth county, Missouri, at 8:02 a. m., through Worth, in same county, at 8:20 a. m., through Albany, Missouri, at 9:05 a. m., and arriving at St. Joseph, Missouri, at 11:15 a. m., the same date; that the regular north-bound passenger train on defendant's said line of railroad did start regularly on each Monday, Tuesday, Wednesday, Thursday, Friday and Saturday from St. Joseph, Missouri, at 3:20 p. m., passing through Albany, Missouri, at 5:30 p. m., through Worth, Missouri, at 6:09 p. m., through Grant City, Missouri, at 6:26 p. m., through Toga, Iowa, at 8:30 p. m., arriving at Chariton, Iowa, at 10:25 p. m.; that both of said trains stopped at all regular stations on the line between Chariton, Iowa, and St. Joseph, Missouri; that, on Sunday, July 28, 1907, the defendant, while in charge and control of said railroad stations, engines and cars, did not run any train whatever on said line of railroad, in or through said Worth county, Missouri, or in or through said stations of Grant City or Worth, in said county of Worth; that said defendant was not on said date prevented from running a passenger train on its said line of railroad in said Worth county, Missouri, by reason of any wrecks or providential hindrance; that during said time (except on certain Sundays) the defendant, by its said trains of cars, passing over said railroad from Chariton, Iowa, to St. Joseph, Missouri, and from St. Joseph, Missouri, to Chariton, Iowa, was, in addition

to its interstate business, transporting for hire passengers and freight from said station at Grant City to said station at Worth.''

Upon that statement the court found the defendant guilty, as charged in the information, and assessed a fine of $100 against it. In due time, the defendant filed a motion for a new trial and in arrest of judgment, which were by the court overruled, and the defendant duly appealed the cause to this court.

The errors assigned here are but three, namely:

"First. The court erred in holding that the Act of 1907 requires the running of trains on Sunday.

"Second. The court erred in holding the Act of 1907 to be valid and constitutional.

"Third. The court erred in holding the Act of 1907 does not interfere with interstate commerce.''

I. The first insistence of counsel for appellant is, that the Act of 1907 does not include Sunday, and for that reason the company did not and could not violate its provisions by not running one of its regular passenger trains, each way, on Sunday, from Grant City to the town of Worth, in this State.

That act reads as folows:

"Section 1. That all persons, copartnerships, companies or corporations operating any railroad or part of a railroad in this State, shall, unless hindered by wrecks or providential hindrance, run at least one regular passenger train each way every day over all lines, or part of a line, of railroad so operated by such person, copartnership, company or corporation in this State, which train shall stop at all regular stations along the line of such railroad for the purpose of receiving and discharging passengers.

"Sec. 2. Any person, copartnership, company or railroad corporation violating the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not less than one hundred

nor more than five hundred dollars for each offense."
[Laws 1907, p. 180.]

There are numerous reasons assigned by counsel
why this act does not include Sunday, which will be
considered in the order stated.

(a) Counsel insist, "in computing time, Sunday
is not counted as a day in legal proceedings."

In support of that proposition we are cited to
the following cases: State v. May, 142 Mo. 135, l. c.
149; Jordan v. Railroad, 92 Mo. App. l. c. 85..

The first case cited had reference to the proper
time, under the statute, for filing a motion for a new
trial. It was there held that Sunday must be consid-
ered as *dies non* in the computation of time in judi-
cial proceedings. That was the common-law rule, and
we have no statute changing the common law in that
regard.

The second case had reference to the computation
of time under the statute for suing out a writ of error.
Section 4160, Revised Statutes 1899, provided that
"the time within which an act is to be done shall be
computed by excluding the first day and including the
last; if the last day be Sunday, it shall be excluded."

Neither of those cases is in point here. The
first had reference to proceedings in open court; and
the latter construed a statute providing specially
for the computation of time. Clearly, this case is
embraced in neither of those decisions. [Porter v.
Paving & Const. Co., 214 Mo. l. c. 15.]

(b) It is next insisted that "it is the policy of
the law of this State to consider Sunday as excluded
in computing time, as the statute on the subject (Sec.
4160) provides that 'if the last day is Sunday, it shall
be excluded.'"

As previously stated, that statute has no appli-
cation to the question here under consideration. This
case does not involve the question of computation of
time, but the simple question is, Does the Act of 1907

require the appellant to run its trains on Sunday, the same as on Monday and all other days of the week? If this act had further provided that it should be in force for a period òf five years froìm and after its passage, and the question for determination was, when would the five years expire? then said section 4160 might become material. But that is not the question here presented; there is no question of computation of time involved in this case.

(c) Counsel for appellant next contend, that it was not the design of the Legislature to require trains to be run on Sunday, for the reason that, if that had been the intention, that day would have been specially mentioned in the act.

That contention is predicated upon the further contention, that the act must be strictly construed, for the reason that it must not be so "construed to include a day not ordinarily considered a day in the law." The contention is unsound, for the reason that it is not a fact that the law ordinarily considers Sunday as *dies non.* It is never so considered, either at common law or under statutes, except under some express statute, such as section 4160, Revised Statutes 1899, or by some rule regarding proceedings in court.

In discussing this question the Kansas City Court of Appeals in the case of Lieberman v. Findley, 84 Mo. App. l. c. 387, used this language: "In computing time under a statute, Sunday will be counted unless expressly excepted. [Clapton v. Taylor, 49 Mo. App. 117; St. Joseph ex rel. v. Landis, 54 Mo. App. 315.] And in computing the time limited for perfecting appeals from a justice, Sunday is to be included— it is not a *dies non.* [Patchin v. Bonsack, 52 Mo. 341.] So that it is plain enough that, according to the rules just referred to, if the intervening Sundays be included, as they must, the appeal was allowed ten days before the first day of the term next after it was allowed, and therefore it had the effect to give the court

to which it was removed·jurisdiction at the term it
was tried.''

In Patchin v. Bonsack, 52 Mo. l. c. 432, Judge
SHERWOOD, in discussing this question, said: ''It ap-
pears from the bill of exceptions that the day on which
the justice rendered judgment was Friday, and the
application for the appeal presented on the follow-
ing Thursday.  And it is now contended by appellant
that the intervening Sunday was *dies non* and there-
fore that the appeal was in time.  In other words, that
when the statute says six days, it may mean seven.
With equal propriety a party against whom a judg-
ment by default was rendered before a justice of the
peace, on Saturday the first day of the month, might
contend that as two Sundays had intervened before
the ten days allowed by law had expired, therefore a
motion to set aside that default would not be too late,
if filed on the 13th of that month.

''So also, by like reasoning, a party on whom serv-
ice was had on Friday, the last day of the month, of
process returnable on the seventeenth of the month
following, might claim he was not served in time for
the ensuing term, because three Sundays had occurred
between the day of the service and the return day of
the writ.

''The position taken by appellant is not a whit
less untenable than that in the case above supposed;
nor are the statutes applicable to those cases any more
plain and unambiguous than the one under considera-
tion.

''The evident theory of appellant's argument is,
that the act respecting forcible entry and detainer was
designed to operate with uniformity, to give to each
similarly situated appellant party an equal number
of days in which to perfect·an appeal; thus six days
exclusive of Sundays during the sessions of the cir-
cuit court, and ten days, Sundays excluded, in vaca-
tion, in which to do the same thing.  A brief examina-

tion of sections 11 and 12 of the act referred to, will, however, incontestably show the fallacy of such position. Under those sections an appeal when taken in vacation may be taken within ten days after rendition of judgment, but must be returnable to the first day of the next term; so that in point of fact a party who in vacation takes an appeal, may be cut down by the operation of those sections to less than three days in which to thus proceed, provided a term of the circuit court should intervene.

"The accident of Sunday intervening has nothing to do with the proper construction of the act in question. The words of the statute respecting the number of days in which an appeal is to be perfected are general, and therefore must receive a general construction, and no exceptions, save those enumerated in that act or in acts *in pari materia* are to be allowed.

"The case cited by appellant, of the National Bank v. Williams, 46 Mo. 17, was a case resting upon the proper construction to be given that section of the practice act relating to motions for new trials. In that section (2 W. S., p. 1059, sec. 6), the Legislature had only in contemplation the regulation of matters which must of necessity take place on a court day. Besides it had been expressly provided (1 W. S. 422, sec. 34) that Sunday should not be one of these days, except for the two therein enumerated purposes, that of receiving a verdict or discharging a jury. And it must be presumed that the Legislature had that provision as well as the rule of the common law in that regard in mind, and, therefore, in prescribing the time in which motions for new trials should be filed, meant four court days, and did not intend that Sunday, which was both by the common law and the statute *dies non,* should be included in the computation. So that nothing enumerated in that case is at all applicable here;

nor can any such presumption as the intended exclusion of Sunday be invoked in the present instance.

"As was well said in Thayer v. Felt, 4 Pick. 354, a case on which appellant also relied, but which has here no application, 'the probable intention of the Legislature must govern,' in cases of this sort.

"Now, we have a rule for ascertaining the intention of our Legislature laid down by the Legislature itself, and it is this: 'Words and phrases shall be taken in their plain and ordinary and usual sense' unless those words and phrases are 'technical' and 'have a peculiar and appropriate meaning in law.' But there is nothing whatever in either of the sections now under discussion, to in the remotest degree indicate that the expression 'within six days' is of 'technical import,' or is to receive any other signification than the usual and ordinary use of those words would denote.

"And again, if any further guide to the conclusion we have reached were needed, where the pathway of legislative intention is so plain, it would be furnished by the uniform construction, in full accord with our views, which the act under consideration has always received.

"For these reasons, no hesitancy is felt in the assertion, that that construction must continue to prevail, and that the phrase 'within six days' is only susceptible of the meaning placed upon it by the court below, whose judgment is accordingly, with concurrence of the other judges, except Judge WAGNER, who is absent, affirmed."

Judge NORTON, in State v. Green, 66 Mo. l. c. 644, in speaking for the court, said: "It is insisted that, as defendant was furnished with a list of jurors on the 28th of November, the court erred in compelling him to make his challenges on the 30th of November, because the 29th day of said month was a public holiday under the proclamation of the Governor of the State

and the Act of 1877, page 37, and should not have been counted as any part of the forty-eight hours within which he had to make his challenges. The first section of said act provides that Thanksgiving days, when appointed by the Governor of the State, or the President of the United States, shall be public holidays. The second provides that such holidays shall be considered the same as the first day of the week, called Sunday, as regards the presenting for payment or acceptance, etc., of bills of exchange, bonds, notes and other commercial paper. In the computation of time, for the purposes mentioned in the act, such holidays may not be counted, except as therein provided. The act extends thus far in estimating time, and no further. If such holidays are to be considered as Sunday for all general purposes, they would still be counted in computing statute time, unless expressly excepted. In Ex parte Dodge, 7 Cowen, 147, it was held that Sunday has in no case been excluded in counting statute time. Anderson v. Baughman, 6 Mich. 298; Franklin v. Holden, 7 R. I. 215, are to the same effect.''

In Keeter v. Wilmington & Weldon Railroad Company, 86 N. C. 346, the defendant was sued for a penalty incurred for the violation of the Act of 1874-5, chapter 240, for allowing a bale of cotton belonging to plaintiff to remain unshipped for one day over five days from the date of the delivery for shipment. In the case, the Supreme Court of North Carolina said:

''The action is brought under the second section of the act, which provides, that 'it shall be unlawful for any railroad company operating in this State to allow any freight they may receive for shipment to remain unshipped for more than five days, unless otherwise agreed between the railroad company and the shipper, and any company violating this section shall forfeit and pay the sum of twenty-five dollars for each day said freight remains unshipped, to any per-

son suing for the same.' The cotton was delivered on Friday and remained unshipped until the next Thursday.

"The defendant company contended that it was not liable to the penalty, upon two grounds: . . . and, secondly, because the Legislature by the Act of 1879, chapter 197 and chapter 203, prohibited the cars running on Sunday, the effect of which was to eliminate Sunday from the five days, when it intervened, so that it was not to be counted in the computation of the time limited for shipment.

"And it was also decided in that case (Branch v. Railroad, 77 N. C. 347), that by the words 'five days' the act meant five full running days including Sunday whenever it intervened. This construction of the act makes it unnecessary for us to decide the disputed question whether the day of delivery is to be included or excluded.

"In our case the delivery for shipment having been made on Friday, the 24th of December, and the five days having ended at 12 o'clock on the night of the Wednesday following, and the seizure having taken place on the next day, Thursday, the 30th day of the same month, the question is, did the defendant incur the penalty imposed for one day's delay.

"The seizure on Thursday is the same as if the bale of cotton had been shipped on that day. The act makes it unlawful for any railroad company to allow freight to remain unshipped for more than five days, and any company violating the act shall forfeit and pay the sum of twenty-five dollars each day said freight remains unshipped. Giving then the defendant the full five days, including Sunday the cotton having been delivered on Friday, the full five days ended on Wednesday. The seizure was made the next day, at what hour we are not informed, but that is immaterial, as the law will not regard the fraction of a day in the enforcement of a penal statute, which is

to be liberally construed in favor of him upon whom the penalty is imposed. The defendant is liable to the penalty for the delay of each day—that means each whole day—and the legal day is twenty-four hours. The defendant then would not incur the penalty until the full expiration of the sixth day after the delivery.

"This is the construction of the act given by the court in Branch v. Railroad, 77 N. C. 347. There the delivery of the cotton was on the 10th day of October and the shipment was on the 19th of the same month. The court say, 'The full five days expired on Sunday, the 15th day of October, and the first penalty was incurred on Monday, the 16th, the second on the 17th, the third on the 18th. On Thursday, the 19th, the cotton was shipped. The day of shipping should not be counted, because no penalty is incurred by any delay of a fraction of a day.' Following this construction of the statute, we must hold that the defendant has not incurred the penalty sought to be recovered."

In the case of City of St. Joseph ex rel. v. Landis, 54 Mo. App. l. c. 324, the court said: "Clapton v. Taylor, 49 Mo. App. 117, also answers the defendants' further objection that in counting the time of the publication that the two Sundays included therein should have been excluded. It was held long ago in this State, that in counting statute time Sunday was not to be excluded. [State v. Green, 66 Mo. 631.] We think so far as any objection is raised in the record before us the contract was legally awarded."

In the case of National Bank v. Williams, 46 Mo. 17, this court held, that under our statute a service of summons fifteen days before the first day of the term of court, including Sunday, was a valid service.

In State ex rel. v. Smith, 177 Mo. l. c. 83, this court said: "This petition was not filed in time unless we exclude Sunday in computing time, but the law is otherwise. [St. Joseph ex rel. v. Landis, 54 Mo. App. 315; State v. Green, 66 Mo. 631.] The property-owners

having failed to exercise their right to select the material for the paving of said street, that duty devolved upon the board of public works which made the following selection: 'Vitrified brick as manufactured by the Pittsburg (Kansas) Vitrified Brick Company.''

In Curtice v. Schmidt, 202 Mo. l. c. 714, this court said: "Under the charter provision, and the ordinance, the petition was not filed within the ten days allowed, unless Sunday be excluded in computing the time. This should not be done. Sunday should be counted. [St. Joseph ex rel. v. Landis, 54 Mo. App. 315; Clapton v. Taylor, 49 Mo. App. 117; German Bank v. Stumpf, 73 Mo. 315; State v. Green, 66 Mo. 631.] It therefore appears that the property-owners failed to avail themselves of the privilege given them.''

And in Porter v. Paving & Construction Company, 214 Mo. l. c. 15, this court said: ''Counsel also rely upon the decisions of the appellate court of this State to the effect that in computing statutory time Sundays will not be excluded. So far as the time of notice only is concerned, no doubt whatever exists that such is the rule. [State v. Green, 66 Mo. 631; St. Joseph ex rel. v. Landis, 54 Mo. App. 315.] But it is conceived that in computing time within which an act must be done these cases do not govern. Thus it is a familiar rule in this State, as well as at common law, that Sunday will not be counted in the construction of statutes giving four days within which to file motions for new trials and in arrest of judgment. [Bank v. Williams, 46 Mo. 17; Cattell v. Pub. Co., 88 Mo. 356; Hales v. Owen, 2 Salk. 625; Rex v. Elkins, 4 Burr. 2130.]''

There is a consensus of opinion among all of the authorities to the effect that a statute dealing with the days of the week includes Sundays unless they are expressly excluded thereby, or where by some act the nature of which by necessary implication excludes them, such, for instance, as the statute requiring a mo-

tion for a new trial to be filed within four days after verdict. In that case the motion must be filed in open court, as court cannot be in session on Sunday; consequently under such a statute Sunday must be excluded by necessary implication, but in all other cases not specially excluded by statute, Sundays are included.

(d) It is also contended that Sunday is not included in said Act of 1907, for the reason that section 2240, Revised Statutes 1899, prohibits labor to be performed on Sunday, and that said act does not purport to repeal or modify said section of the statute; or, in other words, it is contended, that, if said act includes Sundays, then it must by necessary implication repeal said section 2240.

That section reads: "Every person who shall either labor himself, or compel or permit his apprentice or servant, or any other person under his charge or control, to labor or perform any work other than the household offices of daily necessity, or other works of necessity or charity, or who shall be guilty of hunting game or shooting on the first day of the week, commonly called Sunday, shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars."

From thus reading said section, it is seen that it does not undertake to prohibit the performance of all labor on Sunday, but by an express provision all "household offices of daily necessity, or other works of necessity or charity" are excepted from its operation.

The power of the Legislature to authorize the performance of any kind of labor on Sunday cannot be questioned, for the reason that in contemplation of law it is simply a civil institution, and may be regulated or abolished altogether by the lawmaking power of the State, as it may see proper, notwithstanding the fact that it is a day of the week given up by Christian people to religious worship. In the eyes of the

law Sunday is merely a day of rest, and is not considered from the standpoint of religion.

In the case of Hennington v. Georgia, 163 U. S. l. c. 304, Mr. Justice HARLAN, in discussing this question, said: "In our opinion there is nothing in the legislation in question which suggests that it was enacted with the purpose to regulate interstate commerce, or with any other purpose than to prescribe a rule of civil duty for all who, on the Sabbath day, are within the territorial jurisdiction of the State. It is none the less a civil regulation because the day on which the running of freight trains is prohibited is kept by many under a sense of religious duty. The Legislature having, as will not be disputed, power to enact laws to promote the order and to secure the comfort, happiness and health of the people, it was within its discretion to fix the day when all labor, within the limits of the State, works of necessity and charity excepted, should cease. It is not for the judiciary to say that the wrong day was fixed, much less that the Legislature erred when it assumed that the best interests of all required that one day in seven should be kept for purposes of rest from ordinary labor. The fundamental law of the State committed these matters to the determination of the Legislature. If the law-making power errs in such matters, its responsibility is to the electors, and not to the judicial branch of the government. The whole theory of our government, Federal and State, is hostile to the idea that questions of legislative authority may depend upon expediency, or upon opinions of judges as to the wisdom or want of wisdom in the enactment of laws under powers clearly conferred upon the Legislature. The Legislature of Georgia no doubt acted upon the view that the keeping of one day in seven for rest and relaxation was 'of admirable service to a State considered merely as a civil institution.' [4 Bl. Com. *63.] The same view was expressed by Mr. Justice FIELD in Ex parte

Newman, 9 Cal. 502, 519, 528, when, referring to a statute of California relating to the Sabbath day, he said: 'Its requirement is a cessation from labor. In its enactment, the Legislature has given the sanction of law to a rule of conduct, which the entire civilized world recognizes as essential to the physical and moral well-being of society. Upon no subject is there such a concurrence of opinion, among philosophers, moralists and statesmen of all nations, as on the necessity of periodical cessations from labor. One day in seven is the rule, founded in experience and sustained by science. . . . The prohibition of secular business on Sunday is advocated on the ground that by it the general welfare is advanced, labor protected, and the moral and physical well-being of society promoted.' ''

In State v. Baltimore & Ohio Railroad Co., 15 W. Va. l. c. 381, the Supreme Court of West Virginia said:

"It is argued, that this statute requires this observance of the Sabbath day as a religious duty imposed upon us by God, and that as corporations can owe no religious duty the statute cannot be construed to extend to them. In this argument it is assumed as universally admitted, that God imposed on all mankind the duty of keeping the first day of the week as holy. This assumption is far from being conceded. It is of course not admitted by those of our citizens who are disbelievers in the Christian religion. Nor is it true that it is admitted by all believers in Christianity.

"Judge READ in his opinion in Sparhawk v. The Union Passenger Railway Co., 54 Pa. St. 434 to 439, discusses this question at length and endeavors to show that Christianity does not enjoin the keeping of the Sabbath as a holy day. To establish this position he cites many texts from the Bible, and among them Col. ii. 14, 15; Gal. iv. 9, 10; and Romans xiv. 5.

He quotes, too, largely from the writings of many recognized Christian divines and theologians as sustaining his view, among them Calvin, Luther, the Rev. Dr. Rice, Barclay's "Apology," Jeremy Taylor, Bishop White, and the Rev. Dr. James W. Alexander; and he asserts that the leading protestant reformers, Melanchthon, Beza, Bucer, Zuinglius, Knox, and Cranmer all believed, that the observance of the Sabbath day as holy was not a requirement of the Christian religion; and he says that with them concurred Milton, Paley, Arnold of Rugby, and Penn, the founder of Pennsylvania.

"But I conceive this theological controversy is utterly unimportant in construing our statute. It might well be admitted, that it was the universally received opinion of all persons in this country that the Christian religion required, as a religious duty, the observance of the Sabbath day, and yet be easy to show, from the very wording of our statute, that our Legislature has not attempted to enforce the fulfillment of this Christian duty by any person. Had the Legislature really imposed on the community an obligation to support this observance of the Sabbath as a tenet of religion, they would in so doing have violated article 2, section 9, of the then Constitution, and article 3, section 15, of our present Constitution, which forbids the Legislature to compel any one to support any religious worship, or to confer any peculiar advantage on any sect. The requiring of those who, for instance, believed that Saturday was a holy day to observe Sunday as such, while those who believed that Sunday was a holy day were not required to observe Saturday as such, would have been conferring peculiar advantages on one sect and would have violated our Constitution.

"The Supreme Court of California, interpreting their statute in reference to the observance of the Sabbath as enforcing on the community this observ-

ance as a religious duty, pronounced the law unconstitutional and void. [Ex parte Newman, 9 Cal. 502.] But it has been elsewhere very generally held that statutes more or less resembling ours were constitutional, because they did not enforce the observance of the Sabbath as a religious duty. [See Specht v. Commonwealth, 8 Pa. St. 312; Shover v. State, 5 Eng. (Ark.) 259; Voglesong v. State, 9 Ind. 112; State v. Ambs, 20 Mo. 214.]

"In construing our statute it would be our duty to give it a meaning consistent with our Constitution, if its meaning was doubtful, and such meaning could reasonably be attached to its language. Its meaning is not, however, doubtful. It was obviously not intended by our statute to enforce the observance of the Sabbath as a religious duty. The Legislature obviously regarded it as promotive of the mental, moral and physical well-being of men, that they should rest from their labors at stated intervals; and in this all experience shows they were right. If, then, rest is to be enjoined as a matter of public policy at stated intervals, it is obvious that public convenience would be much promoted by the community generally resting on the same day; for otherwise each individual would be much annoyed and hindered in finding that those, with whom he had business to transact, were resting on the day on which he was working. The Legislature holding these views in selecting the particular day of rest doubtless selected Sunday because it was deemed a proper day of rest by a majority of our people who thought it a religious duty to rest on that day; and in selecting this day for these reasons the Legislature acted wisely. The law requires that the day be observed as a day of rest, not because it is a religious duty, but because such observance promotes the physical, mental and moral well-being of the community; and Sunday is selected as this day of rest, because if any other day had been named, it would

have imposed unnecessarily onerous obligations on the community, inasmuch as many of them would have rested on Sunday as a religious duty, and the requirement of another to be observed as a day of rest would have resulted in two days being observed instead of one, and thus time would have been uselessly wasted. This I conceive is the main object of our law; but it is not its only object. While I am thus resting on the Sabbath in obedience to law, it is right and reasonable that my rest should not be disturbed by others. Such a disturbance by others of my rest is in its nature a nuisance, which the law ought to punish, and Sabbath breaking has been frequently classed with nuisances and punished as such. [See Commonwealth v. Jeandell, 2 Grant (Pa.), 506.] That these are the objects of our statute are to my mind clearly shown by the wording of the law and by its provisions.

"The 17th section of the act, see Code, p. 695, provides that the forfeiture imposed by the 16th section 'shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular labor on that day, provided he does not compel an apprentice or servant not of his belief to do secular work or business on Sunday, or does not on that day disturb any other person.' This in effect says: The resting on Sunday is not required of any one on the ground that it is a religious duty, but because the well-being of men require that they should rest one-seventh part in their time and public convenience requires this rest should be taken on the day when a majority of the community would, even without law on the subject, rest, as they regard it a religious duty to do so, and it would be prejudicial to the public and tend to idleness, if two-sevenths of the time was devoted to rest. If then any portion of the community should regard it as their

religious duty to rest on some other day than Sunday, and do so rest, they are not required to rest on Sunday, as one-seventh of their time is all that the public requires to be devoted to rest. But if you do not rest on Sunday, you must take care not to disturb those who do, and not to compel others to work who should rest on that day.

"The obvious purpose of the law was not to enforce the performance of a religious or moral duty; for it expressly provides that this supposed religious duty may be neglected by any one, who will rest the required seventh part of his time. It may be said, however, that the 16th section in prohibiting hunting or shooting on Sunday shows that the true and real spirit of the law is to enforce the keeping of the Sabbath holy as a religious duty. But it must be obvious that this section does not prohibit hunting or shooting on Sunday; it only prohibits it from being done in a way which shall be 'to the annoyance of the public.' That is, your hunting and shooting must not be so done as to make it a public nuisance; and this is in full accord with the general purpose of the act as I have explained it. No inference can be drawn from the act forbidding a person 'to employ his minor children, apprentices or servants in labor' that the purpose of the act was to enforce on parents the social duty of training religiously their children, as has been suggested in argument. The spirit of this clause is simply to forbid masters from compelling their servants to labor more than six-sevenths of their time; and minor children are named simply because minor children are the servants of their parents. Nor can any inference be drawn that the whole scope of this law has not been correctly stated, because it is placed in the chapter headed 'Offenses against morality and decency.' There are other sections in this chapter punishing offenses or acts which cannot be regarded as *mala in se,* or as contrary to religion or abstract

morality; as the intermarriage of a white person with a negro.

"If these be correct views of the true meaning and purpose of this act, it is obvious that there is no reason why its observance should not be enforced against corporations, and why they should not be fined according to the provisions of this act for employing their servants in labor. The punishment inflicted is not because they in employing their servants in labor on Sunday are violating the fourth commandment or committing any immoral act, but because they are requiring their servants to labor more than six-sevenths of their time; and this is regarded by the State as prejudicial to their well-being. The corporation is therefore punished not for the violation of any social or moral obligation, but simply because it is violating a positive law forbidding it to employ its servants in labor on Sunday; or because it is annoying others who are thus resting in obedience to law."

So in the case of District of Columbia v. Robinson, 30 App. Cases l. c. 288, the court said:

"Thus it will be observed that it is not the policy of the law to enforce an observance of the Sabbath day because of its general observance by the Christian world, but to enforce a cessation from labor on one day in seven. It is within the power of the Legislature to fix any other day in the week and the law would be equally as effective for the purpose of its enactment. In the selection of the Sabbath day the Legislature has selected the day society generally recognizes as a day of rest, irrespective of any legal requirement. The constitutionality of this class of legislation can no longer be questioned. It has been universally upheld by the courts. [Mugler v. Kansas, 123 U. S. 623; Minnesota v. Barber, 136 U. S. 313; Hennington v. Georgia, 163 U. S. 299; Petit v. Minnesota, 177 U. S. 164; Ex parte Andrews, 18 Cal. 678.]

"While it is the legitimate prerogative of the Legislature to impose upon society the civil duty of observing one day in seven as a day of rest, it is beyond its power to impose the observance of Sunday as a purely religious duty. In other words, while the Legislature may very properly prescribe and impose upon the citizen obligations of a civil nature, it cannot impose the same obligations as religious duties. If, therefore, the act in question was intended to enforce the observance of the Sabbath as a religious obligation, and not a civil duty, whatever power the colonial legislative assembly may have had to prescribe and enforce such a law, we are of the opinion that it can not be legally enforced under our present constitutional form of government. The Constitution of the United States guarantees to the citizen absolute religious freedom in that it forbids the enactment of any law respecting an establishment of religion, or that will prohibit the free exercise thereof."

In Bloom v. Richards, 2 Ohio St. l. c. 391, Judge THURMAN, in speaking for the Supreme Court of Ohio, said:

"We are, then, to regard the statute under consideration as a mere municipal or police regulation, whose validity is neither strengthened nor weakened by the fact that the day of rest it enjoins is the Sabbath day. Wisdom requires that men should refrain from labor at least one day in seven, and the advantages of having the day of rest fixed, and so fixed as to happen at regularly recurring intervals, are too obvious to be overlooked. It was within the constitutional competency of the General Assembly to require this cessation of labor, and to name the day of rest. It did so by the act referred to, and, in accordance with the feelings of a majority of the people, the Christian Sabbath was very properly selected. But, regarded merely as an exertion of legislative author-

ity, the act would have had neither more nor less validity had any other day been adopted.

"Nay, more, it may protect the various festival days which, by some of the churches, are considered scarcely less sacred than the Sabbath day. But were the power conceded to the Legislature, it has not attempted to exercise it. It would, in the opinion of most Christians, be a far greater desecration of Sunday to go to an infidel lecture on that day, than to buy a tract of land; and yet the former is certainly not unlawful. The statute leaves a man to study atheism or the Bible on the Lord's day, as he may see fit; although, in the judgment of most men, the former occupation is as vicious as the latter is laudable. There are various religious duties, the performance of which on Sunday is considered peculiarly appropriate; various occupations or amusements, harmless in themselves, but deemed by most Christians irreligious if indulged in on the Sabbath; yet the law neither enforces the one nor forbids the other. In a word, we repeat, that, legally considered, Sunday is merely a day of rest. To the Christian it is far more. With him, it has a sanctity not derived from human laws but stamped upon it by the Almighty. His observance of it is not the mere performance of a civil duty, but an obedience to a precept of the Most High. In this faith he is protected; the faith itself is regarded with respect; but the law does not enforce it."

In Ex parte Newman, 9 Cal. l. c. 521, the Supreme Court of California, in speaking through Judge FIELD, later one of the justices of the Supreme Court of the United States, said:

"But it is urged that the intention of the law is to enforce the Sabbath as a religious institution. This position is assumed from the description of the day and the title of the act, but is not warranted by either. The terms 'Christian Sabbath or Sunday' are used simply to designate the day selected by the Legisla-

ture.  The same construction would obtain and the same result follow if any other terms were employed, as 'the Lord's day, commonly called Sunday,' contained in the statute of Pennsylvania, or simply 'the Sabbath day,' or 'the first day of the week,' as in several statutes.  The power of selection being in the Legislature, there is no valid reason why Sunday should not be designated as well as any other day. Probably no day in the week could be taken which would not be subject to some objection.  That the law operates with inconvenience to some is no argument against its constitutionality.  Such inconvenience is an incident to all general laws.  A civil regulation cannot be converted into a religious institution because it is enforced on a day which a particular religious sect regards as sacred.  The Legislature has seen fit, in different enactments, to prohibit judicial and various kinds of official business on Sunday, and yet it has never been contended that these enactments establish any religious observances, or that the compulsory abstinence from judicial or official labor is a discrimination or preference in favor of any religious sect.  The law requires notes, when the last day of grace falls on Sunday, to be presented to the maker on Saturday, in order to hold the indorser.  Would the complaint of an Israelite, that this was a discrimination in an important class of contracts in favor of the Christian, be listened to for a moment?  But why not?  In the course of his business it often becomes important to his interest that he should take commercial paper, not given to him in the first instance, and when, therefore, it is not in his power to fix the day of payment; and if the opinion of my associates is law, I see no reason why he should be compelled to have the note presented on Saturday, in order to hold the indorser.  And why should he be denied the power of enforcing on that day, by legal process, contracts

239 Sup.—17

entered into with him? To be consistent, we ought to hold all this legislation as discriminating and giving a preference in favor of one religious sect, and therefore unconstitutional. The answer consists in the simple fact that the legislation is not based upon any idea of enforcing a religious observance, but of establishing, as a civil regulation, a day of rest from judicial and other official labor; and the Constitution itself contains a recognition of Sunday as a day of rest, in the clause which provides that a bill presented to the Governor shall become a law in like manner as if he had signed it, if not returned by him within ten days, Sunday excepted, unless the Legislature, by adjournment, prevent such return. The word Sundays, in the plural, is in the Constitution on file in the office of the Secretary of State, not Sunday, in the singular, as found in the printed copy. [Price v. Whitman, 8 Cal. 412; Const., Art. 4, sec. 17.]

"The fact that the civil regulation finds support in the religious opinions of a vast majority of the people of California is no argument against its establishment. It would be fortunate for society if all wise civil rules obtained a ready obedience from the citizen, not merely from the requirements of the law, but from conscientious or religious convictions of their obligation. The law against homicide is not the less wise and necessary because the Divine command is, 'thou shalt do no murder.' The legislation against perjury is not the less useful and essential for the due administration of justice because the injunction comes from the Most High, 'thou shalt not bear false witness against thy neighbor.' The establishment by law of Sunday as a day of rest from labor, is none the less a beneficent and humane regulation, because it accords with the Divine precept that upon that day 'thou shalt do no manner of work; thou, and thy son, and thy daughter, thy man-servant and thy maid-servant, thy cattle, and the stranger that is within thy gates.'"

In State v. Ambs, 20 Mo. l. c. 217, Judge Scott, in speaking for this court, said:

"Long before the convention which framed our Constitution was assembled, experience had shown that the mild voice of Christianity was unable to secure the due observance of Sunday as a day of rest. The arm of the civil power had interposed. The convention sat under a law exacting a cessation from labor on Sunday. [1 Edward's Compilation, 302.] The journal of the convention will show that this law was obeyed by its members as such, by adjournments from Saturday until Monday. In the tenth section of the fourth article of the Constitution it is provided that, if the Governor does not return a bill within ten days (Sundays excepted), it shall become a law without his signature. Although it may be said that this provision leaves it optional with the Governor, whether he will consider bills or not on Sunday, yet, regard being had to the circumstances under which it was inserted, can any impartial mind deny that it contains a recognition of the Lord's day, as a day exempt by law from all worldly pursuits? The framers of the Constitution, then, recognized Sunday as a day to be observed, acting themselves under a law which exacted a compulsive observance of it. If a compulsive observance of the Lord's day, as a day of rest, had been deemed inconsistent with the principles contained in the Constitution, can anything be clearer than, as the matter was so plainly and palpably before the convention, a specific condemnation of the Sunday law would have been engrafted upon it. So far from it, Sunday was recognized as a day of rest, when, at the same time, a cessation from labor on that day was coerced by a penalty. They, then, who engrafted on our Constitution the principles of religious freedom therein contained, did not regard the compulsory observance of Sunday as a day of rest a violation of those principles. They deemed a stat-

ute compelling the observance of Sunday necessary to secure a full enjoyment of the rights of conscience. How could those who conscientiously believe that Sunday is hallowed time, to be devoted to the worship of God, enjoy themselves in its observance admidst all the turmoil and bustle of worldly pursuits, amidst scenes by which the day was desecrated which they conscientiously believed to be holy? The Sunday law was not intended to compel people to go to church, or to perform any religious act, as an expression of preference for any particular creed or sect, but was designed to coerce a cessation from labor, that those who conscientiously believed that the day was set apart for the worship of God, might not be disturbed in the performance of their religious duties. Every man is free to use the day for the purpose for which it is set apart or not, as he pleases. If he sees proper to devote it to religious purposes, the law protects him from the disturbance of others; if he will not employ himself in religious duties, he is restrained from interrupting those who do. Thus the law, so far from affecting religious freedom, is a means by which the rights of conscience are enjoyed. It cannot be maintained that the law exacting a cessation from labor on Srnday compels an act of religious worship. Because divines may teach their churches that the reverential observance of the Lord's day is an act of religious worship, it by no means follows that the prohibition of worldly labor on that day was designed by the General Assembly as an act of religion. Such an idea can only be based on the supposition of an entire ignorance in the Legislature of the nature of the worship which God exacts from his creatures. A compliance with the law, induced by a fear of its penalties, could never be regarded as an act acceptable to the Deity. No act of worship, unless dictated by heartfelt love, can be pleasing to the Almighty. God listens alone to the voice of the heart.''

And in the case of Commonwealth v. Louisville & Nashville Railroad Company, 80 Ky. l. c. 298, the court said: ''The statute (the Sunday statute) is only a civil regulation enacted from motives of public policy, and to discuss it in a religious point of view would be to attribute to the Legislature the exercise of a power it does not possess, that is, the power to enforce the performance of religious duties.''

In Hennington v. Georgia, 90 Ga. 396, l. c. 397-398, being the case reported in 163 U. S. 299, supra, Chief Justice BLECKLEY, in speaking for the court, said: ''There can be no well-founded doubt of its being a police regulation, considering it merely as ordaining the cessation of ordinary labor and business during one day in every week; for the frequent and total suspension of the toils, cares and strain of mind or muscle incident to pursuing an occupation or common employment, is beneficial to every individual, and incidentally to the community at large, the general public. Leisure is no less essential than labor to the well-being of man. Short intervals of leisure at stated periods reduce wear and tear, promote health, favor cleanliness, encourage social intercourse, afford opportunity for introspection and retrospection, and tend in a high degree to expand the thoughts and sympathies of people, enlarge their information, and elevate their morals. They learn how to be, and come to realize that being is quite as important as doing. Without frequent leisure, the process of forming character could only be begun; it could never advance or be completed; people would be mere machines of labor or business—nothing more. If a law which, in essential respects, betters for all the people the conditions, sanitary, social and individual, under which their daily life is carried on, and which contributes to insure for each, even against his own will, his minimum allowance of leisure, cannot be rightly

classed as a police regulation, it would be difficult to
imagine any law that could.''

That court further said: ''With respect to the
selection of the particular day in each week which
has been set apart by our statute as the rest day of
the people, religious views and feelings may have had
a controlling influence. We doubt not that they did
have; and it is probable that the same views and
feelings had a very powerful influence in dictating the
policy of setting apart any day whatever as a day of
enforced rest. But neither of these considerations is
destructive of the police nature and character of the
statute. If good and sufficient police reasons under-
lie it, and substantial police purposes are involved
in its provisions, these reasons and purposes con-
stitute its civil and legal justification, whether they
were or not the direct and immediate motives which
induced its passage, and have for so long a time kept
it in force. Courts are not concerned with the mere
beliefs and sentiments of legislators, or with the mo-
tives which influence them in enacting laws which are
within legislative competency. That which is properly
made a civil duty by statute is none the less so because
it is also a real or supposed religious obligation; nor
is the statute vitiated, or in anywise weakened, by the
chance, or even the certainty, that in passing it the leg-
islative mind was swayed by the religious rather than
by the civil aspect of the measure. Doubtless it is a
religious duty to pay debts, but no one supposes that
this is any obstacle to its being exacted as a civil duty.
With few exceptions, the same may be said of the whole
catalogue of duties specified in the Ten Command-
ments. Those of them which are purely and exclusive-
ly religious in their nature cannot be or be made civil
duties, but all the rest of them may be, in so far as they
involve conduct as distinguished from mere opera-
tions of mind or states of the affections. Opinions
may differ, and they really do differ, as to whether

abstaining from labor on Sunday is a religious duty; but whether it is or not, it is certain that the Legislature of Georgia has prescribed it as a civil duty. The statute can fairly and rationally be treated as a legitimate police regulation, and thus treated, it is a valid law. There is a wide difference between keeping a day holy as a religious observance and merely forbearing to labor on that day in one's ordinary vocation or business pursuit.''

To the same effect are the following cases: Commonwealth v. Has, 122 Mass. 40-42; Specht v. Commonwealth, 8 Pa. St. 312, 322; Frolickstein v. Mobile, 40 Ala. 725; Ex parte Andrews, 18 Cal. 678 (in which the dissenting opinion of Mr. Justice FIELD in Ex parte Newman, 9 Cal. 502, was approved); State v. Railroad, 24 W. Va. 783; Scales v. State, 47 Ark. 476; Mayor v. Linck, 12 Lea, 499, 515; 27 Am. & Eng. Ency. Law, 388.

As previously stated, it is clearly settled by all the authorities that in contemplation of law, Sunday is simply a civil regulation, designed as a day of rest and to promote the health, intelligence, morals, peace, happiness and the general well-being of the citizens of the State, and not as a religious institution, set apart and devoted to religious worship. That being true, then, unquestionably, the Legislature had the same power and authority to declare what acts of labor of to-day are of necessity within the meaning of said section 2240, Revised Statutes 1899, as it originally had when that statute was first enacted, exempting household duties and other work of necessity from the operation thereof; and having so declared by the Act of 1907, that all railroads should run at least one regular passenger train each way every day over all of their lines or parts of lines in this State, that was a legislative declaration that such public service is a work of necessity within the meaning of said section.

In this connection it might shed some light upon the question to state that "*judicial proceedings upon Sunday* are prohibited by the common law. Any other business can lawfully be done upon that day, except so far as it is prohibited by statute." Boynton v. Page, 13 Wend. l. c. 429; Eden v. People, 161 Ill. 296; 27 Am. & Eng. Ency. Law, 389.]

The general policy of this country regarding the preservation of Sunday as a day of rest is better stated in the case of Carver v. State, 69 Ind. 61, than in any case to which my attention has been called. There it is said:

"The condition of a country, the form of its government, the history of its inhabitants, their pursuits, general intelligence, modes of life, manners and habits, enter into the construction of the laws made to govern them; and laws are not made so much for their abstract perfection as for their adaptability to the people they govern. We must also look to the period of the world at which they were enacted to get at their meaning, that meaning being the true intent and purpose of the legislative power that enacted them. What, then, did the Legislature mean by the use of the words 'works . . . of necessity,' in the law under consideration? The word 'necessity' means (1) irresistible force, (2) inevitable consequence. But these are not its true meanings when used in a law touching the voluntary conduct of men. It means, (3) being necessary, (4) something that is necessary. We say, 'The necessities of our nature; the necessaries of life. Habit and desire create necessities; but nature requires only necessaries.' Sometimes the word 'necessity' means no more than 'occasion,' or that which gives rise to something else. [Worcester.] We are not to seek the physical, metaphysical, philosophical, scientific, moral, or theological meaning of the word 'necessity'; but its legal meaning, as applicable to the rights, duties and conduct of men. Sailing

ships, running steamboats and railroad trains, carrying the mails, operating telegraph lines, keeping up water-works and gasworks, carrying on distilleries, breweries, and running flouring mills, are not prohibited on Sunday, we believe, anywhere in the civilized world, and seldom regulated any differently on Sunday than on a week day; and large manufactories, blast-furnaces, salt-works, oil wells, and other pursuits wherein heavy machinery is used, and where a stoppage is attended with loss or inconvenience, are seldom interfered with in their operations on Sunday by legal restriction.

"The earliest regulation we find touching Sunday, as a civil institution, was an edict of Constantine, A. D. 321, which declared that 'on the venerable day of the Sun, let the magistrates and people residing in cities rest, and let all workshops be closed. In the country, however, persons engaged in the work of cultivation may freely and lawfully continue their pursuits, because it often happens that another day is not so suitable for grain-sowing or for vine-planting, lest by neglecting the proper moment for such operation the bounty of Heaven should be lost.' This edict was modified by various provisions of the civil law, A. D. 326, 368 and 386. In the year 469 all legal proceedings were prohibited on Sunday. These regulations were adopted by the several rulers of the Heptarchy, continued after their union under Egbert, and subsequently confirmed by William the Conqueror, as a part of the common law. [Swann v. Broome, 3 Burr. 1595.]

"By an act of Parliament, A. D. 1552, 5 and 6 Edward VI. c. 3, it was declared that nothing in the Scriptures prescribed any certain day upon which Christians should refrain from labor, and enacted that Sunday and certain other days should be observed as holidays, provided that, when necessity might require, it should be lawful 'to labor, ride, fish, or work

any kind of work.' The king further ordered 'that the lords of the council should upon Sundays attend to the public affairs of his realm, dispatch answers to letters for the good order of the State, and make full dispatches of all things concluded the week before.' James I, in his Book of Sports, declared that 'our pleasure is after the end of divine service; our good people be not disturbed, letted or discouraged from any lawful recreation.' This regulation was confirmed by Charles I. By the statute 29 Charles II. c. 7, it was enacted that 'no tradesman, artificer, workman, laborer, or other person whatever, shall do or exercise any worldly labor, business or work of their ordinary callings upon the Lord's day, or any part thereof, works of necessity and charity only excepted.' This statute, we believe, remains substantially the law of England to the present day, with a tendency, however, to relax the stringency of former decisions. By this statute the sale of meat in public houses, and milk at certain hours, on Sunday is not prohibited. [4 Bl. Com. 63.]

"In the United States, where religion can be neither opposed nor supported by law, and where Sunday, under the law, is viewed purely in a secular light, the tendency naturally is to relax the restrictions of the Sunday laws in all things which do not interfere with the rights of others, and do not annoy or discomfort the public generally. The present statute of this State, we believe, is substantially in harmony with the Sunday laws in the several States of the Union. Throughout the civil law from Constantine, or the common law and statutes of England from William the Conqueror, and the statutes of the several States of the Union, we have found no case which holds the performance of ordinary domestic services in a household on Sunday, or the performance on Sunday of the ordinary services necessary to carry on, in the usual manner, a hospital, almshouse, hotel or other public institution

of the kind, to be within the statutory laws prohibiting labor or Sunday. All such services are uniformly held to be exceptions under the law. [Rex v. Cox, 2 Burr. 785; Rex v. Younger, 5 T. R. 449; Commonwealth v. Nesbit, 34 Pa. St. 398; Flagg v. Millbury, 4 Cush. 243; Bennett v. Brooks, 9 Allen, 118; Commonwealth v. Knox, 6 Mass. 76; Commonwealth v. Sampson, 97 Mass. 407; Doyle v. Railroad, 118 Mass. 195; Crosman v. Lynn, 121 Mass. 301.]

"There is a difference between a work which may be done on one day as well as another, and which is not a daily need, and a work necessary to supply a constant daily want. There is no necessity for working in a shop, ploughing a field, selling from a store, opening an office, going to the exchange or mart of commerce, or working at any common labor or usual avocation, on Sunday; but there is a daily necessity for putting a house in order, cooking food, taking meals, drinking coffee or tea, smoking a cigar by those who have acquired the habit, or continuing any other lawful habit, on Sunday, the same as there is upon a week day; and whatsoever is necessary and proper to do on Sunday to supply this constant daily need, is a work of necessity within the fair meaning of the law under consideration.

"In this State it has been held that manufacturing malt beer, gathering and boiling sugar-water to prevent its waste, receiving the verdict of a jury by a court, and gathering the fruits of the earth to prevent their decay and taking them to the market-place on Sunday are works of necessity within the meaning of the present act. [Crocket v. State, 33 Ind. 416; Morris v. State, 31 Ind. 189; Jones v. Johnson, 61 Ind. 257; Wilkinson v. State, 59 Ind. 416.] In the last case, the true rule, we think was laid down by Howk, J., namely, that labor performed on Sunday, which is necessary, under any particular state of circumstances, for the accomplishment of a lawful purpose, is

not a violation of the Sunday law. [See, also, Edgerton v. State, 67 Ind. 588, and Turner v. State, 67 Ind. 595.]

"Keeping a hotel in this State on Sunday is not unlawful. Keeping a hotel on Sunday, in the same way that it is usually kept on a week day, is not unlawful. It follows, then, that if a hotel keeps a cigar stand, which is a part of its establishment, from which it sells cigars to its guests, boarders and customers, on a week day, to sell cigars from the same stand in the same way on Sunday is not unlawful. Indeed, we see no difference, legally, between the act of selling a cigar under such circumstances, and the act of furnishing a cup of tea or coffee, a meal of victuals, or supplying any other daily want, to a customer on Sunday for pay.

"In this view of the case, it is clear that the evidence does not support the conviction.

"The judgment is reversed and the cause remanded, with instructions to sustain the motion for a new trial, and for further proceedings in accordance with this opinion."

The State of Kentucky has a statute almost identical with section 2240 of our State, prohibiting the performance of labor on Sunday, 'except the ordinary household offices, or other work of necessity or charity.' But that State has no such statute as the Act of 1907, before mentioned. In the case of Commonwealth v. Louisville & Nashville Railroad Co., supra, the defendant was prosecuted for running its passenger trains on Sunday, in violation of the statute of that State. The defendant defended upon the ground that the running of its trains upon Sunday was work of necessity within the meaning of the exception of that statute. In discussing that question, the Court of Appeals of Kentucky in speaking through Judge PRYOR, on page 295, said:

"The meaning to be attached to the words 'or other work of necessity,' found in the act, must control the decision of this case, and if we are to attach to those words their scientific or physical meaning, that is, that the action of the company was inevitable or could not have been otherwise, its liability would at once be fixed, as it might have stopped its trains or declined to receive freight or passengers unless upon the agreement that the delay in transportation should relieve it from responsibility. Under such a ruling the cooking of food or the feeding of stock on the Sabbath might be dispensed with, and every other necessity in the way of labor that was not indispensable to man's existence.

"Could this have been the legislative intent when using such language in the statute, or shall we not interpret the words as having a legal meaning designed to apply to the wants of the citizen, adapting the language in its construction to the manners, habits, wants, and customs of the people it is to effect; and, in many cases, the rights and duties of those charged with a public or private duty, and the obligations they are under to others must also be considered in determining the character of labor falling within the statutory prohibition. It is argued in the case of Sparhawk v. The Union Passenger Railway Company, reported in 54 Pennsylvania, that it was not intended by such acts to exempt the party charged from the prohibition of the statute because his labor was a work of necessity to others, but it must be a work of necessity to him who does the labor. We do not so construe the statute. If so, why protect the apothecary who sells his medicines for the relief of the patient, or the dairyman who furnishes the milk for his customers, or the hotel-keeper who furnishes his guests with food and lodging? It is the exigencies of the object to be accomplished that determines, to a great extent, the means to be resorted to for that purpose. No safer rule, we think,

can be established, or any better definition given of the word *necessity,* than is found in the decision cited as adverse to the views therein expressed, and that is: 'The law regards that as necessary which the common sense of the country, in its ordinary mode of doing business, regards as necessary.' The change in the habits and customs of the people, and the mode and character of transporation and travel, makes that a necessity at this day that half a century since would not have been so regarded.

"It is impossible, and certainly not practicable, to draw the line of distinction with certainty between works of necessity and such labor as falls within the denunciation of the statute, and we are not disposed to venture so far as to attempt to place a limit to the meaning of the word necessity when applied to the wants of man. In the case of McGatrick against Wason, reported in 4th Ohio State, it was held 'that works of necessity are not limited to the preservation of life, health, or property from impending danger. The necessity may grow out of, or indeed be incident to, the general course of trade or business, or even be an exigency of a particular trade or business, and yet be within the exception of the act. Hence, the danger of navigation being closed may make it lawful to load a vessel on Sunday, if there is no other time to do so.'

"In the case of the Philadelphia, etc. R. R. v. Steam Towboat Co., reported in 23 Howard, the court said: 'We have shown, in an opinion delivered at this term, that in other Christian countries, where the observance of Sundays and other holidays is enforced by both Church and State, the sailing of vessels engaged in commerce, and even their lading and unlading, were classed among the works of necessity which are excepted from the operation of such laws. This may be said to be confirmed by the usage of all nations,

so far at least as it concerns commencing a voyage on that day.'

"Railroad companies, as carriers of passengers, furnish at this day almost every accommodation to the traveler that is to be found in the hotels of the country. His meals, as well as sleeping apartments, are often furnished him, and to require the train, when on its line of travel, to delay its journey that the passenger may go to a hotel to enjoy the Sabbath, where the same labor is required to be performed for him as upon the train, or to require him to remain on the train and there live as he would at the hotel, would certainly not carry out the purpose of the law, and besides, the necessity for reaching his home or place of destination must necessarily exist in so many instances as to make it indispensable that the train should pursue its way. So of the trains transporting goods, merchandise, live stock, fruits, vegetables, etc., that, by reason of delay, would work great injury to parties interested. A private carriage, in which is the owner or his family, driven by one who is employed by the month or the year, to the church in which the owner worships, or to the home of his friend or relative, on the Sabbath, is not in violation of the statute. So in reference to the use of street railroads in towns and cities on the Sabbath day. Those who have not the means of providing their own horses or carriages travel upon street-cars to their place of worship, or to visit their friends and acquaintances; and such is the apparent necessity in all such cases, that no inquiry will be directed as to the business or destination of the traveler, whether in the one case or the other, nor will an inquiry be directed as to the character of the freight being transported; nor will the person desiring to hire the horse from the livery stable be compelled to disclose the purpose in view in order to protect the keeper from the penalty of the law. Such employments are necessary, and not within the inhibition of the statute.

"The common sense, as well as the moral senti-
ment of the country, will suggest that the merchant who
sells his goods, or the farmer who follows his plow,
or the carpenter who labors upon the building, or the
saloon-keeper who sells his liquors on Sunday, are
each and all violating the law by which it is made penal
to follow the ordinary vocations of life on Sunday.
The ordinary usages and customs of the country teach
us that to pursue such employments on the Sabbath is
wrong. Every man can realize the distinction between
pursuing such vocations and that of transporting the
traveler to his home, or the pursuit of such employ-
ments as must result from the necessary practical
wants of trade."

In Southern Railway Co. v. Wallis, 133 Ga. 553,
the defendant in error sued the plaintiff in error to re-
cover damages for failure to stop one of its passenger
trains for him at a flag station on the line of its road.
The defense was substantially that the day upon which
the train mentioned was being run was Sunday, and
for that reason it was unlawful for the company to
run trains on that day, and, consequently, it owed de-
fendant in error no legal duty to stop for him at said
station. In discussing that question, the Supreme
Court of Georgia, on page 555, said: "The defendant
pleaded 'that the 2d day of February, 1908 (the day
the plaintiff avers the train failed to stop), was upon
the Sabbath day and the defendant had the right to
refuse to enter into a contract of carriage if it desired
to do so, and that it was guilty of no breach of duty
as a carrier by not stopping at said station.' The de-
fendant contends that it is under no duty to enter in-
to any contract of carriage on Sunday, nor is it under
duty to stop its passenger trains at a particular station
when run on Sunday for the purpose of receiving
passengers. This contention is not sound. At common
law contracts made on Sunday were valid and en-
forceable. [Hayden v. Mitchell, 103 Ga. 431, 440;

Bishop on Contracts (2 Ed.), sec. 536.] Nor was it crime at common law to pursue one's ordinary calling on the Sabbath day.    [Bishop, supra, sec. 538; 2 Bishop's New Crim. Law, secs. 950 *et seq.*]    By statute the doing of certain acts on the Sabbath day has been made penal.   And a contract made on the Sabbath day in furtherance of a violation of a criminal statute is obnoxious to publice policy, and will not be enforced.   But unless the contract is in furtherance of a violation of a criminal statute, or is prohibited, it is valid and enforceable.    [Sanders v. Johnson, 29 Ga. 526; Dorough v. Equitable Mortgage Co., 118 Ga. 178; Red Cypress Co. v. Perry, 118 Ga. 879.] There is no statute in this State prohibiting a carrier from running a passenger train on the Sabbath day, or prohibiting it from entering into contracts of carriage on that day.   By the penal Code, section 420, it is made penal to run freight or excursion trains on the Sabbath day, but 'regular trains for the carrying of the mails or passengers' are expressly excepted therefrom.   The prohibition of the Penal Code, section 422, against any person pursuing his business or ordinary calling on the Lord's day when not a work of necessity or charity, does not apply to the running of passenger trains; otherwise it would have been idle for the General Assembly to have made the running of an excursion passenger train on the Sabbath day an indictable offense.   The two sections, 420 and 422, are *in pari materia,* and must be construed together.   It would seem that the General Assembly having expressly or by necessary implication legalized the running of passenger trains on the Sabbath day, the doing of the work necessary thereto is to be regarded as a 'work of necessity.'   But aside from this, a railroad company which runs a regular passenger train on the Sabbath will not be relieved of the performance of its legal duties incidental thereto.''

239 Sup.—18

In the case of Yonoski v. State, 79 Ind. 393, where it was shown that there was a real necessity for the repairs of a railroad track, and that the necessary work in making them could be done only on Sunday without delay of the company's trains, it was held, under a statute similar to our section 2240, prohibiting labor on Sunday, that such work was work of necessity within the meaning of the exception to the statute of that State, and that the conviction of the employees for doing the work on Sunday was contrary to law, and could not be sustained.

In the case of Edgerton v. State, 67 Ind. 1. c. 592, the plaintiff in error was prosecuted, under the statute, for desecrating the Sabbath, by performing labor on Sunday, namely, feeding hogs on Sunday. On cross-examination the plaintiff in error testified that "I did not feed them on Saturday enough to do over Sunday, because I thought they would do better to have it fresh on Sunday." In disposing of that case, the Supreme Court of Indiana said:

"We cannot see anything in this evidence out of the ordinary way of feeding hogs, in the fall of the year, before the corn is ripe enough to crib, as practiced generally in the State of Indiana by good husbandmen. The work of feeding the hogs on Sunday being lawful and necessary, the manner of feeding them —taking into view the time of year, the condition of the corn, the place where the corn was, and where the hogs were—also became lawful and necessary; and the work thus being lawful and necessary, it was lawful and necessary to feed them on Sunday, in the same manner that would be usual and proper, according to the circumstances, to feed them on a week day.

"The evidence is so clearly insufficient that we cannot approve the verdict.

"A work of necessity, within the meaning of the statute, does not mean a physical or absolute necessity; but a moral fitness or propriety in the work done, under

the circumstances of each particular case, may be deemed a work of necessity, within the meaning of the law. Nor need the necessity be dangerous to life, health or property, which is beyond human foresight or control. On the contrary, the necessity may grow out of, or be incident to, a particular trade or calling, and yet be a work of necessity within the meaning of the act. It is not the design of the law to impose onerous restrictions upon, or add burdens to any lawful trade or business. It has been held that keeping up a blast-furnace, running a mill, manufacturing gas, supplying water by water-works, furnishing milk by dairyman, gathering and boiling sugar-water, making malt beer, taking watermelons to market—according to the circumstances of each case—are works of necessity within the meaning of the law; and we think that hauling the corn and feeding hogs on Sunday, under the circumstances of this case, fall within the same principle. See the case above cited; also Morris v. State, 31 Ind. 189, and the cases there cited, and Crocket v. State, 33 Ind. 416.

"So strict a construction of the act as that held by the court below might authorize the arrest of superintendents, engineers, firemen, conductors and brakemen, while operating railroads, laborers in depots and stockyards, herdsmen and feeders of cattle, 'engaged in their usual avocations' on Sunday, and thus embarrass, if not entirely stop, the great commercial interests and leading industries of the State, a result certainly not intended by the Legislature that enacted the law."

In Murray v. Commonwealth, 24 Pa. St. 270, the court said:

"This is a summary conviction of a lock-keeper of the Schuylkill Navigation Company, for attending to his business, as such, on the Lord's day, by opening the locks for the passage of boats. Is this a civil offense? We think not.

"The Schuylkill river is a public highway; and as people are not forbidden by law, and therefore have a right, for some purposes, to pass along it, even on the Lord's day, the navigation company must keep it open, and, for this purpose, must have lock-keepers to act for them. There may, indeed, be unlawful travel on Sunday, and for such travel there can be no right to have the locks opened; but the criminality of the lock-keeper is not proved by the criminality of the travel, because, as agent of the company, *he is bound to keep the navigation open for travel, and is not made the judge of its rightness.*

"Every man travels at his own risk on Sunday, and that risk is measured legally only by the legal penalty. To stop him would be the imposition of a different penalty, tenfold more serious perhaps; and it is not the remedy of the law. Beside this, the law would not impose upon the lock-keeper the authority to judge of the rightness of the travel, without investing him with the exemption from liability for misjudgment that ordinarily belongs to judicial officers, and then the traveler would be without remedy in case of his error of judgment, and would be justified in going on in case of a decision in his favor. This would make a lock-keeper, in this respect, a more important public officer than a justice of the peace.

"True enough, the lock-keeper was engaged in his ordinary occupation; but it has never been considered that the occupation of gate-keepers on public highways and bridges is included in the Sunday laws; and the defendant's occupation is of the same sort. The turnpike-roads and bridges are not ordered to be shut on the Sabbath, and to throw them open free of toll would greatly encourage breaches of the law.

"But it is said that the act of 11th April, 1845, exempts canal companies from attending their locks on the Sabbath. So it does; but this assumes that it was their duty, before that, to attend them; and the

law designed to relieve them from one duty cannot
have the effect of imposing another upon them, and
especially one that may be enforced by a legal penalty.
It is a permission, not a command; an exemption, not
a prohibition; and no penalty can be attached to it.
The matter is left to their discretion.''

In the case of Commonwealth v. Nesbit, 34 Pa.
St. 1. c. 409, the Supreme Court of Pennsylvania tersely
and clearly stated the policy in this language:
''Necessity itself is totally incapable of any sharp
definition. What is a mere luxury, or perhaps entirely
useless or burdensome to a savage, may be a matter of
necessity to a civilized man. What may be a mere
luxury or pleasure to a poor man, may be a necessity
when he has grown rich. Necessity, therefore, can it-
self be only approximately defined. The law regards
that as necessary, which the common sense of the
country, in its ordinary modes of doing its business,
regards as necessary.''

And in Burnett v. Western Union Tel. Co., 39 Mo.
App. 1. c. 611, that court said:

''The message was tendered for transmission on
Sunday. The defendant tendered a declaration of law
to the effect that, this being the allegation in the peti-
tion and the undisputed evidence, 'the finding must be
for the telegraph company, unless the evidence fur-
ther shows that the sending of said dispatch was a
work of necessity:' also another declaration of law
as follows: 'The said dispatch was not a work of ne-
cessity, unless, under all the circumstances, it appears
from the evidence that it was absolutely requisite that
it should be sent on Sunday. But if the evidence shows
that it was a work of necessity, but that the plaintiff
neglected to send a similar dispatch or similar in-
formation on the preceding day, and by such neglect
on his part created a necessity for sending it on Sun-
day, he cannot recover.' The court also gave, at the
request of the plaintiff, the following: 'The court

declares the law to be that the necessity contemplated by the Sunday law is not an absolute necessity, but a relative necessity; and such a relative necessity may be a necessity arising from inadvertence on the part of the person pleading the necessity, but not from willfulness. The pulling of ears of barley in a field on Sunday to appease hunger, which might have been readily provided for on the preceding day, would not be, *per se*, a violation of the Sunday law.' The court also found as a fact 'that the sending of the message and transmitting of the message on Sunday was a work of necessity.' These rulings indicate the theory of the court, that the sending of this dispatch, under the circumstances disclosed in the evidence, was a work of necessity, and that it was none the less so because the necessity, which arose for sending it on Sunday, instead of the previous day, may have been due to the plaintiff's inadvertence. If the sending of this message was not a work of necessity or charity, so as to fall within the prohibition of section 1578, Revised Statutes of 1879, the plaintiff cannot recover, because no action will lie for the failure to perform an act prohibited by law. [Thompson v. Telegraph Co., 32 Mo. App. 191; Rogers v. Telegraph Co., 78 Ind. 169; Western Union Tel. Co. v. Yopst, 118 Ind. 248.] . . .

"It is a rule of appellate procedure that a case cannot be tried upon one theory, and determined in the appellate court upon another theory. But the rule has no application to cases where the judgment of the trial court is affirmed for reasons other than those on which the trial court proceeded; for, although the trial court has given the wrong reason for the right judgment, or an insufficient reason for a correct judgment, the judgment is not to be reversed, if it is supported by good reasons, and if it is an application of the law to the undisputed facts. If, therefore, the sending of this message was, under the circumstances disclosed

by the evidence, a work of charity, it was not labor or work prohibited by the statute above quoted, although it may not have been a work of necessity.

"But we think that it was a work of necessity. The undisputed evidence shows that it was intended to advise the plaintiff's wife of his whereabouts and of the time of his arrival at home, after he had been absent from home two days, a portion of his absence being protracted and unexplained to his wife—in order to allay any anxiety on her part as to his whereabouts and safety. It also shows that this fact was communicated to the agent of the defendant, who received the dispatch. We are of opinion that this was a work of necessity within the meaning of the statute. In Massachusetts, where the court has gone as far, perhaps, as any court in the Union in upholding laws against what is called Sabbath-breaking, it has been said: 'By the word "necessity" in the exception, we are not to understand a physical and absolute necessity, but a moral fitness or propriety of the work and labor, done under the circumstances of any particular case, may well be deemed necessity within the statute.' [Flagg v. Inhabitants of Millbury, 4 Cush. (Mass.) 243.] We think that the common sense of those who are most rigorously in favor of Sunday observance would unite in saying that the sending of a message to a man's wife and family under such circumstances —where he had been from home an unexplained and unaccountable length of time—for the purpose of allaying anxiety as to his whereabouts, would be regarded as a work of necessity."

It will be observed from reading the last mentioned cases, that the defense interposed to the prosecution in all of them was that the labor performed on Sunday was a work of necessity within the exception to the general statute, prohibiting labor from being done on that day, with the exception of the case of the Southern Railway Co. v. Wallis, supra, where

a special statute authorized the company to run its passenger trains on Sundays.

If it can be logically contended and held, as shown by the foregoing cases, that the running and operation of railroad trains on Sunday, and the performance of various other acts of labor upon that day are works of necessity within the meaning of the exception to the general statute prohibiting labor on that day, then, *a fortiori,* it can be logically held that the running of trains on Sunday is a work of necessity, where it is expressly authorized, as was true in the case of Commonwealth v. Wallis, supra, or in the case at bar, where the Act of 1907 expressly requires railroad companies to run their trains on that day.

From this view of the case, we must hold that there is no inconsistency between the Act of 1907 and section 2240, Revised Statutes 1899. Said act is but a legislative declaration of the public policy of the State, regarding what are some of the modern works of necessity, which may be performed on Sunday, under the exception to the general statute prohibiting labor from being done on that day.

If that is not the meaning of the Act of 1907, then it has no meaning whatever, for the reason that all of the authorities hold that the railroad companies of the country had the authority under the exception to the general statute prohibiting labor on Sunday, to run their trains on Sunday, and there is not a case to be found in the books to the contrary.

We must presume that the Legislature, at the time of the passage of this act, was familiar with the public service that these public corporations were rendering to citizens of the State, and that they were running their trains upon and over all of their lines in the State every day in the week, with the exception of a few stubs or branch lines, such as the one mentioned in this case; and it is common knowledge that, upon those stubs, the companies have rarely, if ever, run

their trains on Sundays. That was known to the Legislature, and the Act of 1907 was enacted for the purpose of remedying that omission.

That view of the case also disposes of the various other reasons assigned by counsel for appellant as to why the Act of 1907 does not embrace Sundays—such, for instance, as that if it does include Sundays, then the act repeals section 2240, and that, too, by implication, which is not favored by the law.

While there is no authority in this State, or elsewhere, which holds that the running of trains on Sundays is not a work of necessity; but, suppose it was not a necessity prior to the passage of the Act of 1907, and also suppose that said act is in conflict with said section 2240, Revised Statutes 1899, then the appellant's compliance with the requirements of the Act of 1907 could not be construed as an unlawful act violative of said section 2240, because of the familiar canon of statutory construction, that, if a special provision applicable to a particular subject be inconsistent with a general law, the special act will prevail. [State ex rel. v. Foster, 187 Mo. l. c. 610; State v. DeBar, 58 Mo. 395; State v. Green, 87 Mo. l. c. 587.]

We are, therefore, clearly of the opinion that the Act of 1907 does apply to and include Sundays, the same as it applies to all other days of the week, and that the act requires appellant to run its trains on Sunday.

II. It is next insisted by counsel for appellant that, even though the Act of 1907 should be held to include Sundays, and to require railroad companies to run their trains on those days, it would be violative of article 14, Amendment of the Constitution of the United States, "in that it is a discrimination against employees of steam railroads, and in favor of all other vocations and the employees of all other kind of car-

riers, because labor on Sunday is not required of any other person whatever.''

We do not understand counsel to present the foregoing contention as an independent legal proposition; but even if they did so intend, the contention, in our opinion, is not well founded.

For the sake of argument we will assume, for the present only, that the Act of 1907 applies to the employees of steam railroads, as contended for by counsel for appellant.

Upon that assumption, we have no hesitancy in holding that the employees of steam railway companies constitute a reasonable and natural classifica-tion of persons within the meaning of the Constitu-tion prohibiting discrimination. It has been repeated-ly held by this court, and by the Supreme Court of the United States, that said constitutional provision does not prevent legislation which embraces all persons or things that naturally belong to the same class, and are similarly situated, and upon whom the legislation must operate equally and uniformly. [State ex inf. v. Standard Oil Co., 218 Mo. 1.]

This court in the case of White v. Railroad, 230 Mo. 287, has gone much further in the classification of persons for legislative purposes than we have in any other case to which my attention has been called. There, this court upheld the constitutionality of an act of the Legislature which divided the employees of steam railroads into two classes, namely: The one embracing all such employees who are sued on demands not exceeding $200, and the other includes all such employees who are sued on demands exceeding the sum of $200. While that case did not receive the unanimous support of the court, however it is binding authority in this State until it is overruled; and that being true, it is unquestionably controlling in this case. But here we are not bound to go to that extent of classification in order to uphold the Act of 1907. In the case at bar

counsel for appellant make no claim that the Act of 1907 subdivides the employees of steam railroads into two classes, as did the act considered in the White case.

But, as previously suggested, the last contention was not intended as an independent proposition, but it is predicated upon the further contention that the appellant cannot run Sunday trains without the labor of employees, and that it cannot compel its employees to labor on Sunday, for two reasons:

"First. Because requiring them to labor on Sunday is a discrimination against them, which the law will not permit, and which the defendant cannot enforce; and,

"Second. Because requiring them to labor on Sunday would prevent them from keeping that day sacred and worshiping thereon, thereby interfering with their religious liberty, and the court cannot assume that railroad employees are not Christians and have no religious scruples."

By coupling the two last contentions together, as counsel have, they insist that the Act of 1907, as applied to employees of steam railways, is violative of section 5 of article 2 of the Constitution of this State, which reads as follows:

"That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no person can, on account of his religious opinions, be rendered ineligible to any office of trust or profit under this State, nor be disqualified from testifying, or from serving as a juror; that no human authority can control or interfere with the rights of conscience; that no person ought, by any law, to be molested in his person or estate, on account of his regligious persuasion or profession; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, nor to justify practices inconsistent with the good

order, peace or safety of this State, or with the rights of others.''

This contention of appellant is untenable, for the reason that the Act of 1907 does not mention railroad employees, nor does it require them to labor on Sunday or upon any other day, much less does it require them to work upon that day, or prescribe a penalty for their failure to do so.

I suppose it would not be seriously contended, that, if an employee of a railroad company should refuse to work upon Sunday, that he could be legally arrested, tried and convicted under the Act of 1907, or under any other statute or law of this State for such failure.

That being unquestionably true, then clearly that act cannot and does not discriminate between employees of steam railroads and the employees of persons following other vocations of life, as previously held, nor interfere with their religious freedom or right to worship God according to the dictates of their own conscience, which are so sacredly guaranteed to all by section 5 of article 2 of the Constitution of this State.

And we might with propriety here add, that there is no employee of the railroads before the court complaining of the Act of 1907; and as to them, we will not attempt to cross the bridge before we come to it. ''Sufficient unto the day is the evil thereof.''

The probability of our ever being required to cross that bridge is so remote that it is not at this time worthy of consideration: First, because, as before stated, there is no law depriving the employees of their religious liberty; and, second, because, even though such a law should be enacted, railroad employees would have to experience quite a change in religious convictions before they would refuse to so labor on Sunday, or complain of said act of the Legislature.

Common observation and experience teach us that their religious scruples do not now prevent them from

operating railroad trains on Sundays. We see thousands of them in this State, and hundreds of thousands of them in this country, engaged in operating railroad trains on Sunday, as well as other days; and should this court in the face of that well-known condition of things hold the Act of 1907 unconstitutional because it might deprive railroad employees of their religious liberty when applied to stub lines, and at the same time permit railroad companies to run their trains over their trunk lines on the same day (which according to all the authorities it must do) would but stultify itself, and be likened unto "ye blind guides, which strain at a gnat and swallow a camel."

But independent of all this, I know of no law, human or divine, which condemns work of necessity or of charity to be performed on the Sabbath day. In all Christendom, all nations thereof, either by express statute or by some rule of conduct, expressly authorize the same.

Christ taught the lawfulness to perform such labor on Sunday:

"1. At that time Jesus went on the Sabbath day through the corn; and his disciples were an hungred, and began to pluck the ears of corn and to eat.

"2. But when the Pharisees saw it, they said unto him, Behold, thy disciples do that which is not lawful to do upon the Sabbath day.

"3. But he said unto them, Have ye not read what David did when he was an hungred, and they that were with him:

"4. How he entered into the house of God, and did eat the shew-bread, which was not lawful for him to eat, neither for them which were with him, but only for the priests?

"5. Or have ye not read in the law, how that on the Sabbath days the priests in the temple profane the Sabbath, and are blameless?

"6. But I say unto you, That in this place is one greater than the temple.

"7. But if ye had known what this meaneth, I will have Mercy, and not sacrifice, ye would not have condemned the guiltless.

"8. For the Son of man is Lord even of the Sabbath day.

"9. And when he was departed thence, he went into their synagogue;

"10. And behold, there was a man which had his hand withered. And they asked him, saying, Is it lawful to heal on the Sabbath days? that they might accuse him.

"11. And he said unto them, What man shall there be among you that shall have one sheep, and if it fall into a pit on the Sabbath day, will he not lay hold on it, and lift it out.

"12. How much then is a man better than a sheep? Wherefore it is lawful to do well on the Sabbath days.

"13. Then saith he to the man, Stretch forth thine hand. And he stretched it forth; and it was restored whole, like as the other." [Matthew, xii, 1 to 13, inclusive.]

Those laws and that *ex cathedra* teaching establish the fact that the Sabbath was made for man and not man for the Sabbath. In other words, there has never been a time when the law of God or those of man have prohibited work of necessity or of charity from being done on the Sabbath day; and why then all this ado about religious liberty and conscientious scruples against working on Sunday, etc., I am unable to comprehend.

As before stated, there is no law to compel any one to work for a railroad company, nor to serve upon the police force, fire department, in the postal service, or in the various eleemosynary institutions of the State, yet there is no shadow of doubt in my mind but

what the Legislature of the State has the constitutional power to require all persons while so employed or serving any of those institutions to perform the ordinary duties incident to such employment on Sundays the same as on other days of the week.

The personal freedom of the citizen of this country, guaranteed by both State and Federal Constitutions, would prevent the Legislature from enacting any valid law which would compel involuntary servitude, either in public institutions or private industries, penal instiutions, for instance, such as penitentiaries, of course, excepted; but when the citizen voluntarily enters the service of any of those public institutions, he, by necessary implication, even in the absence of any law, impliedly, at least, agrees to discharge his duties in the premises on Sunday, the same as on other days of the week.

And in pursuance to that implied agreement, it is a well-known fact that every policeman, fireman, postal officer or clerk, and eleemosynary employees do perform their duties on Sundays as they do on other days of the week; and because of the public character of, and the great necessity for the performance of those duties on each and every day in the year in those institutions, that would justify the Legislature in enacting laws which would compel all such employees to perform those duties on Sundays, so long as they voluntarily remained connected with them. Nor would such a law, in my judgment, offend against either the State or Federal Constitution. Under such a law any person who has conscientious scruples against working on Sunday need not enter into their service, and all officers and employees whose conscience should become quickened against laboring on the Sabbath day might resign their positions and thereby relieve themselves from the performance of all labor on that day. But who, for an instant, would contend, because some one or more of such employees might

have conscientious scruples against working on Sunday, that the police and fire departments of our great cities, that the United States mails, or that the eleemosynary institutions of the State, should be closed on Sundays?

The proposition that a policeman is under no legal obligation to arrest a criminal or suppress a riot on Sunday; that a fireman may with impunity permit a city to be consumed by fire on the Sabbath day; that the individual mind of a postal employee may paralyze the postal service of the entire country, or that an attendant may suffer the unfortunate inmates of our eleemosynary institutions to go hungry and dirty on the first day of the week, commonly called Sunday, is to my mind monstrous, and should not and will not be tolerated by an enlightened, civilized Christian people; and if there is no law which can prevent the officers and employees of such institutions from bringing about those disturbing, deplorable and dangerous conditions to society, then the sooner they are enacted the better off will society and the State be.

The foregoing observations apply with equal force to railroad companies, for the reason that railroads are public highways and common carriers of passengers and freight. [Art. 12, secs. 1-14, Constitution of Missouri, 1875.] These roads are the great arteries of commerce, connecting the various dependent sections of the country with each other; they traverse every State and Territory of the Union, and penetrate almost every county, city, town and hamlet in the country; they gather together the products of the farm, garden and orchard, as well as the output of the mines, and distribute them to the marts of the great cities; supply the factories with raw material and deposit the surplus at the sea-board for exportation to foreign countries. In return they distribute the fabrics of the industrial institutions to the millions of consumers throughout the length and breadth of the United

States, thereby equalizing production and consumption, and at the same time furnishing employment and plenty to the people of all sections of the country.

The people of our great cities, who are numbered by the millions, are dependent upon the railroads for their daily bread; and, under the modern changes in the industrial conditions, the country people must look to the railroads for most of their fabrics, including clothing and farm implements. They also afford the people of this vast country the means of intercourse with each other, carry the United States mail, and disseminate knowledge to the citizens of the entire Union, which is so essential to the wisdom and stability of good government, both State and National, and which also contributes so largely to the peace and happiness of our citizens.

Up to the date of the passage of this Act of 1907, there was no law in this State, or country, to which our attention has been called, requiring railroad companies to perform those valuable services to the public on Sundays. Prior to that date, the State and Federal Governments seem to have relied entirely upon the patriotism, good sense and self-interest of the companies to perform those indispensable services on those days; but the observation and experience of the various members of the Legislature taught them that the companies would not always perform those services, especially upon short lines, where the expenses of running the trains were equal to or greater than were the receipts from the traffic. By that neglect of duty on the part of the companies, the people residing along those short lines were greatly damaged and inconvenienced. They could neither leave home or return thither, if absent therefrom on Sundays, however necessary it might have been for them to have done so; nor could they receive their mail

upon those days. In other words, those people were practically shut out from the rest of the world one day out of every seven, to their great annoyance, inconvenience and damage. In order to remedy this evil the Act of 1907 was passed.

In oral argument it was suggested that the necessity for running trains on the branch road in question from Worth to Grant City could not have been very great, because of the limited number of people residing there. It occurs to us that such argument manifests an erroneous conception of the situation. While it is true there are not as many people residing along this line of road and in these two small towns as there are living along other and longer lines and in larger cities, nevertheless their necessities for railroad transportation are just as great to them as they are to those who reside in the more densely populated districts of the State.

From the foregoing view of the situation, it seems to us that the Legislature was amply justified in passing the Act of 1907; and that it had the power to compel the railroads of the State to operate their roads and to run daily trains thereon to accommodate the public will, we suppose, scarcely be questioned. [Commonwealth v. Railroad, 120 Ky. 91; State v. Railroad, 29 Conn. 538; People ex rel. v. Railroad, 70 N. Y. 569.]

The latest and one of the ablest opinions discussing this question is that of Mr. Justice WHITE in the case of Atlantic Coast Line v. North Carolina Corporation Commission, 206 U. S. 1. In that case two questions were decided, first, the power of the State to compel the company by statute to run its trains over one of its lines from Rocky Mount to Selma, in the State of North Carolina; and, second, the constitutionality of the statute, where the evidence showed that the daily cost to operate the train between those two points was $40, and that the total daily

receipts therefrom was only $25, or a net loss of $15 per day. Under that showing, the railroad company contended that the act was unconstitutional, null and void, because it deprived the company of its property without just compensation. In discussing those questions, Mr. Justice WHITE, in speaking for the Supreme Court of the United States, said:

"[It is contended] that, however otherwise just and reasonable the order may have been, it is inherently unjust and unreasonable because of the nature of the burden which it necessarily imposes.

"This proposition is based on the hypothesis that the order, by necessary intendment, directed the Coast Line to operate an additional train, although such train could not be operated without a daily pecuniary loss. The premise upon which this proposition rests would seem to be irrelevant, since the court below in one aspect of its opinion treated the order of the commission as not requiring the operation of an extra train from Rocky Mount to Selma. Yet, as the facts found by the commission and which were affirmed by the court would indicate that it was considered that the operation of such train was the most direct and efficient means for making the ordered connection, and as the court considered and passed upon the duty of the railroad to comply with the order, even if to do so it became necessary to operate the extra train at a loss, we think the proposition relied upon is open and must be decided. The contention is that the fact that some loss would result from the requirement that the extra train be operated, in and of itself, conclusively establishes the unreasonableness of the order and demonstrates that to give it effect would constitute a taking of property without due process of law in violation of the Fourteenth Amendment. Conclusive support for this contention, it is insisted, is afforded by the doctrine upheld in Smyth v. Ames, 169 U. S. 466, and the cases which preceded that decision.

The cases relied upon, however, only involved whether a general scheme of maximum rates imposed by State authority prevented the railroads from earning a reasonable compensation, taking into view all proper considerations as to the value of the property and the cost of operation, and, if not, whether the enforcement of rates so unreasonably low would be unjust and unreasonable, and, therefore, be confiscation, that is, a taking of the property without due process of law in violation of the Constitution of the United States. The principle upon which the cases in question proceeded was thus summed up by Mr. Justice HARLAN, delivering the opinion of the court in Smyth v. Ames, 169 U. S. 526:

" 'A State enactment, or regulations made under the authority of a State enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would therefore be repugnant to the Fourteenth Amendment of the Constitution of the United States.'

"But this case does not involve the enforcement by a State of a general scheme of maximum rates, but only whether an exercise of State authority to compel a carrier to perform a particular and specified duty is so inherently unjust and unreasonable as to amount to the deprivation of property without due process of law or a denial of the equal protection of the laws. In a case involving the validity of an order enforcing a scheme of maximum rates of course the finding that the enforcement of such scheme will not produce an adequate return for the operation of the railroad, in and of itself demonstrates the unreasonableness of the order. Such, however, is not the case when the question is as to the validity of an order to

do a particular act, the doing of which does not involve the question of the profitableness of the operation of the railroad as an entirety. The difference between the two cases is illustrated in Railroad v. Gill, 156 U. S. 649, and Railroad v. Minnesota, 186 U. S. 257. But even if the rule applicable to an entire rate scheme were to be here applied, as the findings made below as to the net earnings constrain us to conclude that adequate remuneration would result from the general operation of the rates in force, even allowing for any loss occasioned by the running of the extra train in question, it follows that the order would not be unreasonable, even if tested by the doctrine announced in Smyth v. Ames, and kindred cases.

"It is insisted that, although the case be not controlled by the doctrine of Smyth v. Ames, nevertheless, the arbitrary and unreasonable character of the order results from the fact that to execute it would require the operation of a train at a loss, even if the result of the loss so occasioned would not have the effect of reducing the aggregate net earnings below a reasonable profit. The power to fix rates, it is urged, in the nature of things, is restricted to providing for a reasonable and just rate, and not to compelling the performance of a service for such a rate as would mean the sustaining of an actual loss in doing a particular service. To hold to the contrary, it is argued, would be to admit that a regulation might extend to directing the rendering of a service gratuitously or the performance of first one service and then another and still another at a loss, which could be continued in favor of selected interests until the point was reached where by compliance with the last of such multiplied orders the sum total of the revenues of a railroad would be reduced below the point of producing a reasonable and adequate return. But these extreme suggestions have no relation to the case in hand. Let it be conceded that if a scheme of maximum rates was

imposed by State authority, as a whole adequately remunerative, and yet that some of such rates were so unequal as to exceed the flexible limit of judgment which belongs to the power to fix rates, that is, transcended the limits of just classification and amounted to the creation of favored class or classes whom the carrier was compeled to serve at a loss, to the detriment of other class or classes upon whom the burden of such loss would fall, that such legislation would be so inherently unreasonable as to constitute a violation of the due process and equal protection clauses of the Fourteenth Amendment. Let it also be conceded that a like repugnancy to the Constitution of the United States would arise from an order made in the exercise of the power to fix a rate when the result of the enforcement of such order would be to compel a carrier to serve for a wholly inadequate compensation a class or classes selected for legislative favor even if, considering rates as a whole, a reasonable return from the operation of its road might be received by the carrier. Neither of these concessions, however, can control the case in hand, since it does not directly involve any question whatever of the power to fix rates and the constitutional limitations controlling the exercise of that power, but is concerned solely with an order directing a carrier to furnish a facility which it is a part of its general duty to furnish for the public convenience. The distinction between an order relating to such a subject and an order fixing rates coming within either of the hypotheses which we have stated is apparent. This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unrea-

sonableness, as would be the case where the whole scheme of rates was unreasonable under the doctrine of Smyth v. Ames, or under the concessions made in the two propositions we have stated. Of course, the fact that the furnishing of a necessary facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance.''

Upon the foregoing authorities we hold that the Act of 1907 was within the constitutional power of the Legislature to enact; and, also, that it does not deprive the appellant of its property without just compensation.

IV. The constitutionality of the Act of 1907 is also challenged, because it is said that it unjustly discriminates against the appellant and in favor of others similarly situated.

Counsel have not suggested in what manner the act discriminates against appellant, and we are unable to see in what possible way it could do so, inasmuch as its provisions are applicable alike to all ''persons, co-partnerships, companies or corporations operating any railroad.''

Such a law is not discriminatory in character. So hold the following authorities: Humes v. Railroad, 82 Mo. l. c. 231; Mo. Pac. Ry. Co. v. Humes, 115 U. S. l. c. 523; Health Department v. Rector, 145 N. Y. 32; N. Y. & N. E. R. R. Co. v. Bristol, 151 U. S. l. c. 571; State v. Swagerty, 203 Mo. 517; State v. Cantwell, 179 Mo. 245; Grainger v. Douglass Park Jockey Club,

148 Fed. 513; Baldwin's American Railroad Law, pp. 213, 217; 2 Elliott on Railroads (2 Ed.), p. 82, sec. 709.

V. Counsel for appellant finally insist that the Act of 1907 is violative of the interstate commerce clause of the Constitution of the United States (Sec. 8, Art. 1) as applied to it in this case.

The ground of this insistence, in the language of the counsel is, that "the agreed statement of facts shows that the only passenger trains operated through Worth county on week days on the track in question run between St. Joseph, Missouri, and Chariton, Iowa; and the State claims it is the duty of defendant to run the same train on Sunday. It would then be an interstate train, presumably carrying interstate passengers; and a State law which would require the running of an interstate train on Sunday (or any other day) would be an attempt by the State to regulate interstate commerce, and therefore void."

This insistence of counsel is unsound both in law and fact. The Act of 1907 does not undertake to compel the appellant to run the trains between St. Joseph, Missouri, and Chariton, Iowa, or from any other point in this State to any other point in Iowa, or other State, but simply requires appellant to run at least one passenger train each way over the line in question within this State on each and every day of the week. That act does not require appellant to run any train one inch beyond the boundaries of Missouri. Independent of the interstate commerce clause of the Constitution, the Legislature of this State has no such extra-territorial authority. Its legislative power is limited to the confines of this State.

It is fundamental that legislative enactments of a State have no extra-territorial force or operation; and it was not the design of our Legislature that the Act of 1907 should have any such force.

This same view of the subject was expressed by the Supreme Court of the United States in the case of Lake Shore & Michigan Southern Ry. Co. v. Ohio, 173 U. S. 285, and on page 306, Mr. Justice HARLAN, in speaking for the court, said: "A statute of Illinois was construed by the Supreme Court of that State as prescribing rates not simply for railroad transportation beginning and ending within Illinois, but for transportation between points in Illinois and points in other States under contracts for continuous service covering the entire route through several States. Referring to the principle contained in the statute, this court held that if restricted to transportation beginning and ending within the limits of the State it might be very just and equitable, but that it could not be applied to transportation through an entire series of States without imposing a direct burden upon interstate commerce forbidden by the Constitution. In the case before us there is no attempt upon the part of Ohio to regulate the movement of the defendant company's interstate trains throughout the whole route traversed by them. It applies only to the movement of trains while within the State, and to the extent simply of requiring a given number, if so many are daily run, to stop at certain places long enough to receive and let off passengers."

The only distinction there is between that case and this one is, that there the statute under consideration was dealing with the goods and chattels which were being transported on the train, while here the statute is dealing with the train itself; but there is no difference whatever in the principle underlying the two cases. This is made clear by the following quotation from the case of Hall v. DeCuir, 95 U. S. 485, to-wit: "It does not act upon the business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without or goes out from within."

But independent of that, if we accept the views of counsel for appellant regarding the facts of the case, still the Act of 1907 would not and could not interfere with interstate commerce within the meaning of the Federal Constitution. The mere fact that an act of the Legislature may indirectly affect interstate commerce while endeavoring to regulate the internal police affairs of the State will not render the act void for violating the interstate commerce clause of the Constitution. The Supreme Court of the United States has so held in a number of cases.

In the case of Lake Shore & Michigan Southern Ry. Co. v. Ohio, supra, the court, on page 308, in discussing this question, said:

"And we adjudge that the above statutory provision was not intended to interfere with the authority of a State to enact such regulations, with respect at least to a railroad corporation of its own creation, as were not directed against interstate commerce, but which only incidentally or remotely affected such commerce, and were not in themselves regulations of interstate commerce, but were designed reasonably to subserve the convenience of the public.

"Imaginary cases are put for the purpose of showing what might be done by the State that would seriously interfere with or discriminate against interstate commerce, if the statute in question be upheld as consistent with the Constitution of the United States. Without stopping to consider whether the illustrations referred to are apposite to the present inquiry, it is sufficient to say that it is always easy to suggest extreme cases for the application of any principle embodied in a judicial opinion. Our present judgment has reference only to the case before us, and when other cases arise in which local statutes are alleged not to be legitimate exertions of the police powers of the State but to infringe upon national authority, it can then be determined whether they are to be

controlled by the decision now rendered. It would be impracticable, as well as unwise, to attempt to lay down any rule that would govern every conceivable case that might be suggested by ingenious minds."
[See, also, Hennington v. Georgia, supra.]

The case last cited originated in the courts of Georgia. The plaintiff in error was indicted and convicted for running a freight train in that State on Sunday, in violation of a statute thereof. Among other defenses made was the one that the statute mentioned was violative of the Constitution of the United States, for the reason that it interfered with interstate commerce. On appeal, the Supreme Court of that State held the statute valid, and that it did no violence to the Federal Constitution. Thereupon, Hennington sued out a writ of error from the Supreme Court of the United States; and in discussing that question the court, on page 307, said:

"Assuming, then, that both upon principle and authority the statute of Georgia is, in every substantial sense, a police regulation established under the general authority possessed by the Legislature to provide, by laws, for the well-being of the people, we proceed to consider whether it is in conflict with the Constitution of the United States.

"The defendant contends that the running on the Sabbath day of railroad cars, laden with interstate freight, is committed exclusively to the control and supervision of the national government; and that, although Congress has not taken any affirmative action upon the subject, State legislation interrupting, even for a limited time only, interstate commerce, whatever may be its object and however essential such legislation may be for the comfort, peace and safety of the people of the State, is a regulation of interstate commerce forbidden by the Constitution of the United States. Is this view of the Constitution and of the relations between the States and the general govern-

ment sustained by the former decisions of this court? Is the admitted general power of a State to provide by legislation for the health, the morals and the general welfare of its people, so fettered that it may not enact any law whatever that relates to or affects in any degree the conduct of commerce among the States? If the people of a State deem it necessary to their peace, comfort and happiness, to say nothing of the public health and the public morals, that one day in each week be set apart by law as a day when business of all kinds carried on within the limits of that State shall cease, whereby all persons of every race and condition in life may have an opportunity to enjoy absolute rest and quiet, is that result, so far as interstate freight traffic is concerned, attainable only through an affirmative act of Congress giving its assent to such legislation?

"The argument in behalf of the defendants rests upon the erroneous assumption that the statute of Georgia is such a regulation of interstate commerce as is forbidden by the Constitution, and not merely a statute enacted by the State under its police power, and which, although in some degree affecting interstate commerce, does not go beyond the necessities of the case, and, therefore, is valid, at least until Congress interferes.

"The distinction here suggested is not new in our jurisprudence. It has been often recognized and enforced by this court. In Gibbons v. Ogden, 9 Wheat. 1, 203, 210, this court recognized the possession by each State of a general power of legislation, that 'embraces everything within the territory of a State, not surrendered to the general government; all which can be most advantageously exercised by the States themselves.' Inspection laws, although having, as the court said in that case, 'a remote and considerable influence on commerce,' are yet within the authority of the States to enact, because no direct, general power over the ob-

jects of such laws was granted to Congress. So, also, quarantine laws of every description, if they have real relation to the objects named in them, are to be referred to the power which the States have to make provision for the health and safety of their people. But neither inspection, quarantine nor health laws enacted by a State have been adjudged void, by force alone of the Constitution and in the absence of congressional legislation, simply because they remotely, or even directly, affected or temporarily suspended commerce among the States and with foreign nations. Of course, if the inspection, quarantine or health laws of a State, passed under its reserved power to provide for the health comfort and safety of its people, come into conflict with an act of Congress, passed under its power to regulate interstate and foreign commerce, such local regulations, to the extent of the conflict, must give way in order that the supreme law of the land—an act of Congress passed in pursuance of the Constitution—may have unobstructed operation. The possibility of conflict between State and national enactments, each to be referred to the undoubted powers of the State and the nation, respectively, was not overlooked in Gibbons v. Ogden, and Chief Justice MARSHALL said: 'The framers of our Constitution foresaw this state of things, and provided for it, by declaring the supremacy not only of itself, but of the laws made in pursuance of it. The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties is to such acts of the State Legislatures as do not transcend these powers, but, though enacted in the execution of acknowledged State powers, interfere with or are contrary to the laws of Congress, made in pursuance of the Constitution, or some treaty made under the authority of the United States. In

every such case the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it.'

"These principles are illustrated in numerous decisions of this court, to some of which it is proper to refer.

"In Willson v. Black Bird Creek Marsh Company, 2 Pet. 245, 251, 252, it appeared that that company claimed the right, under a statute of Delaware, to place a dam across a navigable creek, up which the tide flowed for some distance, and thereby abridge the rights of those accustomed to use the stream. This court, after observing that the construction of the dam would enhance the value of the adjoining land and probably improve the health of the inhabitants, and that such an abridgment of private rights, unless it came in conflict with the Constitution or a law of the United States, was an affair between the government of Delaware and its citizens, of which this court could not take cognizance, said: 'The counsel for plaintiffs in error insist that it comes in conflict with the power of the United States "to regulate commerce with foreign nations and among the several States." If Congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern States; we should feel not much difficulty in saying that a State law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. We do not think

that the act empowering the Black Bird Creek Marsh Company to place a dam across the creek can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject.' Notwithstanding that case has been sometimes criticized, its authority has never been questioned in this court. On the contrary, it was declared in Pound v. Turck, 95 U. S. 459, 463, that it had never been overruled, but had always been sustained.

"In Gilman v. Philadelphia, 3 Wall. 713, 729, the question was as to the validity of an act of the Legislature of Pennsylvania, authorizing the construction of a bridge over the Schuylkill, 'an ancient river and common highway of the State.' It appeared that the bridge, if constructed, would prevent the passage up the river of vessels having masts, interfere with commerce and materially injure the value of certain wharf and dock property on the river. Congress had not passed any act on the subject, but the contention was that such an interference with commerce on a public navigable water was inconsistent with the Constitution of the United States. The court said: 'It must not be fogotten that bridges, which are connecting parts of turnpikes, streets and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs. It is for the municipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other. The States have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it, subject, however, in all cases to the paramount authority of Congress, whenever the power of

the States shall be exerted within the sphere of the commercial power which belongs to the nation.'

"In Cooley v. Board of Wardens, etc., 12 How. 299, 320, it was adjudged that the mere grant to Congress of the power to regulate commerce did not deprive the States of power to regulate pilots on the public navigable waters of the United States.

"In Owners of Brig James Gray v. Owners of Ship John Fraser, 21 How. 184, 187, the court held to be valid two ordinances of the city of Charleston, one providing that no vessel should be in the harbor of that city for more than twenty-four hours, and inflicting certain penalties for every disobedience of the ordinance; the other requiring all vessels anchored in the harbor to keep a light burning on board from dark until daylight, suspended conspicuously midships, twenty feet high from deck. The court said: 'The power of the city authorities to pass and enforce these two ordinances is disputed by the libellants. But regulations of this kind are necessary and indispensable in every commercial port for the convenience and safety of commerce. And the local authorities have a right to prescribe at what wharf a vessel may lie and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor and for what time, and what description of light she shall display at night to warn the passing vessels of her position, and that she is at anchor and not under sail. They are like to the local usages of navigation in different ports, and every vessel, from whatever part of the world she may come, is bound to take notice of them and conform to them. And there is nothing in the regulations referred to in the port of Charleston which is in conflict with any law of Congress regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States.'

''In Railroad Company v. Fuller, 17 Wall. 560, 567, 570, the question was as to the validity of a statute of Iowa requiring that each railroad company should, in the month of September, annually, fix its rates for the transportation of passengers and of freights of different kinds; that it should put up a printed copy of such rates at all its stations and depots, and cause a copy to remain posted during the year; and that a failure to fulfil these requirements, or the charging of a higher rate than was posted, should subject the offending company to the payment of the penalty prescribed. The court said: 'In all other respects there is no interference. No other constraint is imposed. Except in these particulars the company may exercise all its faculties as it shall deem proper. No discrimination is made between local and interstate freights, and no attempt is made to control the rates that may be charged. It is only required that the rates shall be fixed, made public and honestly adhered to. In this there is nothing unreasonable or onerous. The, public welfare is promoted without wrong or injury to the company. The statute was doubtless deemed to be called for by the interests of the community to be affected by it, and rests upon a solid foundation of reason and justice. It is not, in the sense of the Constitution, in any wise a regulation of commerce.' Again: 'If the requirements of the statute here in question were, as contended by the counsel for the plaintiff in error, regulations of commerce, the question would arise whether, regarded in the light of the authorities referred to, and of reason and principle, they are not regulations of such a character as to be valid until superseded by the paramount action of congress. But, as we are unanimously of opinion that they are merely police regulations, it is unnecessary to pursue the subject.'

239 Sup.—20

"In Railroad Co. v. Husen, 95 U. S. 465, 470-473, the court, while holding to be invalid under the Constitution of the United States a statute of Missouri, which met at the borders of the State a large and common subject of commerce, and prohibited its crossing the line during two-thirds of each year, except subject to onerous conditions, which obstructed interstate commerce and worked a discrimination between the property of citizens of one State and that of citizens of other States, said that 'the deposit in Congress of the power to regulate foreign commerce and commerce among the States was not a surrender of that which may properly be denominated police power;' that the power extended 'to making regulations of domestic order, morals, health and safety;' but could not be exercised over a subject confided exclusively in Congress, nor invade the domain of the national government, nor by any law of a police nature interfere with transportation into or through the State, 'Beyond what is absolutely necessary for its self protection.' The court, in that case, concluded with these words: 'The police power of a State cannot obstruct foreign commerce or interstate commerce beyond the necessity for its exercise; and under color of it objects not within its scope cannot be secured at the expense of the protection afforded by the Constitution. And as its range sometimes comes very near to the field committed by the Constitution to Congress, it is the duty of the courts to guard vigilantly against any needless intrusion.'

"A leading case upon the subject is that of Morgan v. Louisiana, 118 U. S. 455, 463-465, which related to certain quarantine laws of Louisiana, the validity of which were questioned party upon the ground that they were inconsistent with the power of Congress to regulate commerce among the States. This court said: 'Is the law under consideration void as a regulation of commerce? Undoubtedly it is in some sense

a regulation of commerce. It arrests a vessel on ·a
voyage which may have been a long one. It may affect
commerce among the States when the vessel is coming
from some other State of the Union than Louisiana,
and it may affect commerce with foreign nations' when
the vessel arrested comes from a foreign port. This in-
terruption of the voyage may be for days or weeks.
It extends to the vessel, the cargo, the officers and
seamen and the passengers. In so far as it provides
a rule by which this power is exercised, it cannot be
denied that it regulates commerce. We do not think
it necessary to enter into the inquiry whether, not-
withstanding this, it is to be classed among those
police powers which were retained by the States as
exclusively their own, and, therefore, not ceded to
Congress. For, while it may be a police power in the
sense that all provisions for the health, comfort and
security of the citizens are police regulations, and
an exercise of the police power, it has been said more
than once in this court that, even where such powers
are so exercised as to come within the domain of Fed-
eral authority as defined by the Constitution, the lat-
ter must prevail. [Gibbons v. Ogden, 9 Wheat. 1, 210;
Henderson v. The Mayor, 92 U. S. 259, 272; New Or-
leans Gas Co. v. Louisiana Light Co., 115 U. S. 650,
661.]   But it may be conceded that whenever Con-
gress shall undertake to provide for the commercial
cities of the United States a general system of quar-
antine, or shall confide the execution of the details of
such a system to a National Board of Health, or to
local boards, as may be found expedient, all State laws
on the subject will be abrogated, at least so far as the
two are inconsistent. But, until this is done, the laws
of the State on the subject are valid.' Again: 'Quar-
antine laws belong to that class of State legislation
which, whether passed with intent to regulate com-
merce or not, must be admitted to have that effect,

and which are valid until displaced or contravened by some legislation of Congress.'

"Upon the subject of legislation enacted under the police power of a State, and which, although affecting more or less commerce among the States, was adjudged to be valid, until displaced by some act of Congress, the case of Smith v. Alabama, 124 U. S. 465, 474, 479, 482, is instructive. A statute of Alabama made it unlawful for an engineer on a railroad train in that State to operate an engine upon the main line of the road used for the transportation of passengers or freight, without first undergoing an examination and obtaining a license from a State Board of Examiners. The point was made that the statute, in its application to engineers on interstate trains, was a regulation of commerce among the States, and repugnant to the Constitution. This court referred to and reaffirmed the principle announced in Sherlock v. Alling, 93 U. S. 99, 103, where it was said: 'In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution.' Referring to the fact that Congress had prescribed the qualifications for pilots and engineers of steam vessels engaged in the coasting trade and navigating the inland waters of the United States, while engaged in commerce among the States, the court, in Smith v. Alabama, said that the power of Congress 'might, with equal authority, be exercised in prescribing the qualifications for locomotive engineers employed by railroad companies engaged in the transportation of passengers and goods among the States, and in that case would supersede any conflicting provisions on the same

subject made by local authority. But the provisions
on the subject contained in the statute of Alabama
under consideration are not regulations of interstate
commerce. It is a misnomer to call them such. Con-
sidered in themselves they are parts of that body of
the local laws which, as we have already seen, properly
governs the relation between carriers of passengers
and merchandise and the public who employ them,
which are not displaced until they come in conflict
with express enactments of Congress in the exercise
of its power over commerce, and which, until so dis-
placed, according to the evident intention of Congress,
remains as the law governing carriers in the discharge
of their obligations, whether engaged in the purely in-
ternal commerce of the State, or in commerce among
the States. No objection to the statute, as an impedi-
ment on the free transaction of commerce among the
States can be found in any of its special provisions.'
Again: 'We find, therefore, first, that the statute of
Alabama, the validity of which is under consideration,
is not, considered in its own nature, a regulation of in-
terstate commerce, even when applied as in the case un-
der consideration; secondly, that it is properly an act
of legislation within the scope of the admitted power
reserved to the State to regulate the relative rights and
duties of persons being and acting within its territo-
rial jurisdiction, intended to operate so as to secure
for the public safety of persons and property; and,
thirdly, that, so far as it affects transactions of com-
merce among the States, it does so indirectly, inciden-
tally and remotely, and not so as to burden or impede
them, and, in the particulars in which it touches those
transactions at all, it is not in conflict with any ex-
press enactment of Congress on the subject, nor con-
trary to any intention of Congress to be presumed
from its silence.'

"So in Nashville, etc. Railway v. Alabama, 128
U. S. 96, 99, 101, which involved the validity of a State

enactment which, for the protection of the traveling public, declared any one disqualified from serving on railroad lines within the State who had color blindness and defective vision, and which statute was equally applicable to domestic and interstate railroad trains, the court said: 'It is conceded that the power of Congress to regulate interstate commerce is plenary; that, as incident to it, Congress may legislate as to the qualifications, duties and liabilities of employees and others on railway trains engaged in that commerce; and that such legislation will supersede any State action on the subject. But until such legislation is had, it is clearly within the competency of the States to provide against accidents on trains whilst within their limits. Indeed, it is a principle fully recognized by decisions of State and Federal courts that wherever there is any business in which, either from the products created or the instrumentalities used, there is danger to life or property, it is not only within the power of the States, but it is among their plain duties, to make provision against accidents likely to follow in such business, so that the dangers attending it may be guarded against so far as is practicable.' Referring to some observations made in Smith v. Alabama, supra, the court said: 'The same observations may be made with respect to the provisions of the State law for the examination of parties to be employed on railways with respect to their powers of vision. Such legislation is not directed against commerce, and only affects it incidentally, and therefore cannot be called, within the meaning of the Constitution, a regulation of commerce.'

"These authorities make it clear that the legislative enactments of the States, passed under their admitted police powers, and having a real relation to the domestic peace, order, health and safety of their people, but which, by their necessary operation, affect to some extent, or for a limited time, the con-

duct of commerce among the States, are yet not invalid by force alone of the grant of power to Congress to regulate such commerce; and, if not obnoxious to some other constitutional provision or destructive of some right secured by the fundamental law, are to be respected in the courts of the Union until they are superseded and displaced by some act of Congress passed in execution of the power granted to it by the Constitution. Local laws of the character mentioned have their source in the powers which the States reserved and never surrendered to Congress, of providing for the public health, the public morals and the public safety, and are not, within the meaning of the Constitution, and considered in their own nature, regulations of interstate commerce simply because, for a limited time or to a limited extent, they cover the field occupied by those engaged in such commerce. The statute of Georgia is not directed against interstate commerce. It establishes a rule of civil conduct applicable alike to all freight trains, domestic as well as interstate. It applies to the transportation of interstate freight the same rule precisely that it applies to the transportation of domestic freight. And it places the business of transporting freight in the same category as all other secular business. It simply declares that, on and during the day fixed by law as a day of rest for all the people within the limits of the State from toil and labor incident to their callings, the transportation of freight shall be suspended.

"We are of opinion that such a law, although in a limited degree affecting interstate commerce, is not for that reason a needless instrusion upon the domain of Federal jurisdiction, nor strictly a regulation of interstate commerce, but, considered in its own nature, is an ordinary police regulation designed to secure the well-being and to promote the general welfare of the people within the State by which it was

established, and, therefore, not invalid by force alone of the Constitution of the United States.''

The fact must not be overlooked that in the last case the statute there under consideration did not command the railroad company to run the train on Sunday, as the statute under consideration in the case at bar does; but, upon the other hand, prohibited the company from running the train on that day.

Upon the slightest reflection it will be readily seen, that, if a statute prohibiting the running of trains on Sunday does not interfere with interstate commerce, then for much stronger reasons it must also be held that a statute requiring trains to be run on that day does not interfere with interstate commerce. [See, also, 2 Elliott on Railroads (2 Ed.), secs. 667, 690, pp. 18, 56; Jacobson v. Wisconsin, 40 L. R. A. 392; Baldwin's American Railroad Law, pp. 384, 385; Gladson v. Minnesota, 166 U. S. 429.]

This contention is also decided against appellant.

The judgment of the circuit court should be affirmed.

*Valliant, C. J.,* and *Brown, J.,* concur; *Lamm, J.,* dissents in separate opinion, in which *Ferriss* and *Graves, JJ.,* concur; *Kennish, J.,* not sitting.

## DISSENTING OPINION.

LAMM, J.—Appeal from a conviction for a misdemeanor. In small compass, the case is this:

Sections 3100-1, Revised Statutes 1909 (Laws 1907, p. 180), provide that ''all persons, copartnerships, companies or corporations operating any railroad or part of a railroad in this State shall, *unless hindered by wrecks or providential hindrance,* run at least one regular passenger train each way every day

over all lines, or part of a line, of railroad so operated by such person, copartnership, company or corporation in this State, which train shall stop at all regular stations along the line of such railroad for the purpose of receiving and discharging passengers;'' and make it a misdemeanor for any such person, copartnership, etc., to violate the provisions of the act, punishable on conviction by a fine of not less than $100 nor more than $500 for each offense.

Defendant (an Illinois corporation) at the time in hand operated a branch line leaving its main line at Albany, Missouri, running north through Worth county, thence to Togo in Iowa, where it connects once more with its main line. At a certain time, hard on the heels of the passage of the aforesaid law, the prosecuting attorney of Worth county, in the Worth Circuit Court, lodged an information charging defendant with violating the statute aforesaid in that on the 28th day of July, 1907, it unlawfully failed and refused to run a regular passenger train each way over its said branch line between certain named stations; and that such failure was not due to ''wrecks on said railroad nor to providential hindrances''—all of which is well set forth in the formal and formidable verbiage of a criminal charge.

There was a motion to quash interposed below. It was overruled and defendant filed ''a written plea or answer.'' The facts were agreed to by stipulation. For our purposes, in so far as material here, those facts are that defendant owned and operated the branch railroad described in the information; that, except on Sundays, it ran a daily regular passenger train each way over said branch, stopping at the stations named in the information in Worth county; that July 28, 1907, fell on Sunday; and that defendant ran no such train on that day.

Presently, the case came on for final hearing, a jury was waived, the agreed facts were read into the

record, defendant's instructions were refused, and it, being adjudged guilty in the manner and form charged, was fined $100 and costs. Thereat, after unsuccessful motions for a new trial and in arrest, it came up by appeal.

The motion to quash, the "written plea or answer," the refused instructions, the overruled motions for a new trail and in arrest, the sundry exceptions below, together with the information itself, would but cumber the record if reproduced here. It is sufficient to say of them that, taken alone or together, by or large, they preserve and present for review the propositions relied on for reversal.

Put broadly, those propositions, in asking form, are:

First. Does the statute in hand when rightly construed cover the first day of the week, commonly called Sunday or the Lord's day?

Second. If read to include Sunday, then is the statute constitutional?

That brace of questions are texts on which I make some observations, viz:

I. Do the terms of the statute include Sunday? If so, the first question must be answered against defendant. If not, it is plain that a failure to run a train on Sunday did not violate its terms, and the judgment is without any legal foot to stand on.

In construing a penal statute (such as this most emphatically is) it is a primer and stiff rule that the construction is *strict*—not liberal. The term "strict construction," as used in law-writing, means one according to the very letter. A penal statute is not to be extended by implication, intendments, analogies or equitable considerations. [Black Inter. of Laws, p. 286.] In strict consideration nothing is recognized, or allowed to cross the line of judicial vision, except what is expressed by the very words of the lawmaker. It is so written in the law. (*Ita lex scripta est*) is the

controlling maxim.  [Black L. Dict., Tit. "Strict Construction".]

The brusque statutory command is: Run your passenger train both ways "every day."  Construing the phrase "every day," with the context, and both in connection with the public policy of this State in relation to the observance of Sunday, much might be justly said in favor of the idea that "every day" should be held to mean each week day or every work day.  If the phrase was up for construction in a contract between private parties, would it not be construed to mean (nothing more appearing) that labor was to be performed on days when it was lawful to labor, and not otherwise?  In other words, the contract would be controlled by the dominating public policy evidenced by our Constitution and statutes, and construed to mean a lawful rather than an lawful thing, in order that the contract might stand and not fall—of which public policy we will have much more to say in another paragraph of this opinion, anent the second question.  It will be observed that the statute is silent about Sunday. It does not attack Sunday openly; neither does it say that other statutes relating to labor on Sunday are repealed as to persons and corporations operating railroads.  And, closer to the point, neither does it say that running a train on the Sabbath Day is declared by the lawmaker a work of necessity or charity within the purview of the law denouncing Sabbath breaking (R. S. 1909, sec. 4801—of which more presently); therefore, such intendment can not come to the aid of the statute under the rule of strict construction.  It results that the question is left to turn solely on the one phrase "every day."  Those are not technical words.  They are therefore to be construed in their plain, ordinary and usual sense.  [R. S. 1909, sec. 8057.] So construed, they may be allowed to include Sunday. It would have been better if the statute had been bravely open-faced about it, and expressly amended other

Sunday laws and let the people of Missouri know precisely what was meant, and thus avoid any charge or suspicion of ambush or slyness.

Though not without doubt and consequent hesitation, we prefer not to pursue the matter further, but clear the way for the main controversy by ruling the proposition against defendant, and pass at once to the second question—a large and vital one—viz.:

II.   Is the statute constitutional?

That question may be put in another way: Is it (or can it be made) a *crime* in Missouri for a man to rest from toil on Sunday? Or (to touch the matter as with a needle): *is it or can it be made under the Constitution of this State, a crime for a class of men, viz., railroad employees and men who operate railroads, not to work on Sunday?*

(a) The question put has several sides—one of them, public policy.

Public policy is got at, among other ways, from the whole body of existing statute and constitutional law. It is also shadowed forth by the settled customs, manners, maxims and ethical beliefs of the people, which by age, universal acceptance and usage have become part and parcel of the very warp and woof of the social compact, and which should as far as practicable be read into statutes. The Act of 1907 flies in the face of public policy and thereby becomes a daring, anxious and unheard of legislative experiment; for it cannot be gainsaid that the body of our statutes unmistakably make of Sunday, not only a sacred day, but a day apart from secular or business days. Witness the revision of 1909, which brings down to us as live law statutes in force many years before 1907. Thus:

By section 1657 it is provided that no convict shall be required to do any work on the Sabbath day, except necessary labor for the State. With the full glow of that interdiction upon us, does it not make a court

wince to see those in bonds set free by the old law while the free are bound by the new?

By section 1785, barring enumerated exceptions arising on emergencies, writs, processes, warrants, orders or judgments in civil cases cannot be served or executed on Sunday.

By section 2298 an attachment writ may be served on Sunday when (and only when) a showing is made by affidavit, as an imperative condition precedent, that plaintiff would lose his claim unless the writ be served on that day.

By section 3108 it is made the duty of a carrier to furnish shippers cars to transport freight. Under specified circumstances a failure to comply with this section (Sundays excepted) a forfeiture is declared in a sum certain.

By section 3109 it is made the carrier's duty to forward such freight sixty miles per day, commencing with the day following receipt. For failure to comply, Sundays excepted, the consignee or consignor may sue for damages and the consignee may recover a forfeiture.

By sec. 3110 if a carload shipment reach its destination and a carrier fail to give notice to the consignee or party whose interest is affected within a time certain, Sundays excepted, a forfeiture is declared recoverable, together with his actual damages sustained.

By section 3880 it is ordained that no court be open or transact business on Sunday except in enumerated and crying emergencies. This section but crystallizes into written law the venerable and endeared common law maxim, viz.: Sunday is not a court day or a day for judicial proceedings or legal purposes. [*Dies dominicus non est juridicus.*] In fact, the time was when the clergy, absorbing nearly every branch of learning, were remarkable for their proficiency in the study of (at least the civil) law. So that the phrase, "No clerk (clergyman), unless he be a lawyer"—

(*Nullus clericus nisi causidicus*)—passed into a legal maxim. The Law and the Gospel flowed from the same fountain and most of the persons in the high offices of the law were in holy orders.  [1 Bl., Comm. p. 17.]

Another section (7409) forbids justices of the peace to hold court on Sunday.

By section 4801 Sabbath breaking is defined. Thereby every person laboring himself or compelling, or permitting his apprentice, servant or any other person under his charge or control to labor or perform any work other than household offices of daily necessity, or other works of necessity or charity, or who shall be guilty of hunting game or shooting on Sunday, shall be guilty of a misdemeanor.

By section 4802 it is ordained that section 4801 shall not extend to any person who is a member of a religious society by whom any other day than the first day of the week is observed as a Sabbath "so that he observe such Sabbath," nor does it prohibit any ferryman from crossing passengers "on any day of the week."

(*Nota bene*: It cannot escape the eye of the student of the history of jurisprudence that up to *Anno Domini* 1907, we, during the ninety years of our existence as a State, had criminal laws to *prohibit* labor on Sunday and never a criminal one to make a man labor on the Lord's day—but verily times change and men change with them.)

By section 4803 horse racing, cock fighting or playing at cards or games of any kind on Sunday is declared a misdemeanor.

By section 4804 any person who exposes to sale any goods, wares or merchandise or who keeps open any ale or porter house, grocery or tippling shop, or sells or retails any fermented or distilled liquors on Sunday is declared guilty of misdemeanor on conviction.

By section 4805 the sale of drugs, medicines, provisions or other articles of immediate necessity is exempted from the terms of section 4804.

By section 6701 certain holidays are set and it is ordained that if one of them fall on Sunday the Monday following becomes such holiday.

By section 7216 it is made a misdemeanor for a licensed dramshop keeper to keep open his dramshop or sell, give away or otherwise dispose of, or suffer the same to be done on his premises, any intoxicating liquors on Sunday.

By section 7261 clergymen are exempt from jury service this (doubtless) agreeably to the common-law maxim: No man warring for God should be troubled by secular business: (*Nemo militans Deo implicetur secularibus negotiis.*)

By section 8057 rules are given for construing statutes. Thereby the word "year" is declared to be equivalent to the words "year of our Lord." The fourth rule is to the effect that the time within which an act is to be done shall be computed by excluding the first day and including the last—but if the last be Sunday, it is excluded.

By section 10055 it is provided that if the maturity day of a negotiable instrument fall on Sunday, the instrument is payable on the next succeeding "business day."

By section 10163 it is provided that if the day or last day for doing an act within the purview of the Negotiable Instrument Law fall on Sunday, the act may be done on the "next succeeding secular or business day."

By section 10701 provision is made for the payment of a sheriff's *per diem,* but Sunday is excluded.

So much for a public policy evidenced by our statutes. Attend now to our Constitution.

The Constitution of Missouri may be likened unto a book of the law whose lids and leaves are tenderly

fastened with a golden hasp, and that hasp is the solemn and reverential recognition of God as worthy of the worshipful adoration of every rational being— witness, the first words, the noble preamble, of the Constitution: "We, the people of Missouri, with profound reverence for the Supreme Ruler of the Universe, and grateful for his goodness, do, for the better government of the State, establish this Constitution." Witness, the last words of that same Constitution, referring to our Lord, viz.: "Done in Convention, at the Capitol, in the City of Jefferson, on the second day of August, in the year of *our Lord* one thousand eight hundred and seventy five." The analysis of that preamble is worthwhile to further the purpose in hand. Notice: It recognizes God, a "Supreme Ruler." "Ruler" implies a kingdom, at least a spiritual kingdom, a kingdom of God. It bespeaks for Him "profound reverence" from every Missourian. It solemnly expresses to Him the gratitude of all the people; thereby intimating the personal duty of gratitude on the part of all of us and acknowledging a gift at His hands in the form of "His goodness." It goes further and by necessary implication states that for and on account of these things and in furtherance of them, by an uplift of the people through orderly fundamental laws, the Constitution is established "for the better government of the State." The people as sovereigns, acting through their Constitution-makers, did not take the pains to give *reasons* for their belief; whether those reasons are found in divine revelation or in natural reason. They did not argue or quibble about the existence of God or our duty to Him. To the contrary, they calmly assumed there was no such thing as disputing about first principles, they assumed those things as established facts to be accepted by all men—whether (as Pope says), by the poor Indian whose "untutored mind" hears Him in the wind or sees Him in the clouds; or by the philosopher, reasoning from ef-

fect back to first cause, who sees His divine hand in the spacious firmament and acknowledges His handiwork and His glory as declared by the starry host of Heaven, as Addison sings.

It would be matter of profound wonder and sorrow if the statutes of a State governed by such a written Constitution were allowed out of line with the lofty sentiments, intimations and public policy of the fundamental law.

Attending still further to our Constitution and statutes in pursuing the same matter:

By section 15 of article 4 of the Constitution each Senator and Representative is required to take an oath or affirmation before entering upon the duties of his office (the significance of an *oath* will be presently referred to). By immemorial custom the legislative sessions of the General Assembly of this Christian Commonwealth are opened by prayer.

By section 6 of article 14 all officers, civil or military, under the authority of this State, shall, before entering on the duties of their respective offices, take and subscribe an oath or affirmation.

By section 5069 it is provided that grand jurors should be sworn, and the administration of this oath has been held indispensable to a legally constituted grand jury.

By section 5070 grand jury witnesses must be sworn in a specified form in addition to the usual oath of a witness.

By section 6350 (Chap. 46, of Evidence; Art. 2, of Oath, etc.) "Every person, believing in any other than the Christian religion, shall be sworn according to the peculiar ceremonies of his religion, if there be any such ceremonies"—the theory of the law (Sec. 6349) being that the oath of a witness shall be administered in that form creating the most solemn and binding obligation on his conscience to speak the truth, the

239 Sup.—21

whole truth and nothing but the truth. [See, in this connection, secs. 7499 and 7508.]

And generally, without further details—details admitting of almost indefinite extention—where a party is to be purged of contempt, or his conscience is to be sifted or purged, or any person performs any function in the administration of justice, whether as judge, witness or juror, or enters into official relations with the State, an appeal to the Deity is prescribed either by express law or by immemorial custom, not only in the solemnity of the final words of the oath, "so help you God," but in the uplift of the right hand, which in itself is a solemn invocation, a mute and significant appeal, to the Deity—both of them exciting the conscience and (when a witness) subjecting the party to the pains and penalties of the abominable crime of perjury for false swearing.

By section 6, article 10, of the Constitution, property used exclusively for "religious worship" may be exempted from taxation, and section 11335 of the statutes (under that constitutional grant of power) exempts such property from paying tribute to the State for governmental purposes.

By section 4496 of the statute it is made a felony to go into any "church or place where people have assembled for religious worship" carrying about the person, concealed or exposed, a deadly weapon or exhibit any such weapon in a rude, angry and threatening manner.

By sections 4499 and 4500 it is made a misdemeanor to discharge a pistol or firearm in the immediate vicinity of a church.

By section 8282 marriage (by prior sections "considered" as a civil contract) may be solemnized by "any licensed or ordained preacher of the Gospel who is a citizen of the United States."

Tracing the public policy, evidenced by the Constitution and the laws we have been considering, to its

ultimate sources, it becomes certain that our Constitution and statutes only tend to outline, preserve and aid such public policy; they in no sense create the public policy of recognizing God and religious worship, and of setting Sunday apart from secular and business days. They are but unmistakable tokens, symbols, signs, evidence of a public policy coming down to us by inheritance in a long line of descent from our fathers—a policy hallowed by time and a thousand sacred memories, tenderly cherished in the hearts of our people, so old, so omnipresent, so persistent as to admit of being personified. It now sits and always sat or should sit by the household fire of every Missourian's home "sipping from his cup and dipping in his dish." To ignore or impugn that policy by statute, to my mind, is to cut every patriotic Missourian to the bone. It seems as clear as the noonday sun to me that the statutes and constitutional provisions named are the creatures of, they sprang from, that public policy, as the children of its loins. Surely, withal, before they were, it was. Human nature itself, with an exceeding bitter cry, cries out for rest one day in seven. Observe, too, there is exceeding high and very old authority for rest from toil one day in seven, and not only so but for making that day of rest a sacred day, commemorative of and associated with a divine event. Witness: Remember the Sabbath day, to keep it holy. Six days shalt thou labor, and do all thy work. But the seventh day is the sabbath of the Lord thy God: in it thou shalt not do any work, thou, nor thy son, nor thy daughter, thy manservant, nor thy maidservant, nor thy cattle, nor thy stranger that is within thy gates; for in the six days the Lord made heaven and earth, the sea and all that in them is, and rested the seventh day: Wherefore the Lord blessed the sabbath day, and hallowed it. .

The ancient pious Hebrew was not alone in that view. There is good heathen authority for the exis-

tence of a worldwide public policy in former times connecting and associating a day of rest with a day devoted to sacred rites. Says Strabo: "The Greeks and barbarians have this in common, that they accompany their sacred rites by festal remission of labor."

Nor is it an overstatement to affirm that a state that borrows the motto on its great seal, as does Missouri, from the twelve tablets of heathen Rome, may, without serious question, be allowed to borrow the basis of its public policy against secular labor on Sunday, as does Missouri, from the Ten Commandments of the living God. The time was when the dry letter of the commandment quoted was interpreted and construed, *ex cathedra,* by one who spoke as having authority and thereby its soul and sense were made to shine through its mere letter. (Vide: Matt. xii: 1-13; Mark ii: 23 *et seq.;* Luke xiii: 14 *et seq.;* Id. xiv: 5.) That interpretation when read into its letter shows that the interdiction of the commandment at bottom was not levelled at daily offices of necessity springing from hunger and thirst, nor at works of charity for the benefit of man. Therefore being hungry we could appease our hunger (e. g., pluck ears of corn to eat). So, the afflicted may be healed on the Sabbath day; so, a sheep or ox fallen into a pit could be lifted out on that day. The controlling and root ideas, as announced, are: The Sabbath was made for man and not man for the Sabbath. [Mark ii: 27.] It is lawful to do well on Sabbath days. [Matt. xii: 12.] All of which, further interpreted, means that the commandment is not, in and of itself, the *end* to be attained, but is a *means* of attaining an end, namely, a help towards realizing the greater ideal in the mind of the law-giver, viz., Love to God as well as love to men. Nay, love to man, in a true and lofty sense, is love to God. So runs the immortal dream of Abou ben Adhem—and so said the Master: Therefore all things whatsoever ye would

that men should do to you, do ye even so to them; for this is the law and the prophets.

The exemption in our statute defining sabbath breaking (Sec. 4801, supra), whereby one is allowed to perform labor and work in the "household offices of daily necessity," or other work of necessity or charity on Sunday, but embodies those sacred precepts, and gives effect to the interpretation by the Master of the commandment He was charged with violating. It but transferred His interpretation over into our written law.

It would be unprofitable for a court of justice to entangle itself in those ancient, time worn, theological controversies, the echo of which is heard even now, incident to a change in the sacred day from the seventh day of the week, the Jewish Sabbath, to the first day of the week, the Christian Sunday. We dismiss that phase of the matter with this remark: It is allowed to be a commonly accepted historical fact that the resurrection was on Sunday, the first day of the week. Therefore the early Christian, as a spontaneous and beautiful expression of fealty and devotion, kept that day for obvious reasons as sacred, and, beginning with Constantine, Christian rulers and Christian lawgivers and lawmakers have recognized the day as having the same purpose as the ancient Sabbath and as taking its place—our statutes (as seen) referring to it indifferently as "Sunday" or as the "Sabbath."

Referring to a former Constitution (that of 1820), Judge Scott put stress on its closing phrase, " in the year of our Lord one thousand eight hundred and twenty," as "a form adopted by all Christian nations, in solemn public acts, to manifest the religion to which they adhere." [State v. Ambs, 20 Mo. l. c. 217.] In judicially interpreting that instrument for this court in a case where the validity of a Sunday law was attacked, he took the high, safe and broad ground that "we must regard the people for whom it was ordained.

It appears," said he, "to have been made by Christian men. The Constitution on its face shows that the Christian religion was the religion of its framers." He builds that theory on the use of the phrase, "year of our Lord," in the close of that instrument. What, we may pause to ask, would that great Judge say, if alive and on the judgment seat, of our present Constitution, prefixed, as it is, by the elevated and Godly preamble hereinbefore set forth? Continuing, he without any qualification repudiates the idea that the Constitution he was dealing with was an "instrument framed for a State composed of strangers collected from all quarters of the globe, each with a religion of his own, bound by no previous social ties, nor sympathizing in any common reminiscences of the past." His argument assumes that the Constitution, like ordinary laws, is to be construed "in reference to the state and condition of those for whom it was intended," with "reference to the history of the people for whom it was made."

Have the history, the traditions, the public policy of our people, have the state and condition of those for whom our present Constitution was intended changed in so much as one jot or tittle? Do we no longer sympathize in any common reminiscences of the past? Should we in a roundabout and indirect fashion now hold that the Christian religion was not the religion of the framers of that Constitution? Or that Sunday was a day to be lightly treated by the lawmaker? Are we at last indeed become a conglomeration of odds and ends, of strangers from all quarters of the globe; or are we a homogeneous people whose Constitution is to be read in the dry light of our common faith and sacred traditions?

A judiciary that fails or refuses to read the laws in the light of the state and condition of those for whom the laws were intended, or construes them contrary to the trend of settled and historical public pol-

icy, or fails to brand laws running contrary to the spirit of the Constitution as void, fails of performing its solemn functions. If we were to read out of our Constitution and laws all protection for the beliefs, and all support for the public policy of this Christian State in regard to Sunday, would it not lay us open to the charge of being such an affliction upon our people as Chief Justice MARSHALL held in mind in a celebrated passage? By no means do the principal opinions intend to do that—but what way do they *head?* What comes *next?* What new law is to be passed by some encouraged later lawmaker making it a crime for other men not to work on Sunday? As for one, I want no entering wedge—no precedent that may beget others and, broadening slowly down, harden into a public policy, subversive of the one we have had up to this time.

In sustaining the legality of Sunday laws, courts are fond of dwelling on the secular advantages of a day of rest for man and domestic beast. Many cases are found where judges have viewed those laws merely from a philosophical, scientific or moral point of view, wholly disconnected from a religious one. This, be it remembered, in order to disconnect the church from the State, not to overthrow or undermine religion, but to leave religion free, thereby furthering true religion by fostering the public policy of complete religious liberty. This view of it does not impugn the idea that the day of rest is also a sacred day. It merely proceeds and justifies itself on the theory that rest one day in seven promotes the well-being of men mentally and socially, morally and physically; that human experience and the teachings of philosophy and science show that rest from labor in the proportion of one day to seven directly subserves the common welfare by tending to that end; and that legislative utterances in that regard but give sanction to a rule of conduct protecting the laborer and the general well-being of so-

ciety. Many opinions express and lay stress on that
view of it, but there is another phase of the question,
presently dealt with when I come to further consider
the doctrine of this court promulgated in State v.
Ambs. 'It may be taken also as true that religious
liberty, in a true sense, is utterly inconsistent with the
idea that the State can coerce this or that religious
observance on the part of the citizen. Verily, freedom
flies out of the window when force comes in at the
door.

Recurring again to State v. Ambs, supra: Com-
ment is there made on the fact that the prohibition
of ordinary worldly labor on Sunday was not designed
as an act of religion. "Such an idea," says Judge
SCOTT, "can only be based on the supposition of an
entire ignorance in the Legislature of the nature of the
worship which God exacts from his creatures." He
goes on to say that "a compliance with the law, in-
duced by a fear of its penalties, could never be re-
garded as an act acceptable to the Deity, no act of
worship unless dictated by heartfelt love can be pleas-
ing to the Almighty. God listens alone to the voice
of the heart." But they listen to the reading of State
v. Ambs to little purpose who do not catch therefrom
another note, equally high and controlling, and that
note is this: Sunday is primarily a sacred day; for
profound reasons of State the day of rest is united
by law with that sacred day and they are made one
and indivisible. The arm of the civil power, under
our Constitution and statutes and the public policy
we have been considering, has interposed to aid "the
mild voice of Christianity" "in securing the due ob-
servance of Sunday as a day of rest." Moreover, the
compulsory observance of the day as one of rest is
plainly in line with and necessary to the constitutional
idea of religious freedom. It was ordained not only
for scientific, physical and moral reasons but (mark
well the further reasons) *in order to secure the full*

*enjoyment of the rights of conscience, and full 'religious liberty.* In the Ambs case, Judge SCOTT announced for this bench the Missouri doctrine in that behalf in this way:

"How could those who conscientiously believe that Sunday is hallowed time, to be devoted to the worship of God, enjoy themselves in its observance midst all the turmoil and bustle of worldly pursuits, admidst scenes by which the day was desecrated which they conscientiously believe to be holy? The Sunday law was not intended to compel people to go to church, or to perform any religious act, or as an expression of preference for any particular creed or sect, *but was designed to coerce a cessation from labor, that those who conscientiously believed that the day was set apart for the worship of God might not be disturbed in the performance of their religious duties.* Every man is free to use the day for the purpose for which it is set apart or not, as he pleases. If he sees proper to devote it to religious purposes, the law protects him from the disturbances of others; if he will not employ himself in religious duties, he is restrained from interrupting those who do. Thus the law, so far from affecting religious freedom, is a means by which the rights of conscience are enjoyed. It cannot be maintained that the law exacting a cessation from labor on Sunday compels an act of religious worship. . . . Convert Sunday into a worldly day by law, and what becomes of Christianity? How can we reconcile the idea to our understanding, that a people professing Christianity would make a fundamental law by which they would convert Sunday into a worldly day? It would have been an act of deadly hostility to the religion they professed, exposing it to the danger of being reduced to the condition in which it was before the Roman world was governed by Christian princes. Though it might not be persecuted by the arm of the civil power, it would be driven by the

annoyances and interruptions of the world to corners and by-places, in which to find a retreat for its undisturbed exercise.

"How startling would the announcement be to the people of Missouri that, by their organic law, they had abolished Sunday as a day of rest, and had put it out of the power of their legislators ever to restore it as such! With what sorrow would the toil-worn laborer receive the intelligence that there was no longer by law a day of rest from his labor! The poor beast of burden would soon find by experience, that our laws were no longer tempered by the softening influences of Christianity, and all the social advantages, which great and good men have attributed to the observance of Sunday as a day of rest, would be taken away."

The doctrine of State v. Ambs has never heretofore been questioned, let alone exploded, in this jurisdiction. In these times of yeasty unrest it may do to say that its doctrine may be likened, to reverently use a pious metaphor, unto a house built upon a rock, by a wise man; and it fell not from the rains that descended, or the floods that came or the winds that blew, and beat upon that house, for it was founded upon a rock. Its doctrine remains now as when uttered the serene and majestic voice of reason and law. As for me, I rest on the reasoning of that case with entire and satisfied judicial tranquility, declining to be blown about by every new wind of doctrine.

We have not dwelt on a statutory public policy of Sunday observance for the purpose of ruling that a public policy, only evidenced by mere statutes, might not be modified or abrogated by an act of the lawmaker, for the purpose of holding that a given statute may be declared void merely because it changes a public policy evidenced merely by other statutes. The accepted rule is laid down by Cooley (Prin. of Const.

L., p. 166, *et seq.*) under caption of Checks and Balances in Government, as follows:

"Nor can a court declare a statute unconstitutional and void when the objection to it is merely that it is unjust and oppressive, and violates rights and privileges of the citizen, unless it can be shown that such injustice is prohibited, or such rights and privileges guaranteed by the Constitution. The propriety or justice or policy of legislation, within the limits of the Constitution, is exclusively for the legislative department to determine; and the moment a court ventures to substitute its own judgment for that of the Legislature, it passes beyond its legitimate authority, and enters a field where it would be impossible to set limits to its inference, except as should be prescribed in its own discretion. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinion upon points of right, reason and expediency with the lawmaking power. The question of the validity of a statute must always be one of legislative competency to enact it; not one of policy, propriety or strict justice."

Such is the general doctrine in Missouri. [County Court v. Griswold, 58 Mo. l. c. 192; State v. Swagerty, 203 Mo. l. c. 527, *et seq.;* Gist v. Construction Co., 224 Mo. l. c. 384.]

There is a doctrine indulged by speculative jurists to the effect that a statute running counter to natural or fundamental justice is void on that ground only, as not being within the legislative function. [Bish. on Stat. Crimes (3 Ed.), sec. 39 a., *et seq.* and cases cited in a footnote by that author.] The curious may

consult the cases cited by him for the aggravated
facts warranting the application of that strong doc-
trine.   A sample fact is in a law making a man a
judge in his own case.   [City of London v. Wood, 12
Md. 669.]   Says Lord HOBART: ". . . as to make
a man judge in his own case is void in itself; for *jura
naturae sunt immutabilia,* and they are *leges legum.*"
[Day v. Savadge, Hobart Rep. l. c. 217-8.]   In Calder
v. Bull, 3 Dall. l. c. 388, Mr. Justice CHASE, speaking
to the point, says: "An act of the Legislature (for
I cannot call it a *law*) contrary to the great first prin-
ciples of the social compact, cannot be considered a
rightful exercise of legislative authority."   But to
return to Bishop.   He (Sec. 40) propounds the ques-
tion whether if the Legislature would endeavor to sub-
vert the fundamental principles of right and justice,
it would be within a legislative function any more than
to endeavor to change the orbit of the earth.   But we
need not borrow in this case help from those extreme
and strong speculative doctrines, nor are we called
upon to decide whether in a very strong and extreme
case they should be applied.   Generally that author
agrees with Judge Cooley, witness: "Legislators are
to judge of the right and expediency of the laws they
frame, and plainly the courts have not in general any
jurisdiction to reverse their decisions.   Therefore, as
a practical question, rarely, if ever, will a considerate
court so set its opinion against the legislative judg-
ment on a point of morals as to hold a statute void on
the grounds now under consideration."   [Bish. Stat.
Crim. (3 Ed.), sec. 40, *supra.*]

As said, we have not outlined the statutory public
policy of Sunday observance in order to declare the
law void merely from that point of view.   Our ob-
ject so far was to point out that the policy of our
statutes take deep root in constitutional provisions,
and that, in turn, the Constitution itself but evidences
a public policy in that regard which antedates that

instrument and takes its source historically in the common beliefs, observances and traditions of all Christian people, and to show its connection with other provisions of the Constitution safeguarding the rights of conscience and religious liberty, and further to show that the statute in hand militates against those other provisions of the Constitution, when construed, as they must be, in the light of the public policy we have been considering. To those other constitutional provisions and that view of the case, we now pass.

(b) By section 4 of article 2 of the Constitution it is ordained: "That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to . . . liberty . . ; that to give security to these things is the principal office of government, and that when government does not confer this security, it fails of its chief design."

Section 5 of the same article reads: "That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no person can, on account of his religious opinion, be rendered ineligible to any office of trust or profit under this State, nor be disqualified from testifying, or from serving as a juror; that no human authority can control or interfere with the rights of conscience; that no person ought, by any law, to be molested in his person or estate, on account of his religious persuasion or profession; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of this State, or with the rights of other."

Section 6 reads: "That no person can be compelled to erect, support or attend any place or system of worship, or to maintain or support any priest, minister, preacher or teacher of any sect, church, creed or denomination of religion; but if any person shall

voluntarily make a contract for any such object, he shall be held to the performance of the same.''

Section 7 reads: ''That no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion, or in aid of any priest, preacher, minister or teacher thereof, as such; and that no preference shall be given to nor any discrimination made against any church, sect or creed of religion, or any form of religious faith or worship.''

Those clauses of the fundamental law comprise a constitutional symposium on the rights of conscience and religious liberty. They sound the gamut of the matter.

The rules for constitutional interpretation are not dissimilar, in many respects, to those for statutory interpretation. Perhaps the most happy, comprehensive, generally quoted and universally accepted summing up of those rules is by Judge Story to the effect that each word, unless qualified by the context, is to be expounded in its plain, obvious and common-sense meaning, without metaphysical or logical subtleties; that a constitution is not designed for nicety of expression, critical propriety, elaborate shades of meaning, or philosophical acuteness; that a constitution is an instrument of a practical nature, founded on the common business affairs of human life, adapted to common wants, common uses, and fitted for common understanding. The people make the constitution, the people adopt it and are supposed to read it with the help of common sense. [Story on Const., (5 Ed.), sec. 451, *quod vide.*] Its words are used by men, peculiarly fitted for the work, with care, discrimination and after deliberation. [People v. Railroad, 24 N. Y. l. c. 487.] Men whose intentions require no concealment employ words expressing most directly and aptly the ideas they intend to convey. The people intend what they say when writing constitutions. [Per

MARSHALL, C. J. in Gibbons v. Ogden, 9 Wheat. 188.] In a word, a constitution is "of the people, by the people and for the people." Its aye is aye, its nay, nay; and even he who runs may read.

Interpreting the constitutional provisions we have quoted, with the others noted in paragraph *a,* in the way thus suggested and with the grave and settled public policy relating to Sunday, heretofore discussed, it seems to me it is our judicial duty to declare the Act of 1907 unconstitutional and void, as beyond the limit of legislative function.

Look at it by way of summing up. Under the prick and goad of penal statute, it makes it a crime not to work on Sunday in operating a railroad train. It is the first statute, I believe, in the history of legislation in any Christian commonwealth of that character. To that extent it is radical and proceeds by a *leap*—and that leap in the dark, for no man may see the end from the beginning in that kind of legislation —it points the way to finally legislate Sunday out of existence. I utterly deny that may be done under our present Constitution. To that situation the maxim applies: Withstand beginnings (*principiis obsta.*) It impinges upon and curtails the religious liberty of the citizen, whether he ply the avocation of a railroad employee, or that of operating a railroad. It is in the teeth of the natural, indefeasible and constitutional right of every man to worship Almighty God according to the dictates of his own conscience. By mere human authority it seeks to control and interfere with the rights of conscience in that behalf. Under those constitutional provisions, no citizen can be legally punished for refusing to labor on Sunday. What says the adage? It is a sore task that does not divide Sunday from the week. A citizen under our organic law cannot be punished for refusing to desecrate a day made sacred by his religion, endeared to him as holy, and protected by public policy and the

organic law. If his conscience tell him to worship on that day, no statute of this State can stand in his way. If his conscience tell him to observe that day by contemplation, by rest, or by innocent recreation, he may do so unfrightened, unfretted and unpunished by human law as our Constitution now stands. Neither may he be molested in his person or estate on account of such religious profession or persuasion; and, more to the point, *any law which encourages, aids, abets or seeks to compel any human authority, corporate or not, to persuade, cajole, threaten or intimidate the citizen into violating any of the rights guaranteed to him by those provisions of the Constitution, is as much against its provisions as if it sought directly to encompass that prohibited end.* As I have had occasion to say more than once before, a thing that cannot be legally done in a straight line as the bee flies cannot be done in a circle as the fox runs.

Are we to hold as a matter of law, that railroad men are not, or are not likely to be, Christian men? That they have no rights of conscience and no right to celebrate the sacred day as conscience dictates? Are we to hold that any law is constitutional which makes it a crime for persons operating railroads not to seek (directly or indirectly) to compel or persuade their employees to give up or violate the free constitutional rights of conscience and worship; thereby putting a premium on a baneful diligence and effort contrary to the Constitution and to a public policy recognized by that Constitution? What is religious liberty, if this law does not invade it? If plenary liberty to worship Almighty God by observing Sunday as conscience points be given men by the Constitution (as it is), may it be halved, quartered or in aught whittled away by the Legislature? What says the maxim? That is not considered as truly belonging to any one, which, upon occasion, can be taken from him. I think the lawmaker daringly laid his hand on the very ark of

the covenant of religious liberty in passing this law, and I make bold to repudiate its validity in whole or part, in letter and spirit. Liberty has no price. It is an inestimable thing, and is more favored by the law than anything else. Like the air and the sunlight we appreciate it best when we are denied it.

The law in hand is leveled at persons, partnerships, companies or corporations operating railroads. If a "person" operating a railroad or the individuals of a partnership operating a railroad were to be adjudged guilty of a crime for not operating it on Sunday, there could be no reasonable chance of escaping the conclusion that the statute ran counter to the constitutional provisions set forth. But it is argued that, as the statute is also leveled against "corporations" and since defendant is a corporation, without a "body to be kicked or soul to be damned," the statute (as to this defendant) cannot be construed as violative of the rights of conscience or of freedom to worship Almighty God in any form permitted by His rational creatures on Sunday. That view of it is sour and narrow. In no just sense does the artificial entity, the mere juristic person, called a corporation, operate a railroad by running trains within the sense, contemplation and meaning of this statute. To run a train takes the manual labor and the presence of men. We know that to be so and we have no call to pretend not to know it, or to stickle on or quibble about the words "operating," or "run a train." Those words imply *men,* the statute in final analysis deals with men. The impalpable corporation does not sit in the office of the general superintendent as an artificial person and run an imaginary train. The general superintendent himself is there, the dispatcher sits in his office and issues the train orders, the hostler oils and fires the engine in the round-house, the track walker sees the tracks and bridges are safe, the fireman shovels the coal, the

239 Sup.—22

engineer stands at his throttle, the conductor and brakeman take charge of the train, the station agent opens his office to sell tickets—*they* operate the train and this law is intended to either compel them to operate it or to compel the corporation to persuade or force them to operate it under sore pains and penalties. No court would be justified in shutting its eyes to such elemental facts and such necessary results.

It may be argued that under the agreed statement of facts the servants and employees of defendant corporation may be ready, able and willing to run the train—nay, anxious to run it—and that it makes no showing it tried to run the train. The answer to that is flat-footed and at hand, viz.: Under the Constitution of this State, it did not have to try. Its duty to its men was not to try. It is not within the charter powers, or within the zone of proper corporate activity, to meddle with the religious liberty of its servants. Six days shalt thou labor and do all thy work, is divine law. It is Missouri law. Therefore, it is *corporate law.* Its moral duty in the first instance, barring necessity, is to allow them to rest on Sunday, and thereby encourage and protect them in exercising and enjoying the great liberties vouchsafed and guaranteed by the fundamental law.

Again, it is argued that it is a matter of common observation and common knowledge that defendant runs its passenger trains on Sunday over certain of its lines, and therefore can with ill grace refuse to run such trains on all its lines. That argument is purely an *ad hominem* one. It has no place at all in the grave discussion of the constitutionality of this law. If defendant in running its trains on Sunday be violating the law of the land, it is open to punishment at the hands of the State. On the other hand, if running trains on Sunday is a work of charity or necessity, and it may well be (as those terms are construed by courts), and is therefore not violative of the law

or public policy, then it is protected by the law in running trains. We need no new law in that view of it. No such question is here. The case in judgment is one against the defendant for *not* running a train on Sunday. When the State of Missouri presents a case against defendant *for* running one, it can get at our hands or from any other appellate court such judgment as the facts and law warrant.

(c) There are other questions in the case. For example: Does the law contemplate punishment for not running a train on Sunday if defendant makes 'a showing of inability, because, in the assertion of their rights to freedom of conscience and religious liberty, its employees refuse to labor on that day? In other words, on top of the two statutory exceptions, namely, wrecks on the line and providential hindrances, should we not read another exception into it to aid the statute and to help make it constitutional? We could hardly do that under the rule of strict construction. We find no such words in the law. No such loophole of escape for defendant on any such showing is provided for in the statute, and, as said before, we may not extend or aid the statute by implications, intendments or equitable considerations. In saying so much, we do not mean to say that if such exceptions were in the law it would save it from a constitutional ban.

Again, it is argued on behalf of defendant that the classification adopted by the statute, considered from the standpoint of the object to be subserved (viz., work on Sunday in running a passenger train) is unnatural and unreasonable and, therefore, unconstitutional; for that it does not include *other* carriers of passengers besides railroads. But the case, for the purposes of this dissent, breaks on the unconstitutionality of the law on the broad lines discussed; therefore the latter question is not reached.

The premises considered, I dissent from the opinion of my esteemed and learned brother Woodson and the opinion of my learned and esteemed brother Botsford, and vote to reverse the judgment. *Graves* and *Ferriss, JJ.*, concur in the views herein expressed.